
FILED
**March 18, 2015**
Third Court of Appeals
Jeffrey D. Kyle
Clerk

ACCEPTED
03-14-00650-CV
4396595
THIRD COURT OF APPEALS
AUSTIN, TEXAS
3/6/2015 10:46:40 AM
JEFFREY D. KYLE
CLERK

WESLEY SPEARS AND RENEE JACOBS, APPELLANTS

V.

RECEIVED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
3/6/2015 10:46:40 AM
JEFFREY D. KYLE
Clerk

FALCON POINTE COMMUNITY HOMEOWNERS' ASSOCIATION, APPELLEE

NO. 03-14-00650

MARCH 5, 2015

## APPELLANTS' OPENING BRIEF WITH SEPARATE APPENDIX

Wesley S. Spears, State Bar No. 18898400, Spears Law, 401 Congress Avenue., Suite 1540, Austin, Texas 78701, Tel. 512-696-2222, Fax. 512-687-3499 Attorney for Appellants, email, wesleys637@yahoo.com.

## ORAL ARGUMENT IS REQUESTED

Appeal from County Court One of Travis County, Texas

C-1-CV-13-010214

## IDENTITY OF PARTIES AND COUNSEL

Appellants, Wesley Spears and Renee Jacobs

Appellants' counsel

Wesley S. Spears, State Bar No. 18898400, Spears Law, 401 Congress Avenue., Suite 1540, Austin, Texas 78701, Tel (512)696-2222, Fax. 512-687-3401.

Appellee, Falcon Pointe Community Homeowners' Association

Appellee's Counsel

David Chamberlain, Chamberlain and McHaney, 301 Congress Avenue, 22nd Floor, Austin, Texas 78701 Tel. 512-474-9124, Fax. 512-474-8582

# TABLE OF CONTENTS

Identity of the parties and Counsel……………………………………… ……………………….i

Table of Contents……………………………………………………………….ii-iii

Index of Authorities………………………………………………………….iv-ix

Issues Presented For Review…………………………………………………….. x

Statement of the Case…………………………………………………………….. 1

Statement Regarding Oral Argument……………………………………………….4

Statement of Facts…………………………………………………………….5-28

Summary of Argument……………………………………………………29-32

Argument…………………………………………………………………33

       Did the trial court, Phillips, J., err in granting appellee's Motion for Traditional and No Evidence Summary Judgment and denying appellants' Motion for Partial Summary Judgment and Motion for New Trial?………………………………………………………………33-41

    (A) The subject Notice of Violation is defective………………..41-48

(B) Appellee violated Texas Property Code § 209.005 and refused to produce relevant documents that appellants are entitled to obtain by statute..................................................................................48-57

Did the trial court, Phillips, J., err in refusing to hear appellants' Three Motions to Compel Discovery and their Motion for Continuance to Complete Discovery, before granting appellee's Motion for Traditional and No-Evidence Summary Judgment and denying appellants' Motion for Partial Summary Judgment?..............................................58-65

Did the trial court err in dismissing appellants' two Texas Deceptive Trade Practices claims without allowing any oral argument on the matter and without any basis in law to dismiss the claims?....................................................................................65-72

Did the trial court Phillips, J., and Wisser, J., err in denying appellants' Motion to Recuse Judge Phillips?.....................................72-76

Prayer...................................................................................76-77

Conclusion..................................................................................77

Certificate of Compliance.........................................................78

Certificate of Service.................................................................79

iii

# INDEX OF AUTHORITIES

*Abdygappariva v. State, 243 S.W. 3d 191, 198 (Tex. App.-San Antonio 2007), p. 74.*

*Ashcreek Homeowner's Association v. Smith*, 902 S.W.2d 586 (App. 1 Dist. 1995), p. 43, 46, 47.

*Axelson, Inc., et al., v. The Honorable Grainger W. McIlhany, 798 S.W. 2d*

*550, 555 (Tex. 1990)*, p. 59.

*Benitz v. Gould Group, 27 S.W. 3d 109, 112 9Tex. App.—San Antonio 2000), no writ), p. 33.*

*Brewer & Pritchard, PC v. Johnson, 167 S.W. 3d 460, 469 (Tex. App*

*Houston (14th Dist.) 2005, rehearing overruled), p. 60 and 64.*

*Brown v. Galleria Area Ford, Inc., 752 S.W. 2d 114, 116 (Tex. 1988), p. 70.*

*Burton v. Cravey, 759 S.W. 2d 160 (Houston 1st District 1988), p. 57.*

*Celotex Corp., v. Catrett, 477 U.S. 317, 323-324, 106 S. Ct. 2548, 2553 (1986), p. 33.*

*Chastain v. Koonce, 700 S.W. 2d 579, 584 (Tex. 1985), p. 70-71.*

*Cire v. Cummings, 134 S.W. 3d 835, 838-39 (Tex. 2004), p. 73.*

*City of Houston v. Clear Creek Basin Authority, 589 S.W. 2d 671, 678 (Tex. 1979), p. 33.*

*City of Pasadena v. Gennedy, 125 S.W. 687 (Tex. App. – Houston [14th District]), p 45.*

*Cf. Creel v. Dist. Attorney for Medina County*, 818 S.W. 2d 45, 46 (Tex.

1991) p. 63.

*Clary Corp., v. Smith, 949 S.W. 2d 452, 464 (Tex. App.—Fort Worth 1997, no writ)*, p. 70.

*Cooper Tire & Rubber Co. v. Mendez, 204 S.W. 3d 797, 800 (Tex. 2006)*, p. 73.

<u>*Crispin v. Paragan Home*</u>, *Inc.,* 888 S.W. 2d 78 (Tex. App.-Houston [1st Dist.] 1994, writ denied.), p. 46.

*Davis v. Huey*, *620 S.W. 2d at 566*, p. 45.

*Downer v. Aquamarine Operations, Inc., 701 S.W. 2d. 238, 241-242 (Tex. 1985), cert denied, 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed. 2d 721 (1986), p. 73.*

*Peter Enters, Inc., v., 51 S.W. 3d 616, 623 (Tex. App--Tyler 2000, pet. denied), p. 71.*

*Estate of William H. Arlitt v. Paterson, 995 S.W. 2d 713, 717 (Tex. App.— San Antonio 1999), p. 35.*

*Flamont Design v. Pennzoil Casplan, 994 S.W. 2d 830, 834 (Tex. App.— Houston [1st Dist.] 1999), p. 36.*

*Friesenhahn, 960 S. W. 2d 656, 654 (Tex. 1998), p. 35.*

*See Galbraith Eng'g Consultants, Inc. v. Pochucha, 290 S.W. 3d 863, 867*

*(Tex. 2009), p. 74.*

*Gaines v. Hamman, 163 Tex. 618, 626, 358 S.W. 2d 557, 563 (Tex. 1962), p. 34.*

*Helfand v. Coane, 12 S.W. 3d 152, 155 (Tex. App. Houston [1st Dist.] 2000, pet denied), p. 58.*

*Hodas v. Scenic Oaks Property Ass'n,* 47 S.W. 2d 747 (App. 4 Dist. 2000), p. 43

*Horizon/CMS Healthcare Corp., v. Auld, 34 S.W. 3d 887, 897 (Tex. 2000), p. 35.*

*In re Cerebus Capital Mgmt., L.P., 164 S.W. 3d 379, 382 (Tex. 2005), p. 73.*

*In re Olshan Found Repair Co., 328 S.W. 3d 883, 888 (Tex. 2010), p. 73.*

*In re Ramirez*, 994 S.W. 2d 682, 683 (Tex. App. San Antonio 1998, orig. proceeding), p. 63.

*Jackson v. Fiesta Mart, 979 S.W. 2d 68, 70-71 (Tex. App.—Austin1998), p. 36.*

*Jampole v. Touchy, 673 S.W. 2d 569, 573 (Tex. 1984) p. 64.*

*J. P. Bdg. Enterprises, Inc., v. Timberwood Development Co., 718 S. W. 2d 841 (Tex. App. Corpus Christi 1986 , writ refused n.r.), p. 45.*

*Kindred v. Con/Chemical, Inc. 650 S.W. 2d 61, 63 (Tex. 1983), p. 36.*

*Lear Siegler, Inc., v. Perez, 819 S.W. 2d 470,471 (Tex. 1991), p. 33.*

*Limestone Products Distributor v. McNamara, 71 S.W. 3d 308, 310 (Tex. 2002), p. 34.*

*State Farm Lloyds v. Nicolau, 951 S.W. 2d 444, 451 (Tex. 1997). P. 70.*

*Low v. Henry, 221 S.W. 2d 609, 614 (Tex. 2007), p. 73.*

*Macdonald v. Painter, 441 S. W. 2d 179 (Tex. 1969), p. 45.*

*Marroquin v. D & N Funding, Inc., 943 S.W. 2d 112, 114 (Tex. App.—Corpus Christi 1997, no pet.), p. 73.*

*Matinez v. City of San Antonio, 40 S.W. 3d 587, 591 (Tex. App.—San Antonio 2001, pet denied), p. 60.*

*Merrill Dow Pharmaceuticals, Inc. v. Havner, 953 S.W. 2d 706, 711 (Tex. 1997), p. 36.*

*M.D. Anderson Hospital, Willrich, 28 S.W. 3d 22, 23 (Tex. 2000), p. 34.*

*Moorehouse v. Chase Manhattan Bank, 76 S.W. 3d 587, 591 (Tex. App—San Antonio 2002, no writ), p. 60.*

*Moore v. K-Mart Corp., 981 S.W. 2d 266, 269 (Tex. App.—San Antonio 1998, pet. denied), p. 34.*

*Munson v. Milton, 948 S.W. 2d 813 (Tex. App.- San Antonio 1997), p. 45.*

*Nast v. State Farm Fire & Cas. Co., 82 S.W. 2d 42, 47 ( Tex. App.—Corpus Christie 1990 (no pet.), p. 70.*

*Nelson v. PNC Mortgage Corp., 139 S.W. 3d 442 (2004), p. 62, 63, 64.*

*Nixon v. Mr. Property Management, Co., 690 S.W. 2d 546, 548-549 (Te 1985), 34-35.*

*Perry v. S.N., 973 S. W. 2d. 301,303 (Tex. 1998), p. 35.*

*Perry Homes v. Cull, 258 S.W. 3d 580, 598 (Tex. 2008), p. 74.*

*Pheasant Run Homeowners Ass'n, Inc., v. Kastor, 47 S.W. 2d 74 (Tex. App. Houston [14th District]) 2001), p. 45.*

*Stephan v. Baylor Med. Ctr. At Garland, 20 S.. 3d 880,891 (Tex. App.— Dallas 2000, no pet.), p. 34.*

*Simon Property Group (Texas) L.P. v. May Dept. Stores Co., 943 S.W. 2d 64 (Tex. App. Corpus Christi 1997), p. 45.*

*Tempay, Inc., v. TNT Concrete & Construction, Inc., 37 S.W. 3d 517, 521-522 (Tex. App.—Austin 2001, no writ) citing Robert W. Clore, Texas Rule of Civil Procedure 166a(1); A New Weapon for Texas Defendants, 29 St. Mary's L. J. 813, 843 (1998), p. 61, 64.*

*Walker v. Guiterrez, 111 S.W. 3d 56, 62 (Tex. 2003), p. 73.*

*Walker v. Harris, 924 S.W. 2d 375, 378 Tex. 1996), p. 35.*

*West v. Solite, 563 S.W. 2d 240, 243* (Tex. 1978), p. 58.

*Wilmoth v. Wilcox, 743 S.W. 2d at 658, p. 46-47.*

*Tex. R. Civ. Proc. 192.3 (a), p. 58-59.*

*U.S. Const. Fourteenth Amendment, p. 58.*

*Texas Constitution Article 1 § 19, p. 58.*

*Tex. R. Civ. Proc. 166a(i), p. 28, 46, 47, 49.*

*Texas Property Code § 209.002 et. seg.*

*Texas Property Code § 209.009, p. 11.*

*Texas Property Code § 209.005, p. 11, 29, 48, 49, 50, 51, 52, 55, 56.*

*Texas Property Code § 209.006 P. 41, 44, 45.*

*Texas Property Code § 209.007, p. 7, 14, 19.*

*Texas Deceptive Trade Practices Act (DTPA) section(s):*

*V.T.C.A., Bus. & C., §17.50, p. 65, 68 and 71.*

*V.T.C.A., Bus. & C. §17.46, p. 69.*

# ISSUES PRESENTED FOR REVIEW

1.      Did the trial court, Phillips, J., err in granting appellee's Motion for Traditional and No Evidence Summary Judgment and denying appellants' Motion for Partial Summary Judgment and Motion for New Trial?

2.      Did the trial court, Phillips, J., err in refusing to hear appellants' Three Motions to Compel Discovery and their Motion for Continuance to Complete Discovery, before granting appellee's Motion for Traditional and No-Evidence Summary Judgment and denying appellants' Motion for Partial Summary Judgment?

3.      Did the trial court err in dismissing appellants' two Texas Deceptive Trade Practices claims without allowing any oral argument on the matter and without any basis in law to dismiss the claims?

4.      Did the trial court Phillips, J., and Wisser, J., err in denying appellants' Motion to Recuse Judge Phillips.

**TO THE HONORABLE THIRD DISTRICT COURT OF APPEALS:**

Appellants, Wesley Spears and Renee Jacobs submit this Brief in Support of their Appeal and request that this court reverse the ruling of the Honorable David Phillips, from County Court One, Travis County, Texas granting appellee's Motion for Traditional and No-Evidence Summary Judgment. Appellants also request that the this court order the trial court to enter an order granting appellants' Motion for Partial Summary Judgment and order the trial court to hold a Hearing regarding appellants' right to attorneys' fees and to restore the remainder of appellants' claims to the trial court docket to complete discovery and for trial.

## STATEMENT OF THE CASE

This matter involves a declaratory judgment action brought by the appellants, Wesley Spears and Renee Jacobs (hereinafter "appellants") against Falcon Pointe Community Homeowners Association (hereinafter "appellee"). The action was brought by the appellants asking the court to determine whether the actions taken by the appellee, Falcon Pointe

Community Homeowners' Association which found the appellants in violations of unspecified deed restrictions of the appellee was done in violation of the *Texas Property Code*.

Appellants' pled in their Petition that the appellee's Violation Notice was defective and therefore, unenforceable because it failed to cite a specific deed restriction that appellants allegedly violated. In addition, the appellants pled, the Violation Notice gave an invalid cure date of "before the August inspection" even though the Notice was dated October 22, 2013. The Hearing, which appellee relies on to support it's actions finding the appellants in violation of the deed restrictions occurred on November 13, 2013. Therefore, the cure date provided in the Violation Notice was defective because it did not give appellants a reasonable opportunity to cure the alleged defect and contained an invalid date.

The Trial Court, Phillips, J., erred in granting appellee's Motion for Traditional and No-Evidence Summary Judgment and denying appellants' Motion for Partial Summary Judgment prior to hearing appellants' three outstanding Motions to Compel Discovery and

appellants', Motion for Continuance to Complete Discovery.

The court also, erred in dismissing appellants *Texas Deceptive Practices Act*, claims without allowing oral argument and without indicating any reason for the dismissal.   Appellants alleged that appellee had violated the Texas Deceptive Practices Act by refusing to provide the appellants with a Hearing in regards to first Violation Notice.   Appellants also alleged that appellee fraudulently omitted appellant, Wesley Spears' name from being placed on the Ballot for the election of Neighborhood Representatives on June 7, 2014, in violation of his rights to due process and equal protection of the law.

The court in it's rulings, demeanor and behavior in this case exhibited extreme bias against the appellants, who are African American and in favor of appellee, which is controlled by Newland Communities the largest private developer in the United States .  The appellants moved for the Court to recuse itself on the basis of bias.  The court, Phillips, J., and Wisser J., erred when it denied appellants' Motions to Recuse Judge Phillips.

3.

## STATEMENT REGARDING ORAL ARGUMENT

Appellants', request that court allow oral argument in this matter. There is no record of the Hearing of  the parties cross Motions for Summary Judgment Motion, therefore, appellants believe oral argument would be very helpful to the court.   This court should hear from counsel and the justices should have an opportunity to inquire of counsel, in order to get a clear picture of what took place at the September 15, 2014, Hearing of the parties' Cross Motions for Summary Judgment and the question of whether the appellee refused to cooperate with discovery and the other issues raised in this Appeal.

## STATEMENT OF FACTS

Appellants purchased a home in Falcon Pointe, a planned community, developed by Newland Communities, the largest private developer in the United States on January 15, 2013. Thereafter, with the permission of the Falcon Pointe Community Homeowners' Association (hereinafter the "appellee" or the "Association), appellants installed a swimming pool on the subject property in April, 2013. After the pool was installed, appellants became aware that the fence on their property sat in a depression and was only four feet high along the side of the pool.

Appellants sought to extend the height of the fence to the full six-foot height allowed by the rules and bylaws of the Association and did so using lattice. By Violation Notice dated July 26, 2013, Diane Bottema, appellee's property manager notified appellants that the lattice extension that appellants installed to their fence violated the rules of the Association.

Ms. Bottema deposition testimony was the property inspector assigned to inspect the properties in the Association, Mr. Morales, prepared the letter and stamped it with Diane Bottema's signature using

5.

a rubber stamp. Appellants advised appellee that they wanted a Hearing and would request a Hearing in writing within the thirty (30) days provided in the Violation Notice and applicable law. [1]

Thereafter, Ms. Bottema sent appellants an email that stated despite the clear language of the Violation Notice and the Texas Property Code appellants were not entitled to a Hearing. The email stated that in matters of clear violations of the rules of the Association, the President of the Association, Ranier Ficken, could act for the Board without a Hearing.[2]

At his deposition, Ranier Ficken, president of the appellee, testified that contrary to Ms. Bottema's email he had no authority to act for the board of the appellee, in matters of clear violations of the rules of the Association.[3] The Association was established in 2002, more than ten years before the appellants' purchased their home.[4] The Board of the appellee is still under the control of the Developer, Newland Communities.

The Board of the Association is comprised of two employees of the developer and a member selected by the Neighborhood Representatives of the Association. Appellants requested a meeting with Ms. Bottema

6.

and the President of the Association, Ranier Ficken after Ms. Bottema refused to grant appellants a Hearing in violation of *Texas Property Code § 209.007* and the rules and regulations of the appellee.[5]

A meeting was scheduled and held as a result of the emails that were exchanged between Ms. Bottema, the property manager and appellants.[6] Prior to that meeting appellants removed the lattice addition to the fence as requested in the first Violation Notice. At the meeting, Ms. Bottema and Mr. Ficken gave appellants oral instructions regarding what kind of privacy screen, appellants, could build.

Pursuant to that meeting and further emails that were exchanged between the parties, appellants built a completely free standing privacy screen, which was not attached to the existing fence in any way in September of 2013.

Appellants did not receive any Notices of Violation in either August or September of 2013. By letter dated October 22, 2013, appellee sent appellants a purported Violation Notice that they were in violation of the rules of the Association as a result of the privacy screen that appellants built on their property, based on the instructions given to appellants, by the president of the Association, Ranier Ficken and

Diane Bottema, the property manager.[7]

The Notice did not cite any specific deed restriction(s) that appellants were alleged to have violated. The Notice provided a cure date of before the "August inspection", even though the Notice is dated October 22, 2013, Ms. Bottema claimed to have no knowledge as to how the cure date was determined. Ms. Bottema, the property manager whose name appears on the Violation Notice answered as follows concerning the cure date in subject the Violation Notice during her deposition:

Q.    What cure dates were you trained to put on notices of violation?

A.    I don't know.

Q.    Well the date of the letter is what?

A.    The date on the letter is October 22nd.

Q.    What year?

A.    2013.

Q.    And it states a cure date of August?

A.    With no date.

Q.    And what do you believe the August they were referring to?

8.

A.     I don't know.

Q.     So you don't even know if I still have time to cure the defect?

A.     I don't know.

Q.     So you don't know if the date refers to 2014, correct?

A.     Right.

Q.     You don't know if the August date refers to 2015?

A.     No.

Q.     You don't know if the August date refers to 2016?

A.     No.

Q.     So what date did I have to cure?

A.     I don't know.

Q.     Well, you said that the cure date could have been the August 2014 August, 2015, August, 2016 August.  I am asking which date it was intended to be .

A.     I don't know.[8]

When asked about the notice Ranier Ficken, President of the appellee testified regarding the subject October 22, 2013, Violation

Notice:

Q.     Let's assume that letter is dated correctly for the purposes of this question.

A.     Okay.

Q.     Then the cure date would have been wrong, correct, if that date was right.

A.     Well, certainly August comes before October, yes.[9]....

Q.     And so from this Letter could you tell me which particular regulation it is that I was alleged to have – the plaintiffs' were alleged to have violated.

A.     The letter just list in violation of the CCR's.

Q.     How would someone know what regulation they were in violation of with that notice letter?

A.     Relative to this particular letter I don't see the specific regulation.[10]

The Appellee held a Hearing regarding the October 22, 2013, Violation Notice on November 13, 2014.  The By-Laws of the Association

10.

provide that if, appellants appear at the Hearing they waive their right to contest lack of legal notice.[11]   Because appellants wished to contest the validity of the Notice, they did not appear at the Hearing.

Thereafter, appellants began to make a series of requests directed to the appellee to produce documents.  Appellants made five requests for documents as homeowners' in the Association.  The Requests were sent certified mail return receipt requested pursuant to *Texas Property Code § 209.005*.[12]

Appellee refused to produce any documents pursuant to appellants' six requests for Production of Documents to appellee as homeowners', in violation of the *Texas Property Code § 209.005.* Thereafter, appellants made six formal requests for the Production of Documents in the subject case.  Appellants also filed six Motions to Compel, the production of documents and witnesses. Appellee refused to produce any documents that appellants requested except for its liability insurance policy and less than twenty pages of minutes of Board meetings, which had nothing to do with this case and two budgets.[13]

Appellee refused to produce any correspondence between the

parties. The appellee, refused to produce the Violation Notice, which it relied on to find the appellants in violation of the rules of the Association. Throughout the short history of the case the appellee has refused to cooperate with any discovery. Appellee admittedly, refused to cooperate with discovery simply asserting it believed that discovery was unnecessary.[14]

Mr. Campbell stated as follows at plaintiffs' first Motion to Compel responding to a question by the court Sheppard, J.:

The court: Here is me (sic) question, I understand your position and I grant that can have that position. But it's an unusual circumstances to decide that because that is your position, you can't give discovery. In any other situation—I mean I'm trying to figure out how it's and unreasonable request for him to ask for the deposition of the key person who's been telling him and communicating with him.

MR. CAMPBELL: In terms of the deposition which is the only issue he brought before the court; trying to compel this deposition. If we need to that we can. That was one issue I raised with him. We got the summary judgment arguments. I do no think we need to go through the process doing the deposition.[15]

12.

The counsel for the appellants' asked the following questions to the court:

MR. SPEARS:  If he says he is not going to produce the documents, how do we get  that resolved before the deposition.

THE COURT:  I recessed this hearing.  This hearing is in recess and it is not over.  Call my Court set the date and we will talk about what in subpoena duces tecum he doesn't want to turnover.  We will have that discussion.  When we are through with that discussion we will figure out what discussion needs to be had next.  I am likely to set a scheduling order and then we will figure out where we are.[16] During the first Hearing the court Sheppard, J., granted appellants' Motion to Compel the Deposition, Duces Tecum, of  Diane Bottema.[17]

In the second Hearing, the court, Sheppard, J., denied appellants' Motion to Compel finding that the Appellee did not have to produce a document that was not in existence, since appellee did not maintain records of the dedicatory violation history of the Association.  As a result the court ruled appellants must request the minutes of the Board meetings and compile the records themselves.  Appellants maintained

13.

that, the Association was required by, *Texas Property Code, § 207.009*, to maintain and compile the requested information. Judge Sheppard further ruled that if the appellee had any objections to appellants' document requests they must submit the objections to the court before the deposition of Diane Bottema, the property manager.[18]

Appellants did not learn that Ms. Bottema was replaced by, Natalie Boykin until appellants' took Ms. Bottema's deposition. Accordingly, appellants were then forced to attempt to depose Natalie Boykin, the new property manager.[19] After appellants noticed Ms. Boykin's deposition appellee moved to quash appellants' Notice to Take Deposition and appellants filed a Motion to Compel Ms. Boykin's Deposition.[20]

Based on the court's ruling appellants amended their production requests to specifically request the minutes of all board meetings, financial records and all other records of the Association. The Association has never filed a copy policy as required by *Texas Property Code, § 209.007*, and therefore, it was obligated by statute to produce copies of all the records of the Association without cost to any homeowner who properly requests the records, with private

information redacted.[21]

Appellants' pursuant to Judge Sheppard's Order filed a new Notice to take the Deposition, Duces Tecum of Diane Bottema. Appellants filed another Motion to Compel after the appellants and appellee exchanged emails regarding whether Ms. Bottema would produce the documents requested in appellants' Notice to take Deposition Duces Tecum. Appellee's counsel indicated, that although he was going to object to producing documents, he refused to submit appellee's objections to the court prior to Ms. Bottema's, Deposition as ordered by Judge Shepperd.[22]

The court, Phillips J., denied appellants' Motion to Compel ruling since the deposition has not taken place, the Motion was premature despite Judge Sheppard's order requiring the appellee to submit it's objections before Ms. Bottema's, Deposition.[23] Judge Phillips' Order ruling the Motion was premature and Judge Shepperd's Order are inconsistent since the Hearing of the parties Motion to Compel was simply adjourned to deal with any objections by appellee to the

15.

production of records.

Appellants subsequently took the deposition of Ms. Bottema and she produced absolutely no documents pursuant to appellants' Notice to take her Deposition Duces Tecum, not even her correspondence with appellants claiming she no longer had access to her own emails even though she now worked for the property manger, Goodwin Management in the office where the records were maintained because the Goodwin Management locked her of her email account and the records of the Appellee.[24]   The transcripts of both Ms. Bottema and Mr. Ficken's deposition were not available prior to the Hearing of the parties cross Motions for Summary Judgment, because of the delays caused by appellee.

Appellants were deprived of their right to produce evidence obtained from those depositions to refute appellee's claims in support of it's Summary Judgment Motion.[25]  Appellants also filed a Notice to take the Deposition Duces Tecum of Ranier Ficken, the president of the Association and the developer, Newland Communities' Project Manager. The appellee oversees yearly dues of the Association, in an amount over one million dollars per year, while allowing no oversight by the homeowners.[26]

The Association is under the control of the developer, Newland Communities that has through its actions demonstrated that it will not comply with the *Texas Property Code* and make the records of the Association available to the homeowners' especially the appellants. Mr. Ficken testified that he had access to all the documents of the Association but relied on his attorney to determine what documents he would produce. Mr. Ficken testified that he made no effort to comply with appellants' Notice to Take his Deposition Duces Tecum[27]

Appellants also served appellee with notice of their intent to take the Deposition Duces Tecum, of Natalie Boykin, the property manager of the Association, who assumed Ms. Bottema's position on or about May 1, 2013.[28] Ms. Boykin replaced Ms. Bottema who was reassigned because of poor performance, including complaints by other residents, according to the deposition testimony of Ranier Ficken.[29] Ms. Bottema denied that she was replaced for poor performance.[30]

As property manager, Ms. Boykin oversaw the June 7, 2014, election. Appellant, Wesley Spears, properly applied to be included on the ballot, for neighborhood representative, nevertheless his name was fraudulently left off the ballot by Natalie Boykin, the new property manager.[31]                    17.

Appellant also Noticed the Deposition of William Meyer, vice president of the Association and vice president of Newland Communities, the developer, who was one of only two people who voted at the Hearing finding the appellants in violation of rules of the Association, based on the Board's "business judgment", not because of a violation of specific deed restriction.[32]

Ms. Bottema and Ms. Boykin were the property managers responsible for the issuance of Violation Notices, conducting elections, collecting dues, and the overall management of the property of the Association. Ms. Boykin became custodian of records when she replaced Ms. Bottema, as property manager and she conducted the election, which is the subject of one of appellants' two DTPA claims. After Ms. Bottema was replaced she testified at her deposition that she did not have access to the records of the Association.

Obviously, this was another attempt to hide the ball by appellee, allowing Ms. Bottema to claim she did not have access to her records not even her own emails or letters related to this matter even though she

18.

was still employed by Goodwin Management the property management company. Clearly, the four witnesses noticed for deposition by the appellants, were not only material witnesses, they were critical witnesses.

Appellants' Fourth and Fifth Amended Complaint alleged that the appellee fraudulent left the appellant, Wesley Spears' name off of the election Ballot, which was held on or about June 7, 2014, for Neighborhood Representative in violation of the DTPA. The election took place approximately seven months after suit was filed in this matter and approximately three months before the court granted appellee's Motion for Summary Judgment. Nevertheless, the court dismissed this claim without allowing argument on the matter or stating any reason for the court's ruling.

Appellants also alleged a violation of the Texas Deceptive Trade Practices Act (hereinafter "DTPA") against the appellee based on appellee's property manager, Diane Bottema's, misrepresentation of the law and the rights and obligations between the parties when she advised the appellants that they were not entitled to a Hearing as provided in Texas Property Code § 209.007, and the by-laws of the

19.

Association regarding the first Violation Notice.[33]

Appellants' counsel sent two emails to court operations officer, Darryl Sanders requesting that appellants' three outstanding Motions to Compel Discovery be heard before appellee's Motion for Traditional No-Evidence Summary Judgment and appellants' Motion for Partial Summary Judgment was heard.[34]  Mr. Sanders was also copied on a series of emails between the parties in which appellants' were attempting to get the appellee to agree on a hearing date for appellants' three Motion to Compel Discover prior to a Hearing of the parties' Cross Motions for Summary Judgment.[35]

All disputed court dates were scheduled in the exact same manner through the Court Operations Officer, Darryl Sanders pursuant to emails throughout this case.[36]  Mr. Sanders would only communicate with the parties by email, which copied opposing counsel, because of his belief that an oral conversation might constitute an improper ex parte communication.[37]

Despite appellants' requests Mr. Sanders testified at the Hearing of appellants' Motion to Recuse Judge Phillips, that he did not advise Judge Phillips of appellants' request that their three Motions to Compel

20.

be heard prior to the hearing of the parties' Cross Motions for Summary Judgment.[38]  Further, Mr. Sanders testified, without explanation, that he did not even respond to either appellants' emails requesting a Hearing of their three Discovery Motions, before the hearing of the parties' Cross Motion for Summary judgment.  After instructing counsel to communicate with him only by email Mr. Sanders' testified that he did respond to appellants' crucial emails.  The following colloquy is contained in one email to Mr. Sanders testified he did not respond to or advise the court of:

A.     I mean, I have one that's to you—I mean, I'm sorry .  I have one September 9th at 3:27 p.m. where it is copied to Mr. Chamberlain. And you're indicating in the e-mail that –well, can I just read the e-mail?

Q.     Yes.

Mr. Spears I think it is short enough, Judge, that it wouldn't be objectionable.

A.     It says, "Dear Mr. Sanders.  Attorney Campbell would give me October 14 and 15 as dates he is available for hearing on the above reference motions.  The discovery cutoff is September 30th, is the discovery cutoff", period.  "Therefore, since we reserved two hours on

21.

September 15, 2014 for the parties' motions for summary judgment, I thought September 15, 2014. I will leave to the court's discretion as the as to the appropriate date for the hearing on the above motions. Please advise. Thank you, Wesley Spears."[39] The testimony of Mr. Sanders went on:

Q   You ever have an occasion, (sic) that you can recall where someone asked you to set a discovery motion before a summary judgment motion and you did not do so?

A.   In this cause or any other cause?

Q.   Any other cause?

A.   No.

Q.   So it is the court's policy to hear discovery motions before summary judgment motions?

A.   It can be, yes.

Q.   It can be or it is?

A.   It can be, yes.

Q.   Well, is it or isn't it?

A.   Well it depends on the setting party.

Q.      Well, no.  I am asking, isn't it the court's policy to hear discovery motions before hearing summary judgment motions?

A.      Yes.

Q.      And in this case there were three outstanding discover motions that were pending before the summary judgment motions.  That's what those emails were about Correct?

A.      I believe so.

Q.      So the court did not follow its own policy in failing to hear those motions before ruling on summary judgment.

A.      I can't—…

There was a serious of objections and the questioning continued:

Q.      So as court operations officer, you don't know if there is a practice that discovery motions are heard before summary judgment motions?

A.      Well there can be moyiond—discovery motions before summary judgment, yes.

Q.      And have you ever experienced an occasion where someone asks for a discovery motion to be heard before summary judgment it was denied before it could be hear?

A.      I don't know of any.

23.

Q. You don't know of any other situation where that has occurred?

A. No sir....

Q So you would not dispute if I testified that I had not received the instruction because you don't recall giving them. Correct?

A. That would be true, sir. I can't I don't have anything.

Q. And in hindsight, you would have given me those instructions had you realized that I did not have such instructions?

A. If I had been the one, yes sir.

Q. And then the only other question is, again, why would you not respond to that e-mail?

A. I don't have answer for you, sir.[40]

Mr. Sanders took the civil equivalent of asserting his Fifth Amendment privilege against self-incrimination. He scheduled every Hearing in this matter that was not set by the Judge in court, or agreed to by the parties, pursuant to emails from the parties. He even sent an email to the parties requesting that the parties communicate with him by email with copy to the opposing counsel.[41] The parties could not agree on a date for the appellants' First Motion to Compel. Counsel for appellee stated to Judge Shepperd that Hearing was set up by email to

24.

Mr. Sanders.[42]  Mr. Sanders also testified that he never advised counsel for the appellants that his requests were not proper nor did he have an explanation as to why he did not respond to appellants' emails.[43]

Mr. Sanders testified that he was not aware of a single case, other than this case, in which the court did not hear all outstanding discovery motions before ruling on motions for summary judgment.  Mr. Sanders testified he had no answer why he did not respond to counsel for the appellants' emails.  There were emails addressed directly to Mr. Sanders and several others he was copied on between the parties because the parties could not agree on a date for the hearing appellants' three Discovery Motions.

Mr. Sanders clearly establishes that the court showed bias against appellants, who are African American, in favor of the largest private developer in the United States, Newland Communities who is in control of appellee by violating the court's policy to hear discovery motions before deciding motions for summary judgment.

On September 15, 2015, the court Phillips, J., convened a Hearing of the

parties Cross-Motions for Summary Judgment.  Counsel for the appellants advised the court of appellants' three outstanding Discovery Motions and Motion for Continuance to Complete Discovery.  Appellants have only filed one Motion for Continuance to Complete Discovery in this matter.  The court refused to hear the appellants' Motions to Compel, because despite appellants', timely requests for a hearing to Mr. Sanders, the Court Operations Officer did not schedule the Motions, which the court used as an excuse for not hearing them.

Despite the anticipated two hours to hear the parties' Cross Motions for Summary Judgment the courtroom was full of lawyers' with much shorter matters waiting to be heard.  Other than a one minute hearing at the beginning of the call of cases, appellants' case was called before all other matters.[44]

Judge Phillips refused to recuse himself, after appellants' filed a Motion to Recuse Judge Phillips and the matter was referred to the Administrative Judge, Billy Ray Stubblefield, who denied the appellants' first Motion to Recuse because it did not request an immediate Hearing.  Appellants' filed a second Motion to Recuse, amending the original

motion to request an immediate Hearing.   Again Judge Phillips refused to recuse himself and the matter was again assigned to the Administrative Judge Stubblefield.  Judge Stubblefield assigned the matter for a Hearing in front of Judge Wisser.

On November 7, 2014, Judge Wisser held a Hearing of appellants' Motion to Recuse Judge Phillips.   During the Hearing, Judge Phillips Court reporter, Cathy Mata, Court Operations Officer, Darryl Sanders, David Campbell, attorney for appellee and Wesley Spears, counsel for appellant testified at the Hearing of appellants' Motion to Recuse.

The court reporter, Ms. Cathy Mata testified that although she was on the record for the first matter on September 15, 2014, which lasted one minute, she went off the record although there was no announcement that the court was going off the record or that the Summary Judgment Hearing was not on the record.[45]  The court reporter, Ms. Mata was still seated in her court reporter's station throughout the Hearing of the parties' Cross Motions for Summary Judgment.[46]

Counsel for Appellants was not familiar with the operations of this

trial court since this was the first time he had ever argued a Summary Judgment Motion in this Court, therefore, counsel believed the Hearing of the parties' Cross Motions for Summary Judgment was on the record. Judge Wisser denied appellants' Motion to Recuse Judge Phillips.[47] Appellants' filed a Motion for New Trial and a Motion for Reconsideration. The court Phillips, J., denied Appellants Motion for New Trial and/or for Reconsideration on December 1, 2014.

## SUMMARY OF THE ARGUMENT

The trial court erred by denying appellants' Motion for Summary Judgment which was based on their claim that the subject Violation Notice was defective because it failed to provide a citation to the specific deed restriction(s) the appellants were alleged to have violated.  The Violation Notice was also defective because it gave a cure date of "before the August inspection" even though the Violation Notice was dated October 22, 2013.  The appellee held a Hearing based on the subject Violation Notice on November 13, 2013.[48]   The subject Hearing which was based on a defective Notice is also defective.

The trial court also erred in failing to grant appellants' Motion for Partial Summary Judgment regarding appellants' claim that the appellee was in violation of Texas Property Code § 209.005, because of appellee's failure to produce the books and records of the Association.

The court also erred in failing to hear appellants' three Motions to Compel Discovery and Motion for Continuance to Complete Discovery before granting appellee's Motion for Traditional and No-Evidence Summary Judgment.  The court refused to hear appellants' Motions

29.

finding that they were not scheduled for the day of the hearing of the parties' Cross Motion s for Summary Judgment. The court abused it's discretion and/or denied appellants due process and violated court's policy, as the Court Operations Officer testified, by failing to hear appellants' three Discovery Motions and Motion for Continuance to Complete Discovery before granting appellees' Motion for Traditional and No-Evidence Summary Judgment.

The appellants also alleged a violation of the DTPA as a result of the false and misleading written statements of the property manager, Diane Bottema, representing that the appellants' were not entitled to a hearing in matters of clear violations because the president of the Association, Ranier Ficken could speak on behalf of the Board.[49] Ranier Ficken the president of the Association testified at his deposition that Ms. Bottema's claim that he could speak for the Board of the appellee on matters of clear violations was false.[50]

Appellants also alleged that appellant, Wesley Spears was subjected voting fraud when his name was left off the ballot for the election of neighborhood representatives on or about June 7, 2014. This claim only existed for three months before the court ruled on the

30.

parties' Cross Motions for Summary Judgment.

The court erred in refusing to recuse itself based on it's refusal to hear appellants' three Motions to Compel Discovery and Motion for Continuance to Complete Discovery that violated court's policy and by showing bias against the appellants by refusing to allow counsel time to argue, as well as making demeaning remarks to counsel for appellants.

The trial court's bias was also demonstrated, by the Court verbally abusing counsel for the appellants, giving no consideration to appellants arguments, as outlined in the appellants' Motion to Recuse.[51]   Even the court reporter, Cathy Mata, testified when she was called as a witness by appellee's counsel, that Judge Phillips does raise his voice and is sarcastic.   Counsel was attempting to impeach, appellants', Wesley Spears testimony that Judge Phillips was shouting at him and acting sarcastically toward appellants' counsel at the Hearing.[52]  As an example of the bias shown by Judge Phillips on July hearing plaintiffs' third Motion to Compel:

"Counsel when they first came here and filed their Motion for Summary Judgment, they felt there wasn't any discovery that was

necessary before the summary judgments motions where heard. I now agree with them…" the court went on … The court: And if you asked for that before file a lawsuit you'd have them in your hands right now. But once you file a lawsuit, things change…."[53] The Judge also made a number of other comments which counsel for the appellant felt were derogatory.[54]

Finally, the court Wisser, J., erred by failing to grant appellants' Motion to Recuse Judge Phillips. A reasonable person presented with the facts appellants presented to the court would lead a reasonable person to question the impartiality of Judge Phillips. Judge Phillips rulings were so clearly against the rules and laws of the State of Texas and the United States to constitute bias.

I.    **Did the trial court, Phillips, J., err in granting appellee's Motion for Traditional and No Evidence Summary Judgment and denying appellants' Motion for Partial Summary Judgment and Motion for New Trial**

Summary Judgment is available to the movant only when the movant establishes that there is no genuine issue of material fact; and that the movant is entitled to summary judgment as a mater of law. *City of Houston v. Clear Creek Basin Authority, 589 S.W. 2d 671, 678 (Tex. 1979).* A defendant/movant is entitled to summary judgment only if no evidence exists to support the plaintiff's causes of action. *Celotex Corp., v. Catrett, 477 U.S. 317, 323-324, 106 S. Ct. 2548, 2553 (1986); See Benitz v. Gould Group, 27 S.W. 3d 109, 112 9Tex. App.—San Antonio 2000), no writ).*

Further a defendant is entitled to summary judgment only if he disproves, as a matter of law, one of the essential elements of each of the plaintiffs' causes of action. *Lear Siegler, Inc., v. Perez, 819 S.W. 2d 470,471 (Tex. 1991).* A no-evidence summary judgment is essentially a pretrial directed verdict, and courts apply the same legal sufficiency standard in reviewing a no-evidence summary judgment as they apply

in reviewing a directed verdict. *Stephan v. Baylor Med. Ctr. At Garland,*

*20 S.W. 3d 880,891 (Tex. App.—Dallas 2000, no pet.); Moore v. K-Mart*

*Corp., 981 S.W. 2d 266, 269 (Tex. App.—San Antonio 1998, pet. denied).*

Courts are to consider all the evidence in the light most favorable

to the party against whom the no-evidence summary judgment is to be

rendered disregarding all contrary evidence and inferences. *Stephan, 20*

*S.W3d at 887, see also, Havner, 953 S.W. 2d at 711.*

It is not the purpose of the summary judgment rule to provide

either a trial by deposition or a trial by affidavit, but rather to provide a

method of summarily terminating a case when it clearly appears that

only a question of law is involved and there is no genuine issue of fact.

*See Gaines v. Hamman, 163 Tex. 618, 626, 358 S.W. 2d 557, 563 (Tex.*

*1962).*

At summary judgment, the court must consider all the non-

movant's proof is true. *Limestone Products Distributor v. McNamara, 71*

*S.W. 3d 308, 310 (Tex. 2002); M.D. Anderson Hospital, Willrich, 28 S.W. 3d*

*22, 23 (Tex. 2000); Nixon v. Mr. Property Management, Co., 690 S.W. 2d*

*546, 548-549 (Tex. 1985).*

Judge Phillips should have also given appellants an opportunity to

amend their pleadings to cure any alleged defects in the pleadings. *Perry v. S.N., 973 S. W. 2d. 301,303 (Tex. 1998); Horizon/CMS Healthcare Corp., v. Auld, 34 S.W. 3d 887, 897 (Tex. 2000); Friesenhahn, 960 S. W. 2d 656, 654 (Tex. 1998).*

At summary judgment, the court must consider the record as whole, viewing the summary judgment evidence and inferences from such evidence and giving the non-movant the benefit of all reasonable inferences that may be drawn from such evidence. *Nixon v. Property Management Co.,* 690 S.W. 2d 546, 548-549 (Tex. 1985).

At summary Judgment, the court must indulge every inference in favor of the non-movant. *M.D. Anderson Hospital v. Willirich, 28 S.W. 3d 22, 23 (Tex. 2000); Walker v. Harris, 924 S.W. 2d 375, 378 Tex. 1996);* *Nixon v. Property Management Co.,* 690 S.W. 2d 546, 548-549 (Tex. 1985).

A motion for summary judgment should be denied if the non-movant produces more than a scintilla of evidence thereby raising a genuine issue of fact as to an essential element of a cause of action of which the non-movant would have the burden of proof at trial. *See Estate of William H. Arlitt v. Paterson, 995 S.W. 2d 713, 717 (Tex. App.—*

*San Antonio 1999), rehearing overruled).* Evidence is more than a scintilla when it "rises to the level that would enable reasonable and fair-minded people to differ in their conclusions". *Merrill Dow Pharmaceuticals, Inc. v. Havner, 953 S.W. 2d 706, 711 (Tex. 1997).*

Evidence is less than a scintilla when it is so weak as to do no more than create a mere surmise or suspicion of the existence of fact. *Tex. R. Civ. Proc. 166a; Kindred v. Con/Chemical, Inc. 650 S.W. 2d 61, 63 (Tex. 1983); Flamont Design v. Pennzoil Casplan, 994 S.W. 2d 830, 834 (Tex. App.—Houston [1st Dist.] 1999); Jackson v. Fiesta Mart, 979 S.W. 2d 68, 70-71 (Tex. App.—Austin1998).*

As will be demonstrated, appellee's Motion for No-Evidence and Traditional Motion for Summary Judgment should have been denied and appellants' Motion for Partial Summary Judgment based on the defective Violation Notice and the other reasons stated herein should have been granted.

Appellants received a first Violation Notice bearing the signature of Diane Bottema, the property manager, which indicated that the lattice

36.

extension that appellants installed to their fence, was in violation of the rules and/or deed restrictions of the Association. By e-mail appellants notified the property manager that they intended to ask for a Hearing after they conducted their own investigation.[55]

By e-mail the property manager told the appellants that they were not entitled to a Hearing in this matter because in matters of clear violations the president of the Association could act for the Board of Directors; see text of e-mail below:

> "Yes the fence in the attached photo needs to be moved forward to screen the pool pump and the lattice removed from the fence. In a situation such as this, the Board President may speak on behalf of the Board of Directors when the home is in direct violations of the Deed Restrictions."[56]

Mr. Ficken testified that as President of the Association he did not have authority to speak on behalf of the Board.[57] Based on Ms. Bottema false and deceptive statements the appellants removed the lattice from the fence all to their loss and damage and requested a meeting with the association president, Mr. Ficken and Ms. Bottema, the property at appellants' home to discuss what type of privacy screen could be built

on appellants' property.  No Violation Letters were issued in August, September or November of 2013.

On October 22, 2013, appellants received a second Violation Notice stating the Privacy Screen as rebuilt violated the rules and deed restrictions of the Association.[58]  In response to the October 22, 2013, Second Violation Notice the appellant, Wesley Spears sent a letter to the property manager, Diane Bottema, dated October 23, 2013, which states in pertinent part:

"In that letter you cite an alleged violation of the rules of the Homeowners' Association":

"Improvement-improvement not in conformance with the CCRs/Rules of the association.  Comments:   Lattice work on top of the fence not in conformance with Falcon Pointe Community HOA guidelines..."[59]

The Violation Notice did not cite the specific deed restriction appellant(s) allegedly violated.   The subject Violation Notice also

provides an invalid cure date of "before the August inspection" even though the Violation Notice was dated October 22, 2013, and the Hearing on the subject Violation Notice was held on November 11, 2013.

In regards to defective Violation Notice as outlined in Appellants' Motion for Partial Summary Judgment, the Texas Property Code and the Bylaws of the Association, provide that in order for a Homeowner's Association to take enforcement action it must provide the homeowner with Notice that provides the specific deed restriction that the Homeowner is alleged to have violated and to provide a reasonable cure date. Appellants' Motion for Summary Judgment provided in pertinent part as follows regarding the issue of defective Violation Notices:

The Second Violation Notice, just like the First Violation Notice does not cite any specific rule(s) and/or deed restriction(s) that the Association claims that the appellants violated, on that basis alone appellants' Motion for Partial Summary Judgment should have been granted.

A Hearing of the subject Violation Notice was held by the Board of the appellee, on November 11, 2013. The matter was heard by two

39.

directors, Ranier Ficken, president and William Meyers, vice president of the appellee, who are also both high ranking employees of the Developer, Newland Communities. The neighborhood representative on the board did not appear or vote at the subject hearing.

The Hearing was conducted at the direction of Alex Valdes, an attorney for the appellee. Mr. Valdes announced the decision of the Board, on November 26, 2013, in a letter to appellant, Wesley Spears, which states as follows:

> "Upon careful consideration of all the facts and circumstances exercise their business judgment as to the best interests of the Association, the Board has made a final determination regarding your installation of improvements and modifications that were not approved by the Association. The Board hereby reaffirms and upholds it's previous decision regarding the violation set forth in its prior correspondence to you."[60]

Just like the subject Violation Notice, Attorney Valdes' letter cites no deed restriction that appellants were alleged to have violated or upon which the Board's decision was based. The decision of the board of the Association was based on the "business judgment" of the Board of Directors of the Association.[61]

Accordingly, the Hearing, which was based on a defective Notice

40.

and which cites no specific deed restriction upon which the board's ruling was based was invalid as a matter of law. The only valid basis for the taking the enforcement action by a homeowners' association against a homeowner is the violation of a specific deed restriction.

A "business decision" is not a valid basis for finding the appellants where in violation of unspecified deed restrictions. In fact, the Texas Property Owners' Protection Act was intended to protect homeowners' from Homeowners' Associations from exercising of business judgments that restricts the homeowners' use of their property, based on any reason other than the violation of a deed restriction.

### (A) THE SUBJECT NOTICE OF VIOLATION IS DEFECTIVE.

The subject Notice of Violation, which was sent to the appellants, at the direction of appellee's, property manager, Diane Bottema was defective and did not comply with the requirements of *Texas Property Code § 209.006*, and the Bylaws and Rules of the Association.[62]

The Bylaws of the Association provide in pertinent part as follows:

(a) <u>Notice.</u> Prior to the imposition of any sanction hereunder, the Board or its delegate shall serve the alleged violator with written notice describing (i) the nature of the alleged violation, (ii) the proposed sanction to be imposed, (iii) a period of not less than the (10) days

41.

within which the alleged violator may present written request to the Board of Directors for a hearing; and (iv) a statement that the proposed sanction shall be imposed as contained in the notice unless a challenge is begun within ten days (10) days of the notice. If a timely challenge is not made, the sanction stated in the notice shall be imposed.

(b)    Hearing.  If a hearing is requested within the allotted ten (10) day period, the hearing shall be held in executive session affording the alleged violator a reasonable opportunity to be heard. Prior to the effectiveness of any sanction hereunder, proof of proper notice shall be placed in the minutes of the meeting. Such proof shall be deemed adequate if a copy of the notice, together with a statement of the date and manner of delivery is entered by the officer, Director, or agent who delivered the notice. The notice requirement shall be deemed satisfied if the alleged violator appears at the meeting. The minutes of the meeting shall contain a written statement of the results of the hearing and the sanction, if any, imposed. The Board of Directors may, but shall not be obligated to, suspend any proposed sanction if the violation is cured within the ten (10) day period.   Such suspension shall not constitute a waiver of the right to sanction future violations of the same or other provisions and rules by any Person.[63]

Appellants did not appear at the Hearing because the Violation Notice were defective and failed to give the appellants' adequate notice of the specific deed restriction that appellants' were alleged to have violated. Further, the bylaws provided that a homeowner waives notice, if they appear at the Hearing, so appellants did not appear and, therefore, appellants did not waive proper notice.

The Bylaws require the Association to send a Notice, which

42.

provides the "nature", (emphasis added) of the alleged violations.

Restrictive covenants are subject to general rules of construction.

*Hodas v. Scenic Oaks Property Ass'n,* 47 S.W. 2d 747 (App. 4 Dist. 2000).

Accordingly, the court must give a restrictive covenant's words and phrases their commonly accepted meaning.  In this case, the by-laws of the Association requires it to state the specific deed restriction and rule that the appellants' are alleged to have violated.  The explicit language of the by-laws requires the Association to identify the "nature" of the violations, which requires the Association to identify the specific deed restriction the appellants were alleged to have violated.

The Court of Appeals, in *Ashcreek Homeowner's Association  v. Smith*, 902 S.W.2d 586 (App. 1 Dist. 1995), the leading case on defective Notice(s) under the Texas Property Code as it relates to Homeowners' Associations held that a Notice was defective and a Hearing invalid because of the Association's failure to identify the specific deed restriction the homeowner' was alleged to have violated.  The *Ashcreek* by-laws, which the court interpreted, were almost identical to the By-laws of the Association in this case.[64]  The Court in the *Ashcreek* case

43.

held, that the Notice of Violation must cite the specific deed restriction that the homeowner is alleged to have violated and the Association must hold a Hearing based on the specific provision of the deed restriction(s) the homeowner is alleged to have violated.

Therefore, as a matter of law the subject Violation Notice was defective because the failed to cite the specific deed restriction(s) and/or rule(s) the appellants are alleged to have violated. Further, the subject Violation Notice also failed to identify a specific cure date simply saying comply before the "August inspection", which was particularly invalid in regards to the subject Notice of Violation which is dated October 22, 2013.[65]

Even if the Appellee argues that no cure date was necessary because this was a second violation, once the subject Violation Notice provides a cure date, it must provide a valid cure date, which complies which the *Texas Property Code, § 209.006*, and the bylaws of the Association. A cure date of before the August inspection for a violation that allegedly occurred in October is clearly defective.

*Texas Property Code § 209.006* provides that Notice is Required

Before Enforcement Action:

(a) Before a property owners' association may suspend an owner's right to use a common area, file a suit against an owner other than a suit to collect a regular or special assessment or foreclose under an association's lien, charge, an owner for property damage or levy a fine for a violation of the restrictions or bylaws or rules of the association, the association or it's agent must give written notice to the owner by certified mail, return receipt requested.

(b)  The notice must:

(1) describe the violation or property damage that is the basis for the suspension, action, charge, or fine and state the amount due the association from the owner, and…

"While a restrictive covenant should be liberally construed to give effect to the purpose and intent, equitable principles require that covenants restricting free use of land which give rise to ambiguity or substantial doubt as to interpretation be construed strictly in favor of the homeowner and the ambiguity is resolved in favor of the free and unrestricted use of the premises." *Simon Property Group (Texas) L.P. v. May Dept. Stores Co.,* 943 S.W. 2d 64 (Tex. App. Corpus Christi 1997); *Macdonald v. Painter,* 441 S. W. 2d 179 (Tex. 1969); *J. P. Bdg. Enterprises, Inc., v. Timberwood Development Co.,* 718 S. W. 2d 841 (Tex. App. Corpus Christi 1986 , writ refused n.r.); *City of Pasadena v. Gennedy,* 125 S.W. 687 (Tex. App. – Houston [14th District]). *Pheasant Run Homeowners Ass'n, Inc., v. Kastor,* 47 S.W. 2d 74  (Tex. App. _ Houston [14th District]) 2001; *Munson v. Milton,* 948 S.W. 2d 813 (Tex. App.- San Antonio 1997).

In *Davis v. Huey,* 620 S.W. 2d at 566, the Texas Supreme

45.

Court addressed the validity of covenant requiring submission of construction plans to an "architectural control committee", while applying Texas common-law rules of construction.  In this case, the subdivision developers attempted to enjoin Davies from building a home on their lot, citing a refusal of the architectural control committee to approve their plan for construction.  The court found that the developers had exceeded their authority, and determined that the restrict covenant was void.  *Id. at 566.*

The Texas Supreme Court extended the rules in the *Davis* Case in *Wilmoth v. Wilcox,* 743 S.W. 2d at 658.

"The court again employed the strict construction standard requirements established in the *Davis* case to construe restrictive covenants strictly against the party seeking to enforce it.  *Davis* and its progeny provide a common-law strict construction of restrictive covenant to protect property owners by construing covenants with ambiguous language in favor of the free and unrestricted use of real property.  In 1987, the Texas legislature enacted chapter 202 of the Texas Property Code. This chapter was intended to create a mechanism for developers and property owner associations to enforce restrictive covenants."

In the *Ashcreek* case the court stated:

"This Court recently addressed this issue in *Crispin v. Paragan Home, Inc.,* 888 S.W. 2d 78 (Tex. App.-Houston [1st Dist.] 1994, writ denied.)  There we concluded that:

46.

> We are unable to discern a conflict between liberally construing a restrictive covenant to give effect to its purpose, and construing a restrictive covenant either in favor of the free and unrestricted use of land or to strictly construe it against a party seeking enforce it Furthermore, section 201.003(a) was effective… The supreme court in *Wilmoth* on July 1, 1987, and denied a motion for rehearing on September 16, 1987. In its decision, the Supreme Court also failed to recognize that the property code had overruled the principles upon which relied.

Id. At 81, n.1.

In this case, appellants were not given any indication of what specific deed restriction they are alleged to have violated and, thus appellants were denied legal Notice and a fair Hearing. The court's ruling in *Ashcreek* reiterates a simply principle that before a homeowner' can be found in violation of the deed restriction(s) of the Association they must receive Notice of the specific provision of the deed restriction(s) they are alleged to have violated and they must be given a fair Hearing based on the specific deed restriction the homeowner' is alleged to have violated.

In this case, the appellee clearly based its decision on a business decision and said so in a letter from their counsel announcing the decision of the Board. The Board's decision was based on a "business

47.

decision" as to the best interests of the Association (in other words the best interest of the developer, Newland Properties, who the only voting members of the Board worked for), not because a violation of a deed restriction.

The appellants were denied their most basic rights, that of reasonable Notice and a fair Hearing with a reasonable opportunity to be heard and present evidence, "due process". Allowing a homeowners' association to take enforcement action without giving a homeowners specific notice of the deed restriction that it claimed the homeowner violated is a denial of due process. It would be akin to charging a person with a crime and not telling them what offense they were charged with.

**(B) APPELLEE VIOLATED TEXAS PROPERTY CODE 209.005 AND REFUSED TO PRODUCE RELEVANT DOCUMENTS TO WHICH APPELLANTS WERE ENTITLED TO OBTAIN BY STATUTE**

Appellee has violated the *Texas Property Code  § 209.005*, by failing to provide appellants with the properly requested records of the appellee. Appellants' have made numerous requests pursuant to *Texas Property Code  § 209.005*, for records of the Association.[66]  As part of

appellee's dilatory strategy, counsel for appellee objected to producing the records primarily arguing that since suit has been filed all requests for documents must be made by a formal document requests.[67]

Appellants are unaware of any legal authority, which suspends appellee's obligations under *Texas Property Code  § 209.005*, to make the books and records of the Association reasonably available to homeowners' after they have filed suit.

*Texas Property  § 209.005* in pertinent part provides:

(c) Notwithstanding a provision in a dedicatory instrument, a property owners' association shall make the books and records of the association, including financial records, open to and reasonably available to for examination by an owner, or a person designated in a writing signed by the owner as the owners' agent, attorney, or certified public accountant, in accordance with this section.  An owner is entitled to obtain from the association copies of information contained in the books and records…

(i)      ….An Association may not charge an owner for the compilation, production, or reproduction of information requested under this section unless the policy prescribing those costs has been recorded as required by this subsection.

The appellee is in violation of the *Texas Property Code § 209.005*, because of its failure to produce any records pursuant to appellants' many requests for the production records.  Appellants' first request

sent, pursuant to the Texas Property Code, was dated December 9, 2013, and was sent to the Appellee by certified mail.

The letter requested a summary of the dedicatory violation history of the Association, with confidential information redacted as specifically provided in *Texas Property Code § 209.005*.[68] The Appellee has refused to provide any records pursuant to appellants' five requests for documents pursuant to Texas Property Code § 209.005.[69] The appellee has never communicated to the appellants that they were unable to produce the records as required by, *§ 209.005 (f)(1)(2) of the Texas Property Code.*

The appellee and the trial court took the position that the Texas Property Code is not applicable after appellants filed suit with regards to the Association's obligation to make the books and records of the Association reasonably available to appellants.[70] The court Phillips J., went so far as to say that appellants should have obtained the records before filing suit.[71]

In fact, the limited authority discovered by appellants' counsel, suggests that the statutory rights of the appellants to records of appellee

do not change after suit is filed. Appellee has refused to produce documents requested pursuant to a series of requests that Appellants' have made pursuant to *Texas Property Code, § 209.005*, saying while this matter is in litigation any requests for documents must be made as a formal document request.[72]

From December 9, 2013, until the parties' Cross Motions for Summary Judgment the appellants' have made several other Formal Discovery Requests for records which complies with *Texas Property Code § 209.005* and the Association has failed to follow the procedure laid out in *Texas Property Code § 209.005*, and simply refused to provide the requested information.*[73]*

Appellants' first formal request dated December 9, 2013, was contained in a certified letter to Diane Bottema, property manager, requested:

"I am again requesting a copy of the dedicatory violation history of the Falcon Pointe Community Association. I am also requesting a summary of the fines imposed for each violation identified. To be perfectly clear, I am not seeking the identity or names and addresses of the Homeowners' involved. I agree any information regarding the identity of homeowners may be redacted or otherwise deleted."[74]

51.

In response to that request appellants were advised pursuant to a letter dated January 13, 2013, letter from an attorney who represented the Association:

> "The Association will comply with all lawful requests for documents submitted under the Property Code. Under *Texas Property Code § 209.005*, certain records must be made available; however, a property owners' association "is not required to release or allow <u>inspection</u> of any books or records that identify the dedicatory instrument violation history of an individual owner of an association."

> "To the extent that you wish for a summary of information. I believe that should be requested through an interrogatory now that this matter is in litigation and the parties are conducting discovery. To the extent that your letter constitutes a discovery request, Falcon Pointe Community Association objects to the discovery request, as vague, overbroad, unduly burdensome, and seeking information that is neither relevant nor likely to lead to the discovery of any relevant or admissible evidence. In addition, objection is made insofar as the requests (sic) seek information that is confidential under Texas law".[75]

Appellants' request for production of a summary dedicatory violation history of the Association, with all confidential information redacted was entirely consistent with *Tex. Prop. Code § 209.005*. On May 23, 2014, appellants' sent a letter certified mail to counsel for appellee asking for copies of all financial records of the Association.[76] Appellants' received the following response to that request pursuant to a letter from David Campbell dated June 10, 2014:

52.

"I write this correspondence in response to your letter dated May 23, 2014, in which you state that you "wish to get copies of the financial records" of appellee, Falcon Pointe Community Association. Any requests for documents should be submitted as a formal discovery requests as this matter is in litigation. After receiving your letter, we have received a request for production "any and all of the books and records of the Falcon Pointe Community Association, including but not limited to all financial records…." Defendant Falcon Pointe Community Association will respond to this discovery request pursuant the Texas Rules of Civil Procedure.[77]

On June 12, 2014, appellants' sent a certified letter to Diane Bottema, Property Manager for the Association requesting the following documents:

"I hereby requests copies of all of the books and records of the Falcon Pointe Community Association pursuant to the Texas Property Code".[78]

Appellants' received the following reply to that request in pertinent part:

"As this matter is in litigation, all requests for documents should be submitted as a formal discovery request to the Falcon Pointe Community association ("Falcon Pointe") through it's counsel."[79]

By letter dated June 20, 2014, appellee reiterated its position that any request for documents had to be made by formal document

request.[80]  Appellee's attorneys' have also requested that appellants make discovery requests formally in court.[81]  The only documents appellee's have released to appellants were a copy of it's policy of insurance, and less than twenty pages of minutes of irrelevant board meetings and two Budgets.   Those documents were produced by Ranier Ficken, President of the Association pursuant to the Notice to take his Deposition Duces Tecum that requested virtually all of the records of the Association.[82]

Those documents were produced pursuant to the Notice to Take the Deposition Duces Tecum, of Ranier Ficken, the president of the Association.  Appellee has refused to produce any correspondence between the parties or any other document relevant to this case.  The appellee even refused to produce copies of the subject Violation Notice.

Appellants have requested formal discovery in the form of Requests for Production of Documents and Notice to take Depositions Duces Tecum.  Appellants have requested copies of all books and records of the Association. The attorney for the appellee indicated that appellee would not comply with future requests for documents unless

they were submitted and ordered through the court in violation of *Texas Property Code § 209.005.*[83]

Appellants' requests were made to the appellee pursuant to *Texas Property Code, § 209.005* which grants to the appellants a statutory right to the requested documents. Appellee cannot escape its responsibilities under *Texas Property Code § 209.005*, by relying on the claim that once appellants' filed suit they must make a formal discovery requests to obtain the requested documents and then appellee is free to assert standard discovery objection to the production.

The appellee has circumvented the rights granted homeowners' under *Texas Property Code § 209.005.* The books and records of the Association belong to the homeowners' of the Association, and therefore, the rules of evidence do not effect the obligation of the appellee to release records requested pursuant to *Texas Property Code§ 209.005.* The appellants have made numerous formal requests under *Texas Property Code § 209.005*, after filing suit in this matter, as well as numerous discovery requests.

The appellee has refused to produce the requested documents

55.

responding by saying since suit has been filed, appellants must make an official document request in the lawsuit in order to obtain the books and records of the Association and the trial court must order the same. Appellee is basically saying any homeowner' except the appellants are entitled to copies of the books and records of the Association, because they filed suit.

Homeowners' who have filed suit are the homeowners' who need the books and records of the Association the most. Appellee should have been found by the trial court, as a matter of law to have violated *Texas Property Code  § 209.005*, for failing to produce the books and records of the Association pursuant to appellants' many requests enumerated above.

The trial court should have also granted appellants' Motion for Partial Summary Judgment and denied appellee's Motion for Traditional and No-Evidence Summary Judgment. Further the trial court refused to hear appellants' three Motions to Compel the production of documents and witnesses in violation of its' own policy.

56.

In *Burton v. Cravey, 759 S.W. 2d 160 (Houston 1st District 1988)*:

The Court of Appeals, Duggan, J., held absent proof by association of improper purpose for inspecting records, owners were entitled to inspect all pertinent records including those of association's attorney. In this case, appellants' numerous requests for documents were necessary in order for the appellants to prosecute their Declaratory Judgment Action, which included claims of deceptive trade practices.[84]

In the *Burton* case the court, rejected appellee's argument that the request for inspection of records were subject the rules of discovery, specifically rejecting the appellee's argument that the request was unduly burdensome. Ruling that unduly burdensome was not applicable to appellants' statutory requests for records. Accordingly, this court should also reject the appellee's argument that appellants' requests were unduly burdensome and not relevant which are the only reasons appellee has put forth for not producing the requested copies of the books and records of the appellee.

**2. DID THE TRIAL COURT, PHILLIPS, J., ERR IN REFUSING TO RULE ON APPELLANTS' THREE MOTIONS TO COMPEL AND MOTION FOR CONTINUANCE TO COMPLETE DISCOVERY PRIOR TO RULING ON THE PARTIES' CROSS MOTIONS FOR SUMMARY JUDGMENT.**

Fundamental requirements of due process demand that a party be given a reasonable opportunity to be heard *U.S. Const. Amendment 14*.[85] Similarly, the Constitution of the State of Texas provides that "no citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disenfranchised, except by the due course of the law of the land. *Texas Const. Art. 1 §19*.[86]

The purpose of discovery is to allow the parties to obtain the fullest knowledge of facts and issues prior to trial. *West v. Solite, 563 S.W. 2d 240, 243* (Tex. 1978). Thus, orders prohibiting discovery may constitute an abuse of discretion. See *Helfand v. Coane, 12 S.W. 3d 152, 155 (Tex. App. Houston [1st Dist.] 2000, pet denied), also Tex. R. Civ. P. 192.3*, ("A court abuses its discretion in unreasonably restricting a party's access to information through discovery.").

The rule regarding the scope of discovery is broad. "In general a party may obtain discovery regarding any matter that is not privileged and is relevant to the subject matter of the pending action, whether it

relates to the claim or defense of the party seeking discovery or the claim or defense of any other party." *TEX CIV. 192.3 (a).* This rule reflects the ultimate purpose of discovery, which is to "seek truth, so that disputes may be decided by those facts that are revealed, rather than concealed." *Axelson, Inc., et al., v. The Honorable Grainger W. McIIhany, 798 S.W. 2d 550, 555 (Tex. 1990).* Due process in all cases is necessary to insure that all people have equal rights to petition the court and to be heard and have equal protection of the law. A trial court abuses its discretion when it acts without reference to any guiding rules and principles, or in other words acts in an arbitrary or unreasonable manner. *Downer v. Aquamarine Operations, Inc., 701 S.W. 2d. 238, 241-242 (Tex. 1985), cert denied, 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed. 2d 721 (1986).*

Before granting a no-evidence motion for summary judgment the trial court must allow the non-movants an adequate time for discovery. *Tex. R. Civ. Proc. 166a(1).* In determining whether the trial court has allowed adequate time for discovery, the reviewing court should determine (a) the nature of the case; (b) the nature of evidence

necessary to controvert the no evidence motion; (3) the length of time the case was active; (4) the amount of time the no evidence motion was on file; (5) whether the movant for summary judgment had requested stricter deadlines for discovery; (6) The amount of discovery that had already taken place; and whether the discovery deadlines in place were specific or vague. *Moorehouse v. Chase Manhattan Bank, 76 S.W. 3d 587, 591 (Tex. App—San Antonio 2002, no writ); Martinez v. City of San Antonio, 40 S.W. 3d 587, 591 (Tex. App.—San Antonio 2001, pet denied).*

Appellants' have been denied due process by the refusal of Judge Phillips to allow them to be heard on their three Discovery Motions and Motion for Continuance to Complete Discovery, before ruling on the parties' Cross Motions for Summary Judgment. There is no justifiable reason why Judge Phillips refused to hear Appellants' properly filed three Motions to Compel Discovery and Motion for Continuance to Complete Discovery. The discovery sought by appellant was intended to respond to the appellee's Motion for Summary Judgment. *Brewer & Pritchard, PC v. Johnson, 167 S.W. 3d 460, 469 (Tex. App.—Houston (14th Dist.) 2005, rehearing overruled).*

60.

A litigant who blocks discovery and withholds evidence cannot use the non-movant's lack of evidence to win a summary judgment. *Tempay, Inc., v. TNT Concrete & Construction, Inc., 37 S.W. 3d 517, 521-522 (Tex. App.—Austion 2001, no writ) citing Robert W. Clore, Texas Rule of Civil Procedure 166a(1); A New Weapon for Texas Defendants, 29 St. Mary's L. J. 813, 843 (1998).* "The ultimate purpose of Discovery is to seek the truth so that disputes are decided by what the facts reveal, not by what facts are concealed." *Jampole v. Touchy, 673 S.W. 2d 569, 573 (Tex. 1984).*

In this case, the Motion for Continuance to Complete Discovery was not only timely filed but it states a number of irrefutable reasons why the Motion should have been heard and granted. The Motion was also verified and had a detailed affidavit explaining the specific need for the requested discovery.[87]

The subject case has been on file for ten months prior to the court granting Appellee's Motion for Traditional No-Evidence Summary Judgment. The discovery cutoff set by Judge Phillips was September 30,

2014. The court granted appellee's Motion for Traditional and No-Evidence Summary Judgment on September 15, 2014.[88] Appellants have filed Six Motions to Compel Discovery and, only three have been heard.

The Motions were made necessary by the planned dilatory actions of defense counsel in refusing to cooperate with discovery. Appellants did not even have the transcripts of the two depositions they were allowed to take of Ranier Ficken, president of the appellee and Diane Bottema, the property manager, at the time the Summary Judgment Briefs in this matter were due in the trial court.[89]

The appellate court, in *Nelson v. PNC Mortgage Corp., 139 S.W. 3d 442 (2004)*, held: "But *Nelson*, even as an incarcerated prisoner was entitled to a ruling on the numerous discovery motions he filed and requests to be heard. The trial court's failure to rule on *Nelson's* discovery motions foreclosed any possibility of _Nelson_ exercising his right to obtain reasonable discovery before summary judgment was rendered against him." *Id. at 444, 445.* The court also ruled that the court should have held a hearing on Nelson's Motion for Continuance.

The court went on to state:

"In reviewing this case on appeal our concern is not so much with the alleged errors in the trial court rulings.  Instead, our concern lies with the trial court's repeated failure to hear or rule on the numerous Motions filed by *Nelson* despite *Nelson's* persistent requests for action.

A trial court is required to consider and rule upon a motion within a reasonable time.  *See In re Ramirez*, 994 S.W. 2d 682, 683 (Tex. App. San Antonio 1998, orig. proceeding).  In this case the vast majority of *Nelson's* Motions were never ruled on.  Yet Washington Mutual and Barrett Burke's were set promptly and ruled on in *Nelson's* absence.*" Id. at 444.

"The trial court granted summary judgment against *Nelson* without giving any apparent consideration to his discovery motions before ordering that he take nothing by his claims, *Nelson* was not given a reasonable opportunity to be heard on the significant issue of his access to evidence that may have supported his claims.  Fundamental requirements of due process demand that a party to cause be given and opportunity to be heard.  *Cf. Creel v. Dist. Attorney for Medina County*,

63.

818 S.W. 2d 45, 46 (Tex. 1991).

"In his motions to continue the hearing on Washington Mutual and Barrett Burke's Motion for Summary Judgment, *Nelson* made the trial court aware of the fact it had not ruled on his pending discovery motions including motions to compel discovery." *Id. at 444.* The *Nelson* case is factually analogous to this case. Appellants filed six Motions to Compel Discovery, three of their Motions remain unheard. Appellants' Motion for Continuance to Complete Discovery also remains unheard.

Repeatedly in this case the trial court, Phillips, J., refused to grant the discovery requested by appellants. The trial court repeatedly granted appellee's requests that the appellants' requested discovery be blocked and stopped. However, appellee cannot block discovery and then be granted dismissal of appellants' causes of action. Fair play, Rule 166a and due process do not allow this maneuver. *Tex. R. Civ. Proc. 166a; Tempay, Inc. v. TNT Concrete Construction, Inc., 37 S.W. 3d 517, 521-522 (Tex. App—Austin 2001, no writ) citing Thomas R. Phillips, Texas Supreme Court Update, 60 Tex. B.J. 858, 861 (1997); Brewer & Pritchard, PC v. Johnson, 167 S.W. 3d 460, 469 (Tex. App.—Houston [14th Dist.] 2005, rehearing overruled); Jampole v. Touchy, 673 S.W. 2d 569, 573 (Tex.*

64.

*1984).*

The trial court erred and abused its discretion, when it granted appellees' demands to block and stop appellants' requested Discovery, and then dismissed appellants' causes of action by granting appellee's No-Evidence and Traditional Motion for Summary Judgment and awarding attorneys' fees. The trial court's granting of the No Evidence and Traditional Motion for Summary Judgment should be reversed and the court ordered to direct a verdict for the appellants' on their Motion for Partial Summary Judgment and to remand appellants' other claims for full discovery and a trial on the merits.

**3.     DID THE TRIAL COURT, PHILLIPS, J., ERR IN DISMISSING APPELLANTS' TEXAS DECEPTIVE TRADE PRACTICES ACT CLAIMS CONTAINED IN THEIR FOURTH AND FIFTH AMENDED COMPLAINTS**

Appellee has violated the Texas Deceptive Trade Practices Act, (hereinafter "DTPA").[90] *V.T.C.A., Bus. & C., Section 17.50*: (a), in two regards. First, as outlined above the property manager, Diane Bottema made false and misleading statements orally and in writing that appellants' were not entitled to a Hearing of their alleged violations of the deed restrictions, in matters of clear violations of the rules of the

Association.

Based on the property managers misrepresentation of the appellants did not request a Hearing regarding the first Violation Notice and tore down the lattice from their fence, as demanded by appellee. Appellants consequently suffered damage for the fair value of the materials and labor expend to add the lattice to the fence and to remove it.

While this matter was pending, appellant, Wesley Spears applied to be on the ballot to be a voting Neighborhood Representative of the Association, the election was held on June 7, 2014. Appellant, Wesley Spears' name was intentionally omitted from the Ballot for Neighborhood Representative by Appellee, effectively disenfranchising, appellant, Wesley Spears, an African American attorney.

What is very ironic is this occurred in a courthouse named for the first african-american student at the University of Texas, School of Law. Heman Marion Sweatt was denied of his dream of becoming a lawyer, because of discrimination. After climbing the ladder on the backs of great men like Marion Sweat, appellant, Wesley Spears, who was born in the same year

66.

Marion Sweat became the first african-american law student at the University of Texas, and appellant, Wesley Spears, became a lawyer in 1979, twenty five years later. Nevertheless, appellant, Wesley Spears was denied his most basic human rights that is to serve in an elected position.

Ranier Ficken, President of Appellee, testified at his deposition, that there was no reason why Appellant', Wesley Spears' name was not placed on the Ballot for Neighborhood Representative.[91] It was a violation of DTPA for the appellee to deny appellant, Wesley Spears of his basic civil and human rights to apply and serve in an elective position because he has brought a lawsuit or because he is African-American.

Appellants, in addition, to the affidavit of appellant, Wesley Spears, provided two affidavits from residents of Falcon Pointe who live on Appellants' street, who also affirmed that appellant, Wesley Spears name was not on the Ballot for neighborhood representative when they attempted to vote for him on June 7, 2014.[92]

Plaintiff also provided copies of the election Ballot that omitted

Appellant, Wesley Spears' name downloaded from Appellee's website.[93] Election Ballots dated June 7, 2014, the same Ballot was again downloaded by appellants from appellee's website on August 17, 2014, neither ballot contained, appellant, Wesley Spears' name.

Appellants were denied the right to fully develop their DTPA claim regarding election fraud since the facts giving rise to the claim occurred approximately ninety days before the court granted appellee's No-Evidence and Traditional Motion for Summary Judgment The court did not allow any oral argument regarding plaintiffs' DTPA. Appellants moved to Compel the Deposition of Natalie Boykin, the Property Manager, of the appellee who replaced Diane Bottema and conducted the election that is the subject one of Appellant's Deceptive Trade Practices Act claims.

Appellee filed a Motion to Quash Appellants' Motion to Compel the Deposition of Natalie Boykin.[94] The court refused to hear appellants' Motion to Compel Natalie Boykin' Deposition even though it was timely filed and appellants made two requests, to the Court Operations for appellants' three Motions to Compel to before the hearing of the parties' Cross Motion's for Summary Judgment. The emails informed Mr.

68.

Sanders that counsel for the appellee refused to agree to a date on or before the Hearing of the parties' Cross Motions for Summary Judgment.

Ms. Boykin was the property manager who conducted the election, which appellants second DTPA claim is based. Clearly, her testimony was relevant to whether there was election fraud since she was in charge of conducting the election and was the current property manager.

Texas' DTPA, *V.T.C.A., Bus. & C., Section 17.50*: (a) A consumer may maintain an action where any of the following constitute a producing cause of economic damages or damages for mental anguish:

(1) the use or employment by any person of a false, misleading, or deceptive act or practice that is:

(A) specifically enumerated in a subdivision of Subsection (b) of Section 17.46 of this subchapter; and…..

*V.T.C.A., Bus. & C. Section 17.46*:

 (a) False, misleading, or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful and are subject to action by the consumer protection division…

(3) any unconscionable action or course of action by any person; or...

(12) representing that an agreement confers or involves rights, or remedies or obligations which it does not have or involve, or which are prohibited by law...

Appellants as homeowners are clearly consumers of the services of the Association they pay dues and receive services. Courts liberally construe the DTPA and give it the most comprehensive application possible without doing damage to its terms. *Clary Corp., v. Smith, 949 S.W. 2d 452, 464 (Tex. App.—Fort Worth 1997*, no writ); In addition, a appellants do not have to prove he actually acquired goods or services. *See e.g. Nast v. State Farm Fire & Cas. Co., 82 S.W. 2d 42, 47 ( Tex. App.—Corpus Christie 1990 (no pet.)* The appellee owed appellants a fiduciary duty of good faith and fair dealing. Appellee failed to fulfill its fiduciary obligation to the appellants by refusing to produce documents properly requested from appellee.

The DTPA defines "unconscionable action or course of action" as follows: (5) "Unconscionable action or course of action" means an act or

70.

practice which to a person's detriment:

(A) takes advantage of the lack of knowledge, ability experience or capacity of a person's to a grossly unfair degree; or

(B) results in a gross disparity between the value received and consideration paid, in a transaction involving transfer of consideration.

The relevant inquiry examines the entire transaction, not the defendant's intent. *Chastain v. Koonce, 700 S.W. 2d 579, 584 (Tex. 1985); see also Brown v. Galleria Area Ford, Inc., 752 S.W. 2d 114, 116 (Tex. 1988); State Farm Lloyds v. Nicolau, 951 S.W. 2d 444, 451 (Tex. 1997).* The relevant inquiry examines the entire transaction, not the defendant's intent. *Chastain, 700 S.W. 2d at 583.* In addition, there must be a showing of what the consumer could have or would have done if he had known about the information. *Peter Enters, Inc., v. Hilton, 51 S.W. 3d 616, 623 (Tex. App--Tyler 2000, pet. denied).*

Clearly, it would be an unconscionable course of action for appellee to prevent appellant, Wesley Spears, to serve in an elected position, for which he is legally eligible, as a neighborhood representative of the appellee because of his race or the fact he filed suit to address

grievances against the appellee or for any other purported reason.

Likewise, it is a violation of the *V.T.C.A., Bus., & C Section 17.50*: to represent that an agreement confers or involves rights or remedies or obligations which it does not have or involve or which is also a violation of the law. In this case this appellants were denied there right to a Hearing of the first Violation Notice due to the misrepresentation of their rights perpetrated by the property manager, Diane Bottema as outlined above. Appellants produced much more than a scintilla of evidence to support their claims.

Appellants produced an email from the property manager, misrepresenting the law, and saying in matters of clear violations the president of the Association can act on behalf of the Board to support their first DTPA claim. The laws governing the conduct of Associations, was designed to protect homeowner's from the arbitrary actions of Homeowners' Associations. The court abused its discretion by dismissing appellants' DTPA claims and without hearing any argument regarding appellants' claims.

**4.     DID THE TRIAL COURT PHILLIPS, J., AND WIZER J., ERR BY DENYING APPELLANTS' MOTION TO RECUSE JUDGE PHILLIPS FROM PRESIDING OVER THIS MATTER.**

Recusal of judge is concerned not only with actual personal or pecuniary interests, but also the appearance of impartiality.  Beyond the demand that judge be impartial is the requirement that a Judge appear to be impartial so that no doubts or suspicions exist as the fairness or integrity of the court.  *Vernon's Ann. Texas Rules of Civ. Proc., Rule 18b(b)(1)*.[95]    There is no standard of appellate review specifically enumerated in Rule 18a for the denial of a Motion to Disqualify. Pursuant to Texas Rules of Civ. Proc., *Rule 18a (j) (2)* application of an abuse of discretion standard is the appropriate standard to review the denial of appellants' Motion to Recuse Judge Phillips.[96]

An abuse of discretion occurs when the trial court acts arbitrarily and unreasonably, without reference to guiding rules or principles or misapplies the law to the facts of the case.  The reviewing court must determine whether the trial court's action was so arbitrary as to exceed the bounds of reasonable discretion.  *Marroquin v. D & N Funding, Inc., 943 S.W. 2d 112, 114 (Tex. App.—Corpus Christi 1997, no pet.);  Low v.*

*Henry, 221 S.W. 2d 609, 614 (Tex. 2007); Cooper Tire & Rubber Co. v. Mendez, 204 S.W. 3d 797, 800 (Tex. 2006); In re Cerebus Capital Mgmt., L.P., 164 S.W. 3d 379, 382 (Tex. 2005); Cire v. Cummings, 134 S.W. 3d 835, 838-39 (Tex. 2004); Downer v. Aquamarine Operations, Inc., 701 S.W. 2d 238, 241-242 (Tex. 1985).*

A trial court abuses it's discretion when it reaches a decision so arbitrary and unreasonable that it amounts to a clear and prejudicial error of law. *In re Olshan Found Repair Co., 328 S.W. 3d 883, 888 (Tex. 2010); In re Cerebus Capital Mgmt., L.P., 164 S.W. 3d 379, 382 (Tex. 2005).* Essentially, when reviewing issues committed to the discretion of the trial court, the reviewing court is not to substitute its own judgment for the trial court's judgment. *Walker v. Guiterrez, 111 S.W. 3d 56, 62 (Tex. 2003).*

The decision whether recusal is necessary is to be assessed on a case-by-case, fact intensive basis. *Abdygappariva v. State, 243 S.W. 3d 191, 198 (Tex. App.-San Antonio 2007).* Even under the abuse of discretion standard the reviewing court does not defer to the trial court

74.

on questions of law.  *Perry Homes v. Cull, 258 S.W. 3d 580, 598 (Tex. 2008).*

In this regard, the construction of statutes and procedural rules are questions of law, which are reviewed de novo.  *See Galbraith Eng'g Consultants, Inc. v. Pochucha, 290 S.W. 3d 863, 867 (Tex. 2009); HCBeck, LTD. V. Rice, 284 S.W. 3d 349, 352 (Tex. 2009); In re Christus Spohn Hosp. Kieberg, 222 S.W. 3d 434, 437 (Tex. 2007);  State v. Gonzales, 82 S.W. 3d 322, 327 (Tex. 2002);  Brown v. Villegas, 202 S.W.  3d 803, 805 (Tex. App.—San Antonio 2006, no pet.).*  Similarly, a de novo standard of review is applied to the interpretation of the state constitution.  *See Tesco Am., Inc., v. Strong Indus., Inc., 221 S.W. 3d 550, 554 n. 15 (Tex. 2006); Ross v. Union Carbide Corp., 296 S.W. 3d 206, 211 (Tex. App.-App.—Houston [14th Dist.] 209, pet. denied).*

Under Texas law, courts have delineated that the test for recusal on the basis of bias or lack of impartiality, is whether a reasonable member of the public at large, knowing all the facts in the public domain concerning the judge's conduct in the case, would have a reasonable doubt that the judge is actually impartial.  *Hansen v J.P. Morgan Chase*

*Bank, N.A., 346 S.W. 3d 769, 776 (Tex. App.-Dallas 2011); Ex Parte Ellis,*

*275 S.W. 3d 109, 116 (Tex. App.-Austin 2008); Burkett v. State, 196 S.W. 3d*

*892, 896 (Tex. App.-Texarkana 2006).*

Stated another way, if a reasonable person, knowing all of the circumstances involved, harbors doubt as to the judge's bias or impartiality then the burden is met and the judge should be recused. *Mendez v. Quarterman, 625 F. Supp. 2d 415, 424 (S.D. Tex. 2009); Abdygappariva v. State, 243 S.W. 3d 191, 198 (Tex. App.-San Antonio 2007).*

The comments that Judge Phillips' directed at appellants counsel and/or appellants identified earlier in this case taken together with unfair and legally unsupportable rulings of the court, leave the appellants, with the good faith belief that Judge Phillips was biased against them.[97]

## PRAYER

The appellants pray that the court reverse the ruling of Judge Phillips granting appellee's Motion for Traditional and No Evidence Summary Judgment and direct the court to grant appellants' Motion for

Partial Summary Judgment and to restore appellants' other claims to the trial court docket and to order the trial court to hold a hearing regarding whether appellants' are entitled to Attorneys' fees. Appellants requests that this court rule that the court erred in not hearing appellants discovery motions before ruling on the parties' Cross Motions for Summary Judgment. Further, appellants also requests that this court rule that Judge Phillips and Judge Wisser erred in not recusing Judge Phillips.

## CONCLUSION

Based on the arguments and law stated herein appellants respectfully request that the Third Court of Appeals grant appellants' prayer for relief and reverse the decision of the trial court and direct the trial court to enter judgment on appellants' Motion for Partial Summary Judgment and restore appellants remaining claims to the trial court docket for discovery and trial.

Respectfully Submitted
By Appellants

/S/Wesley Spears_____
    Wesley Spears
    Their Attorney

**77.**

**CERTIFICATION OF COMPLIANCE**

This is to certify that the word count on this document is in excess of 15,000 words. The total word count is 18,124, and is therefore, not in compliance with the rules of the Third Court of Appeals. Therefore, plaintiff is filing a Motion contemporaneously herewith, requesting permission to submit this Brief, which exceeds the word count provided in the rules of the Third Court of Appeals.

/s/s Wesley Spears
Wesley Spears
Attorney for Appellant

# CERTIFICATION OF SERVICE

This is to certify that a copy of the foregoing Brief in Support of

Appellants Appeal to the Third Court of Appeals was served on counsel

for appellee, David Chamberlain, Chamberlain and McHaney, 301

Congress Avenue, 22nd Floor, Austin, Texas 78701 Tel. 512-474-9124,

Fax. 512C 474C 8582 by hand delivery on this 6th day of March, 2015.

/s/s Wesley S. Spears
Wesley S. Spears
Bar No.18898400 401
Congress Avenue,
Suite 1540
Austin, Texas 78701
Tel.: 512C 696C 2222
Fax.: 512C 687C
3499 Attorney for
Appellants

[1] *See Appendix p. 1 Email from Wesley Spears to Diane Bottema*

[2] *See Appendix p. 3 Email from Diane Bottema to Wesley Spears regarding the rights of homeowners to seek a Hearing before the Board regarding alleged violations.*

[3] *See Appendix p. 68-69, Transcript of Deposition of Ranier Ficken pages 79-80.*

[4] *See Appendix p. 4-6, Articles of Incorporation of the Association dated August 6, 2001.*

[5] *See Appendix p. 90-94, Texas Property Code § 209.005.*

[6] *See Appendix p. 4-5 Emails between Wesley Spears and Diane Botttema, dated*

[7] *See Appendix p. 1 Violation Notice dated October 22, 2013.*

[8] *See Appendix p. 49-51, Transcript of Diane Bottema's Deposition pages 81-83.*

[9] *See Appendix p. 117 Transcript of Ranier Ficken Deposition p. 56 L. 13 - L 18.*

[10] *See Appendix p. 118  Transcript of Ranier Ficken Deposition p. 57 L. 11 - L 18.*

[11] *See Appendix p.7-23, Bylaws of the Association* paragraph 22 (b) Hearing Appendix p. 18.

[12] *See Certified letters requesting documents from the Association Court Record* p. 788, 789 790 and 791.

[13] *See Appendix p. 72-84, Transcript of the Depositon of Ranier Ficken, Exhibit 2, documents produced by Mr. Ficken.*

[14] *See Transcript of Hearing of Plaintiffs' Motion to Compel dated May 28, 2013, p. 8.*

[15] *See Transcript of Hearing of Appellants' Motion to Compel Deposition Duces Tecum of Diane Bottema dated May 15, 2013 p. 13-17*

[16] *See Transcript of Hearing of appellants' Motion to Compel Deposition Duces Tecum of Diane Bottema dated May 15, 2013 p. 18.*

[17] *See Transcript of Hearing appellants' Motion to Compel deposition of Diane Bottema Duces Tecum dated May 15, 2014 p. 14-20.*

[18] *See Transcript of Hearing of appellants' Motion to Compel dated May 15, 2013 p*. 15-18.

[19] *See Appendix p. 48, Transcript of Deposition of Diane Bottema p. 9.*

[20] *See Court Record p. 820-822, Motion to Compel Deposition of Natalie Boykin.*

[21] *See Appendix p. 103, Texas Property Code  § 209.007.*

[22] *See Transcript of Hearing of appellants' Motion to Compel Deposition of Diane Bottema dated May 15, 2014 p. 13-18.*

[23] *See Transcript of Hearing of Appellants' Motion to Compel dated May 15, 2013 p. 13-18.*

[24] *See Appendix p*. 45, Transcript of Diane Bottema's deposition p. 5.

[25] *See Court Record p. 961-966, Affidavit of Appellant, Wesley Spears attached to* appellants' Motion for Continuance to Complete Discovery.

[26] *See Appendix p. 72-84, Budgets and minutes of board meetings produced by Ranier Ficken which other than an insurance policy were the only documents that appellee produced to appellants throughout the pendency of this case.*

[27] *See Appendix Transcript of Ranier Ficken's deposition p. 15-18.*

[28] See Notice to take Deposition of Natalie Boykin, Duces Tecum, *Court Record p. 396-402.*

[29] *See Appendix p. 57-58, Deposition of Ranier Ficken p. 11 -12*.

[30] See Appendix p. 47, Transcript of Diane Bottema's deposition p. 7.

6[31] *See Appendix p. 24-25, Election Ballots showing appellants' Wesley Spears was left off the ballot* for Neighborhood Representative also see Court Record p.  Motion for Continuance to Complete Discovery affidavits of two of appellants' neighbors attesting to the fact the Wesley Spears name was left off the ballot for neighborhood representative.  *See Appendix p. 42-46, Transcript of Deposition of Ranier Ficken verifying that the pages downloaded from appellee's website appeared authentic and there was no reason that appellant, Wesley Spears', name was left off the ballot for neighborhood representatives pages.*

[32] *See Court Record p. 843-849 and 863-873.  Appellee moved to in bad faith to quash both depositions of Natalie Boykin, who conducted the election, which took place on June 7, 2014, and William Meyer, Board Member who voted to find appellants in violation of unspecified deed restriction(s).  The trial court, Phillips, J., refused to hear appellants' Motion to Compel the Depositions of Natalie Boykin, the property manager, who conducted the election that the appellants, allege Ms. Boykin intentionally and fraudulently left appellant, Wesley Spears' name off the ballot for neighborhood representative. Mr. Meyer is also Vice President of the developer Newland Communities and was the deciding vote to find the appellants' in violation of unspecified deed restrictions developer two votes, homeowners' no votes, big surprise!   See Court Record p. 961-966, Motion for Continuance to Complete Discovery.*

[33] *See Appendix p. 46-47, Transcript of Diane Bottema's deposition regarding her lack of access to her own emails and the records of the Association p. 6 and 7 when Ms. Bottema claims she has no access to her emails or other records because, although she worked in the office where the records were located her employer Goodwin Management, the property manager locked out her access to her emails and the records of the Association.  Again appellee's were playing __hide the ball, a million dollar budget with no oversight by the homeowners'__.  Ms. Bottema contradicted the sworn testimony of Ranier Ficken when she denied being replaced by Natalie Boykin because of her poor performance and locked out of her email.  See Appendix p. 47.*

[34] *See Court record p. 1059 and Transcript of appellants' Motion to Recuse Judge Phillips Exhibit 34, Vol. 3. Emails to Darryl Sanders, Court Operations Officer requesting that appellants' Motion to Compel be heard before the parties Cross Motions for Summary Judgment.*

[35] *See Transcript of Appellants' Motion to Recuse Judge Phillips November 7, 2014, Emails requesting appellants' three Motions to Compel Discovery be heard prior to the parties cross Motions for Summary Judgment p. 36-39.*

[36] See Transcript of the appellant's Motion to Recuse Judge Phillips November 7, 2014, testimony of Wesley Spears p. 41-54.

[37] *See Transcript Motion to Recuse Judge Phillips November 7, 2014, testimony of Wesley Spears p. 41-54 and Darryl Sanders p. 13-22.  Mr. Sanders' admits that he was*

81.

*the only Court Operations Officer involved in this matter up to the hearing of the parties Cross Motion for Summary Judgment and that he never gave counsel for the appellants' any instructions informing that it was in appropriate to ask for a setting by email. He admits in hindsight he should have given those instructions and it was his job to give those instructions and it was his job to respond to counsel for the appellants' email. Appellants' should not lose their case because of an inadvertent mistake by the Court Operations Officer or appellants' counsel, especially after it was brought to the court's attention. Judge Phillips abused his discretion when he refused to correct this wrong at the Hearing of Appellants' Motion for New Trial. Judge Phillips again denied appellants' request that that the court hear their three Discovery Motions and Motion for Continuance to Complete Discovery, in their Motion for New Trial, Court Record p. 1105-1119. See Appendix p. 116, email from Darryl Sanders, Court Operations Officer, to counsel for the appellants specifically asking that counsel for the appellants should contact his office only by email to avoid any ex parte communications, with copy to opposing counsel. Counsel for the appellants' was following the directions of the Court Operations Officer.*

[38] See Transcript of Motion to Recuse Judge Phillips November 7, 2014, p. 20.

[39] *See Transcript of Motion to Recuse Judge Phillips, November 7, 2014, p. 19-20.*

[40] *See Transcript of Motion to Recuse Judge Phillips November 7, 2014, p. 22 L1-L12.*

[41] *See Appendix p. 116 Email from Darryl Sanders to counsel for appellants asking them to communicate with him by email to avoid ex parte communications.*

[42] See Transcript of Motion to Recuse Judge Phillips November 7, 2014 p. 21-22.

[43] *See Transcript of Motion to Recuse Judge Phillips November 7, 2014, p. 21, L1-25.*

[44] *See Transcript of Motion to Recuse Judge Phillips Hearing November 7, 2014,* testimony of Cathy Mata P 11 L 1 through p 12 L 7.

[45] *See Transcript of Motion to Recuse Judge Phillips p. 12 L. 8 to L22.*

[46] *See Transcript of Motion to Recuse* Judge Phillips p. 11 L20 to page 12 L4.

[47] *See Appendix p.* 40, Judge Wisser Order denying Appellants' Motion to Recuse Judge Phillips.

[48] *See Appendix p. 30-31, Attorney Alex Valdes' November 26, 2013, Letter announcing the decision of the Board finding the appellants' in violation based on it's "business judgment".*

[49] *See Appendix p.3 Bottema's email representing that appellants' were not entitled to a Hearing.*

[50] *See Appendix p. 79-80, Transcript of Deposition for Ranier Ficken Appendix.*

[51] *See Transcript of July 1, 2014, Hearing of Appellants' Motion to Compel Deposition of Diane Bottema p. 23-26.*

[52] *See Transcript of the Hearing Appellants' Motion to Recuse Judge Phillips November 7, testimony of Cathy Mata p. 66 L 16 to L21 and P. 67 L 17 to L22.*

[53] *See Transcript of Hearing Appellants Motion to Compel, July 1, 2014, p. 24 L 4 through p. 26 L. 10.*

[54] *See Court Record p. 1176-1186 bias and/or sarcastic comments made by Judge Phillips to counsel for appellant.*

[55] *See Appendix p. 1 Email to Diane Bottema from Wesley Spears responding to the first violation letter.*

[56] *See Appendix p. 2, Email from Diane Bottema to requesting the fence to be moved in front of the pool pump.*

[57] See Appendix p. 68-69, Transcript of Deposition of Ranier Ficken 79-80.

[58] See *Appendix p.* 1, Violation Notice dated October 22, 2013.

[59] *See Appendix p. 1, Violation Notice dated October 22, 2013.*

[60] *See Appendix p. 30-31, Valdes letter dated November 26, 2013*

[61] *See Appendix p. 30-31, Valdes letter dated November 26, 2013.*

[62] *See Appendix p. 100, Texas Property Code Section 209.006 and the Bylaws of the Association.*

[63] See Appendix p. 7-23, Bylaws of the Association.   The only notes of the 11-13-13, Hearing were contained in handwritten minutes of the 11-13-2013, by Diane Bottema.  Ms. Bottema's notes do not comply with Tex. Prop. Code § 209.006 because they do not indicate the sanction imposed.

[64] *See Appendix p. 7-23, Bylaws of the Association*

[65] *See Violation Notice, dated October 22, 2013, Appendix p. 1.*

[66] See Court Record p. 788, 789, 790, 791 Appellants' requests for documents.

[67] *See Appendix p. 32-33, letter from Alex Valdes, Esq., January 13, 2014*

[68] *See Appendix p. 90-93 Texas Property Code § 209.005.*

[69] *See Appendix p. 32-33* letter from Alex Valdes, Esq., January 13, 2014.

[70] *See statement by Judge Phillips indicating the rules change once suit if filed transcript July 1, 2014, Motion to Compel Court Record p. 1176 to 1186.*

[71] *See Transcript of Motion to Compel dated May 28, 2014* p. Court Record 1176-1186.

[72] *See Court Record p. 792-793, letter from Alex Valdes, Esq., dated January 13, 2014.*

[73] *See Court Record p.* 788, 789, 790, 791 Appellants' requests for documents  *and* Appellee's responses to Appellants' requests for records 792-793, 794, 793-796, 797.

[74] *See* Court Record appellants', December 9, 2013, letter to Diane Bottema p. 788.

[75] *See Court Record* letter from Alex Valdes Esq., to Wesley Spears, dated January 13, 2014 p. 792-793.

[76] *See Appendix p. 34 appellants' letter to David Campbell dated May 23, 2014*

[77] *See Court Record p. 788-791*, letter from David Campbell to Wesley Spears dated June 10, 2014.

[78] *See Court Record 788-791*, Appellants' letter to Diane Bottema dated June 12, 2014.

[79] *See Court Record p. 788-791*, letter from David Campbell to the appellants dated June 18, 2014.  *See Court Record 788-791 and Court Record p. 407, Plaintiff's Motion for Partial Summary Judgment, Exhibit 15, letter to Diane Bottema requesting copies of all the books and records of the Association, dated June 18, 2014.*

83.

[80] *See Court Record 788-791*, Letter from David Campbell to appellants dated June 20, 2014.

[81] *See Court Record p.* 788, 789, 790, 791 Appellants' requests for documents.

[82] *See Appendix p. 72-84, Transcript of the Depositon of Ranier Ficken, Exhibit 2, documents produced by Mr. Ficken at his deposition.*

[83] *See Court record* appellee's responses to appellants' requests for records 792-793, 794, 793-796, 797.

[84] *See Court Record p. 804-816 appellants' Fourth Amended Complaint 804-816.* See also Court Record appellants' Fifth Amended Complaint p 922-939.

[85] See Appendix *p. 119, U.S. Const. Amendment 14*.

[86] See Appendix *p. 120, Texas Const. Art. 1 § 19.*

[87] *See Court Record p 965-966*, Affidavit of Wesley Spears attached to appellants' Motion for Continuance.

[88] *See Appendix p. 37*, Court's Order Granting Appellee's Motion for Traditional and No-Evidence Summary Judgment.

[89] See Court Record Affidavit of Wesley Spears attached as an exhibit to Appellant's Motion for Continuance 961-968.

[90] *See Appendix p. 113-114,Texas Deceptive Trade Practices Act §§ 17.50 and 1746.*

[91] *See Appendix p. 63-67, Transcript of Deposition of Ranier Ficken pages 42-46.*

[92] See Court Record p. 966-968, Affidavits of Jonathan Concepcion and Vahness Swilley Concepcion attached to Appellants' Motion for Continuance attesting to the fact that appellant, Wesley Spears' name was left off the ballot for neighborhood representative in support of appellants DTPA claims.

[93] See Court Record Motion for Continuance election ballots with appellant, Wesley Spears name omitted Court Record 961-968 not legible. See also, Appendix p. legible copies of election ballots with appellant, Wesley Spears' name omitted Exhibit to Ranier Ficken's deposition.

[94] *See Court Record p. 863-873, Appellee's Motion to Quash the deposition of Diane Boykin.*

[95] *See Appendix p. 121,Texas Rules of Civ. Proc., Rule 18b(b)(1).*

[96] *See Appendix p. 122, Texas Rules of Civ. Proc., Rule 18a (j) (2)*

[97] *See Statements by Judge Phillips demonstrating his bias: See Transcript of July 1, appellants' Motion to Compel Deposition of Diane Bottema p. 23-26, Judge Phillips made the following comments: "The Court: You got good common sense I hope. Mr. Spears: I think so. The court: That's what were counting on… Counsel, when they first came here and filed their motion for summary judgment, they felt there wasn't any discovery that was necessary before the summary judgment motions were heard. I know agree with them…. The court: I was going to ask if you filed a request for production. Mr. Spears: Yes. And I requested all the Books and Records of the Association, which is everything. The Court: You're not going to get that. Mr. Spears: Well, I will get whatever I'm going to get. The Court: Well, no. They're going to object that it's overly broad and burdensome and I'm going to sustain it… The Court: Shakespeare wrote a play about this case didn't he? I can't remember whether it was a*

*"Comedy* of Errors" or "Much Ado about Nothing.  Mr. Spears: Well, it is much ado about nothing.  I agree with you there."

WESLEY SPEARS AND RENEE JACOBS, APPELLANTS

V.

FALCON POINTE COMMUNITY ASSOCIATION, APPELLEE

NO. 03-14-00650

MARCH 5, 2015

**APPELLANTS' APPENDIX TO THEIR OPENING BRIEF**

Wesley S. Spears, State Bar No. 18898400, Spears Law, 401 Congress Avenue., Suite 1540, Austin, Texas 78701, Tel. 512-696-2222, Fax. 512-687-3499 Attorney for Appellants.

Appeal from County Court One of Travis County, Texas

C-1-CV-13-010214

**IDENTITY OF PARTIES AND COUNSEL**

Appellants, Wesley Spears and Renee Jacobs

Appellants' counsel

Wesley S. Spears, State Bar No. 18898400, Spears Law, 401 Congress Avenue., Suite 1540, Austin, Texas 78701, Tel (512)696-2222, Fax. 512-687-3401.

Appellee, Falcon Pointe Community Homeowners' Association

Appellee's Counsel

David Chamberlain, Chamberlain and McHaney, 301 Congress Avenue, 22nd Floor, Austin, Texas 78701 Tel. 512-474-9124, Fax. 512-474-8582

# TABLE OF CONTENTS

Subject October 22, 2013, Violation Notice...................................................p. 1

Emails Between appellants and Dian Bottema...............................................p. 2-3

Articles of Incorporation of the Association...............................................p. 4-6

By Laws of the Association...................................................................p. 7-23

Election Ballot...............................................................................p. 24-25

Affidavit of Wesley Spears....................................................................p. 26-27

Affidavit of Vahness Swilley-Concepcion......................................................p. 28.

Affidavit of Jonathan Concepcion.............................................................p. 29

Alex Valdes November 26, 2013, letter announcing the Board's Business Judgment p. ...................................................................................................p. 30-31

Alex Valdes' January 13, 2014 Letter refusing to produce records.................p. 32-33

Wesley Spears May 23, 2014, Letter to David Campbell.......................................p. 34

Court's Order Deny Plaintiffs' Motion to Compel Deposition............................p. 35

Order Denying Plaintiffs' Motion for Partial Summary Judgment....................p. 36

Final Judgment................................................................................p. 37

Order on Defendants' Objections to the Plaintiffs' Summary Judgment evidence ...................................................................................................p. 38-39

Order Denying plaintiffs' Second Motion to Recuse Judge Phillips...................p. 40

Diane Bottema's Deposition Transcript ....................................................p. 41-52

Deposition Transcript of Ranier Ficken....................................................p. 53-71

Exhibit 2 to Ficken Deposition...............................................................p. 72-84

Chapter 209. Texas Residential Property Owners Protection Act...................p. 85-112

V.T.C.A. Bus. & C. § 1750....................................................................p.113

V.T.C.A. Bus. & C. § 17.46............................................................p. 114

Emails from Darryl Sanders asking counsel to communicate by email........p. 115-116

Deposition Transcript of Ranier Ficken............................................p. 117-118

Fourteenth Amendment to the U.S. Constitution.............................p. 119-120

Texas Constitution Article 1 § 19....................................................p. 121-122

Rule 166a Summary Judgment.........................................................p. 123-124

Rule 193 (a)...................................................................................p. 125-126

# Falcon Pointe

## c/o Goodwin Management, Inc.
## 11149 Research Blvd. Suite 100, Austin TX 78759-5227

### Office (512) 670-1400

October 22, 2013

UnitKey:  20319
VID:  395803

Wesley Spears and Renee Jacobs
2913 Dusty Chisolm Trl
Pflugerville, TX 78660

**RE:  2nd violation - 2913 Dusty Chisolm Trail**
**Violation Date - 10/22/2013; Fine Assessed: $25.00**
**Property Inspected by Johnathon Morales**

BY CERTIFIED AND REGULAR MAIL
RETURN RECEIPT REQUESTED

Dear Homeowner:

As the owner of the above captioned property it is your responsibility to comply with the Conditions, Covenants, and Restrictions (CCR's) and rules and regulations concerning the association.  Please accept this letter as a courteous reminder that you are in violation of the CCR's and/or rules and regulations as follows:

Improvement - Improvements not in conformance with CCRs/Rules of the association

Comments:  Lattice work on fence is noncompliant with Falcon Pointe Community HOA guidelines. Please remove before next inspection in August. Failure to address this issue before the next inspection will result in additional violations and a $50 fine. We appreciate your attention to this matter.

The Board, acting on behalf of all the owners, sets the policy to enforce the CCR's and rules and regulations in order to preserve and enhance property values.

Your cooperation in curing any existing violations and preventing future violations is greatly appreciated.

on behalf of the Board of Directors of Falcon Pointe,

*Diane Bottema*

Diane Bottema, Property Manager
direct office line (512) 670-1400
email: falconpointemanager@goodwintx.com

*The following information is required by law: As the property owner you are entitled to a reasonable period of time to cure this violation if the association has not notified you of the same or a similar violation within the past 6 months in order to avoid any fines or any suspension of your rights as an association member. If this violation, or a similar type of violation, has occurred in the past six months, you may be liable for fines. If a fine has been assessed, it is noted in this letter. You may request a hearing before the Board to discuss and verify facts and resolve the matter in issue. Your written request for a hearing must be submitted within 30 days of your receipt of this letter. Any such hearing will take place within 30 days following the date your request is received by the Board. In the event an attorney is retained to enforce compliance or the collection of any money due to the association, you will be responsible for the payment of attorney's fees and/or costs of collection after the expiration of 30 days of the date you receive this letter if no hearing has been requested, or immediately after any such hearing provided the Board does not waive the fine(s). Owners may have special rights or relief reltated to the enforcement action under federal law, including the Servicemembers Civil Relief Act (50 USC app. Section 501 et seq) if an owner is service on active military duty. Please notify us immediately if you are a service member.*

1.

Compose

Inbox

Drafts (99+)

Sent

Spam (99+)

Trash (20)

Folders

Recent

Messenger

Calendar

Contacts

Notepad

Yahoo Mail for Mobile

Send Feedback

↩ Search results    ↩ ⇜ ⇝    🗑 Delete    📁 Move ⌄    ⊗✕Sp

Courtesy Notice Violation 2913 Dusty Chisolm... (5)



**Falcon Pointe Manager**                                Aug 6
To Me

Mr. Spears,
I spoke to the Board president today and showed him the
photo of your home. We have two issues here, the first being
that the pool pumps cannot be installed in front of the fence.
Please contact Cody Pools and have them move the fence
forward or move the pump back behind the fence. This was
not made clear on the pool plan submitted. Secondly, the
lattice must be removed from the top of the fence. Fences can
be a maximum height of 6 ft.


*Best Regards,*


*Diane Bottema*
*Community Association Manager*
*Falcon Pointe Community Association, Inc.*
*19015 Falcon Pointe Blvd.*
*512-670-1400 office*
*Diane.Bottema@Goodwintx.com*


**From:** Wesley Spears [mailto:wesleys637@yahoo.com]
**Sent:** Tuesday, July 30, 2013 6:48 PM
**To:** Falcon Pointe Manager
**Subject:** Re: Courtesy Notice Violation 2913 Dusty Chisolm Trail

Dear Ms. Bottema:

I am in receipt of your violation letter dated July 26. I will follow with a
written request for a Hearing within thirty days. I will need some time to
investigate this matter and explore my legal rights in relation to what I
perceive as numerous violations of the Rules and Regulations of the HOA
by various tenants. First the lots on the side of my house where the
lattice was attached to the fence is full of tall weeds. That have been cut
once that I know of in six months, necessitating in part the use of the
lattice. Second the lattice doe not raise the fence height since the fence
sits in a whole three feet below ground on which my house sits on even
though it is only four feet from the house. When I look over the fence on
that side the top of the fence is barely chest high. I would gladly just
increase the height of the fence if that is acceptable I thought lattice
would be less objectionable. When the houses are built in front of the
lattice I am sure the neighbors are not going to want me to be able to
look directly over the fence into their back yard with out obstruction every
time come out of my back door or use my grill. These yards are
supposed to provide some privacy the fence as constructed does not do
that. I will also talk to Lennar. I take this matter very seriously and would
be happy with any solution which provides me with the same level of
privacy which ever other homeowner to my knowledge has which will be
part of my investigation. I do not think we should be discriminated
against and given less privacy than every other home owner. I think it is
obvious that we as much as any other homeowner has made great raised
the value of our home and the other homes in the neighborhood. I will
be happy to meet to discuss my concerns. I would ask that the lattice
remain up until hearing is held and I can explore my options.

Sincerely,


Wesley                                2.

Reply, Reply All or Forward | More



Home    Mail    News    Sports    Finan    Weather    Games    Groups    Answers    Flickr    Mobile    More ⌄

✏ Compose

✉ Inbox
▦ Drafts (99-)
✈ Sent
🛡 Spam (99+)
🗑 Trash (20)
▦ Folders
▦ Recent

◉ Messenger
📅 Calendar
▦ Contacts
▦ Notepad

⎯ Yahoo Mail for Mobile
▱ Send Feedback

◀ Search results    ↰    ↞    ↦    🗑 Delete    ▣ Move ⌄    ⊗ Sp

### Courtesy Notice Violation 2913 Dusty Chisolm... (5)

**Falcon Pointe Manager**    📎 Aug 6
To Me

Yes, the fence in the attached photo needs to be moved forward to screen the pool pump and the lattice removed from the fence. In a situation such as this, the Board President may speak on behalf of the Board of Directors when the home is in direct violation of the Deed Restrictions.

*Best Regards,*

*Diane Bottema*
*Community Association Manager*
*Falcon Pointe Community Association, Inc.*
*19015 Falcon Pointe Blvd.*
*512-670-1400 office*
*Diane.Bottema@Goodwintx.com*

**From:** Wesley Spears [mailto:wesleys637@yahoo.com]
**Sent:** Tuesday, August 06, 2013 5:01 PM
**To:** Falcon Pointe Manager
**Subject:** Re: Courtesy Notice Violation 2913 Dusty Chisolm Trail

Hi Diane:

First, I have thirty days to request a hearing I intend to request a hearing. Secondly, what fence do you want moved forward just the short section that fronts the yard. There is no fence present on the side because Centerra has not installed the fence as required. I request an on site meeting to discuss my options prior to filing my request for a Hearing. There should be a logically solution but I need some guidance regarding what your looking for. Please contact me at 5125178280 to schedule an onsite meeting. I thought the association worked through a Board and the Chairman should not make rulings without putting them to a vote. I am continuing to investigate this matter and reserve my rights to take all legal options available to me.

Thanks,

Wesley Spears, Esq.,

**From:** Falcon Pointe Manager <FalconPointeManager@goodwintx.com>
**To:** 'Wesley Spears' <wesleys637@yahoo.com>
**Sent:** Tuesday, August 6, 2013 4:49 PM
**Subject:** RE: Courtesy Notice Violation 2913 Dusty Chisolm Trail

Mr. Spears,
I spoke to the Board president today and showed him the photo of your home. We have two issues here, the first being that the pool pumps cannot be installed in front of the fence. Please contact Cody Pools and have them move the fence forward or move the pump back behind the fence. This was not made clear on the pool plan submitted. Secondly, the lattice must be removed from the top of the fence. Fences can be a maximum height of 6 ft.

*Best Regards,*                    3.

*Diane Bottema*
*Community Association Manager*

# ARTICLES OF INCORPORATION
## OF
## FALCON POINTE COMMUNITY ASSOCIATION, INC.

I, the undersigned, being of the age of eighteen years or more, acting as incorporator of a corporation under the Texas Non-Profit Corporation Act, Article 1396-1.01, et seq., as it may be amended, do hereby adopt the following Articles of Incorporation for such corporation:

Article 1.　　Name. The name of the corporation is Falcon Pointe Community Association, Inc. ("Corporation" or "Association").

Article 2.　　Duration. The Corporation shall have perpetual duration.

Article 3.　　Applicable Statute. The Corporation is a non-profit corporation organized pursuant to the provisions of the Texas Non-Profit Corporation Act, Article 1396-1.01, et seq.

Article 4.　　Purposes and Powers. The Corporation does not contemplate pecuniary gain or profit, direct or indirect, to its members.

　　　　(a)　　By way of explanation and not of limitation, the purposes for which the Corporation is formed are:

　　　　　　(i)　　to be and constitute the Association to which reference is made in the Declaration of Protective Covenants for Falcon Pointe, recorded, or to be recorded, in the Office of the County Clerk of Travis County, Texas, as it may be amended from time to time (the "Declaration"), to perform all obligations and duties of the Association, and to exercise all rights and powers of the Association, as specified therein, in the Bylaws of Falcon Pointe Community Association, Inc. ("Bylaws"), and as provided by law; and

　　　　　　(ii)　　to provide an entity for the furtherance of the interests of the owners of property subject to the Declaration.

　　　　(b)　　In furtherance of its purposes, the Corporation shall have the following powers, which, unless indicated otherwise by the Declaration or Bylaws, may be exercised by the Board of Directors:

　　　　　　(i)　　all of the powers conferred upon non-profit corporations by common law and the statutes of the State of Texas in effect from time to time;

　　　　　　(ii)　　all of the powers necessary or desirable to perform the obligations and duties and to exercise the rights and powers set out in these Articles of Incorporation, the Bylaws or the Declaration, including, without limitation, the following:

　　　　　　　　(A)　　to fix, levy, and collect assessments and other charges to be levied against the property subject to the Declaration and to enforce payment thereof by any lawful means;

(B)     to manage, control, operate, maintain, preserve, repair and improve property subject to the Declaration or any other property for which the Corporation by rule, regulation, declaration or contract has a right or duty to provide such services;

(C)     to enforce covenants, conditions or restrictions affecting any property to the extent the Corporation may be authorized to do so under the Declaration or Bylaws;

(D)     to engage in activities which will actively foster, promote and advance the common interests of all owners of property subject to the Declaration;

(E)     to buy or otherwise acquire, sell or otherwise dispose of, mortgage or otherwise encumber, exchange, lease, hold, use, operate and otherwise deal in and with real, personal and mixed property of all kinds and any right or interest therein for any purpose of the Corporation, which shall include the power to foreclose its lien on any property subject to the Declaration by judicial or non-judicial means;

(F)     to borrow money for any purpose, subject to such limitations as may be contained in the Bylaws;

(G)     to enter into, make, perform or enforce contracts of every kind and description, and to do all other acts necessary, appropriate or advisable in carrying out any purpose of the Corporation, with or in association with any other association, corporation or other entity or agency, public or private;

(H)     to act as agent, trustee, or other representative of other corporations, firms or individuals, and as such, to advance the business or ownership interests in such corporations, firms or individuals;

(I)     to adopt, alter and amend or repeal such Bylaws as may be necessary or desirable for the proper management of the affairs of the Association; provided, however, such Bylaws may not be inconsistent with or contrary to any provisions of the Declaration; and

(J)     to provide or contract for services benefiting the property subject to the Declaration, including, without limitation, garbage removal and any and all supplemental municipal services as may be necessary or desirable.

The foregoing enumeration of powers shall not limit or restrict in any manner the exercise of other and further rights and powers which may now or hereafter be allowed or permitted by law; provided none of the objects or purposes herein set out shall be construed to authorize the Corporation to do any act in violation of the Texas Non-Profit Corporation Act, and all such objects or purposes are subject to said Act.

The powers specified in each of the paragraphs of this Article 4 are independent powers, not to be restricted by reference to or inference from the terms of any other paragraph or provision of this Article 4.

Article 5.     Definitions. All capitalized terms used in these Articles of Incorporation shall be defined in the same manner as defined in the Declaration, which definitions are incorporated herein by this reference.

Article 6.    Membership.  The Corporation shall be a membership corporation without certificates or shares of stock. All Owners (as defined in the Declaration), by virtue of their ownership of Units subject to the Declaration, are members of the Association.  The members shall be divided into classes and entitled to vote in accordance with the Bylaws.

Article 7.    Board of Directors.  The business and affairs of the Corporation shall be conducted, managed and controlled by a Board of Directors.  The Board shall consist of no less than three (3) and no more than five (5) members.  The initial Board of Directors shall consist of the following three (3) members:

E. William Meyer                    Dennis Guerra
1717 West 6ᵗʰ Street, #220          1717 West 6ᵗʰ Street, #220
Austin, TX  78703                   Austin, TX  78703

Daniel Gilpin
1207 South White Chapel Boulevard, #150
Southlake, TX  76092

The method of election, term of office, removal and filling of vacancies shall be as set forth in the Bylaws.

Article 8.    Liability of Directors.  To the fullest extent permitted by Texas statutes, as the same exist or as they may hereafter be amended (but, in the case of such amendment, only to the extent that such amendment permits broader limitation than permitted prior to such amendment), a director of the Corporation shall not be personally liable to the Corporation for monetary damages for an act or omission in the director's capacity as a director.  Any repeal or amendment of this Article by the Corporation shall be prospective only and shall not adversely offset any limitation on the personal liability of a director of the Corporation existing at the time of such repeal or amendment.

Article 9.    Dissolution. The Corporation may be dissolved only as provided by the Bylaws and by the laws of the State of Texas. Any dissolution shall be subject to the terms of Article 11 hereof, if applicable.

Article 10.   Amendments.  Subject to the provisions of the Texas Non-Profit Corporation Act, these Articles of Incorporation may be amended as set forth in the Declaration or Bylaws.

Article 11.   Registered Agent and Office.  The initial registered office of the Corporation is 350 North St. Paul Street, Suite 2900, Dallas, Texas 75201, and the initial registered agent at such address is CT Corporation System.

Article 12.   Incorporator.  The name and address of the incorporator are as follows:

Michael M. Watson
3030 LBJ Freeway, Suite 1500
Dallas, Texas 75234

IN WITNESS WHEREOF, the undersigned incorporator has executed these Articles of Incorporation this ____ day of _____, 2001.

_____
Michael M. Watson, Incorporator

BY-LAWS

OF

FALCON POINTE COMMUNITY ASSOCIATION, INC.

Article I
Name, Principal Office and Definitions

Section 1.    Name.  The name of the Association shall be Falcon Pointe Community Association, Inc. (hereinafter sometimes referred to as the "Association").

Section 2.    Principal Office.  The principal office of the Association in the State of Texas shall be located in Travis County.  The Association may have such other offices, either within or outside the State of Texas, as the Board of Directors may determine or as the affairs of the Association may require.

Section 3.    Definitions.  The words used in these By-Laws shall have the same meaning as set forth in that Declaration of Protective Covenants for Falcon Pointe recorded in the Travis County, Texas public records (said Declaration, as amended, renewed, or extended from time to time, is hereinafter sometimes referred to as the "Declaration"), unless the context shall prohibit.

Article II
Association:  Membership, Meetings, Quorum, Voting, Proxies

Section 1.    Membership.  The Association shall have two (2) classes of membership, Class "A" and Class "B", as more fully set forth in the Declaration, the terms of which pertaining to membership are specifically incorporated herein by reference.

Section 2.    Place of Meetings.  Meetings of the Association shall be held at the principal office of the Association or at such other suitable place convenient to the Members as may be designated by the Board of Directors either within the Properties or as convenient thereto as possible and practical.

Section 3.    Annual Meetings.  The first meeting of the Association, whether a regular or special meeting, shall be held within one (1) year from the date of incorporation of the Association.  Meetings shall be of the Voting Representatives or their alternates.  Subsequent regular annual meetings shall be set by the Board so as to occur at least one hundred and fifty (150) but not more than one hundred eighty (180) days after the close of the Association's fiscal year on a date and at a time set by the Board of Directors.

7.

Section 4. <u>Special Meetings</u>. The President may call special meetings. In addition, it shall be the duty of the President to call a special meeting of the Association if so directed by resolution of a majority of a quorum of the Board of Directors or upon a petition signed by Voting Representatives representing at least ten (10%) percent of the total Class "A" votes of the Association. The notice of any special meeting shall state the date, time and place of such meeting and the purpose thereof. No business shall be transacted at a special meeting except as stated in the notice.

Section 5. <u>Notice of Meetings</u>. Written or printed notice stating the place, day, and hour of any meeting of the Voting Representatives shall be delivered, either personally or by mail, to each Voting Representative entitled to vote at such meeting, not less than ten (10) nor more than fifty (50) days before the date of such meeting, by or at the direction of the President or the Secretary or the officers or persons calling the meeting.

In the case of a special meeting or when required by statute or these By-Laws, the purpose or purposes for which the meeting is called shall be stated in the notice. No business shall be transacted at a special meeting except as stated in the notice.

If mailed, the notice of a meeting shall be deemed to be delivered when deposited in the United States mail addressed to the Voting Representative at his or her address as it appears on the records of the Association, with postage thereon prepaid.

Section 6. <u>Waiver of Notice</u>. Waiver of notice of a meeting of the Voting Representatives shall be deemed the equivalent of proper notice. Any Voting Representative may, in writing, waive notice of any meeting of the Voting Representatives, either before or after such meeting. Attendance at a meeting by a Voting Representative or alternate shall be deemed waiver by such Voting Representative of notice of the time, date and place thereof, unless such Voting Representative specifically objects to lack of proper notice at the time the meeting is called to order. Attendance at a special meeting shall also be deemed waiver of notice of all business transacted thereat unless objection to the calling or convening of the meeting, of which proper notice was not given, is raised before the business is put to a vote.

Section 7. <u>Adjournment of Meetings</u>. If any meeting of the Association cannot be held because a quorum is not present, a majority of the Voting Representatives who are present at such meeting, either in person or by alternate, may adjourn the meeting to a time not less than five (5) nor more than thirty (30) days from the time the original meeting was called. At the reconvened meeting, if a quorum is present, any business which might have been transacted at the meeting originally called may be transacted. If a time and place for reconvening the meeting is not fixed by those in attendance at the original meeting or if for any reason a new date is fixed for reconvening the meeting after adjournment, notice of the time and place for reconvening the meeting shall be given to Voting Representatives in the manner prescribed for regular meetings.

The Voting Representatives present at a duly called or held meeting at which a quorum is present may continue to do business until adjournment, notwithstanding the withdrawal of enough Voting Representatives to leave less than a quorum, provided that Voting Representatives or their alternates representing at least twenty-five (25%) percent of the total Class "A" votes of the Association remain in attendance, and provided further that any action taken is approved by at least a majority of the Members required to constitute a quorum.

Section 8.    Voting. The voting rights of the Members shall be as set forth in the Declaration, and such voting rights provisions are specifically incorporated herein.

Section 9.    Proxies. Voting Representatives may not vote by proxy but only in person or through their designated alternates.

Section 10.    Majority. As used in these By-Laws, the term "majority" shall mean those votes, owners, or other group as the context may indicate totaling more than fifty (50%) percent of the total eligible number.

Section 11.    Quorum. Except as otherwise provided in these By-Laws or in the Declaration, the presence in person or by alternate of the Voting Representatives representing a majority of the total eligible Class "A" votes in the Association shall constitute a quorum at all meetings of the Association. Any provision in the Declaration concerning quorums is specifically incorporated herein.

Section 12.    Conduct of Meetings. The President shall preside over all meetings of the Association, and the Secretary or designated Managing Agent shall keep the minutes of the meeting and record in a minute book all resolutions adopted at the meeting, as well as a record of all transactions occurring at the meeting.

Section 13.    Action Without A Meeting. Any action required by law to be taken at a meeting of the Voting Representatives, or any action which may be taken at a meeting of the Voting Representatives, may be taken without a meeting if written consent shall have the same force and effect as a unanimous vote of the Voting Representatives.

Article III
Board of Directors: Number, Powers, Meetings

A.    Composition and Selection.

Section 1.    Governing Body: Composition. The affairs of the Association shall be governed by a Board of Directors, each of whom shall have one (1) vote. Except with respect to directors appointed by the Class "B" Member, the directors shall be Members or spouses of such Members; provided, however, no person and his or her spouse may serve on the Board at the same time. In the case of an Owner which is a corporation or partnership, the person designated in writing to the secretary of the

9.

Association as the representative of such corporation or partnership shall be eligible to serve as a director.

Section 2.    Directors During Declarant Control Period.    Subject to the provision of Section 6 below, the directors shall be selected by the Class "B" Member acting in its sole discretion and shall serve at the pleasure of the Class "B" Member until the first to occur of the following:

(a)    when one hundred (100%) percent of the total number of Units permitted for the property described on the land use plan ("General Land Use Plan") for the development of Falcon Pointe, as it may be amended, which includes all of the property described in Exhibit A to the Declaration and all or a portion of the property described in Exhibit C to the Declaration have been conveyed to Persons other than the Declarant or builders holding title solely for purposes of development and sale; or

(b)    when, in its discretion, the Class "B" Member so determines.

Section 3.    Right To Disapprove Actions.    This Section 3 may not be amended without the express, written consent of the Class "B" Member as long as the Class "B" membership exists.

So long as the Class "B" membership exists, the Class "B" Member shall have a right to disapprove actions of the Board and any committee, as is more fully provided in this Section. This right shall be exercisable only by the Class "B" Member, its successors, and assigns who specifically take this power in a recorded instrument. The right to disapprove shall be as follows:

No action authorized by the Board of Directors or any committee shall become effective, nor shall any action, policy, or program be implemented until and unless:

(a)    The Class "B" Member shall have been given written notice of all meetings and proposed actions approved at meetings of the Board or any committee thereof by certified mail, return receipt requested, or by personal delivery at the address it has registered with the Secretary of the Association, as it may change from time to time, which notice complies as to the Board of Directors meetings with Article III, Sections 8, 9 and 10, of these By-Laws and which notice shall, except in the case of the regular meetings held pursuant to the By-Laws, set forth in reasonable particularity the agenda to be followed at said meeting; and

(b)    The Class "B" Member shall be given the opportunity at any such meeting to join in or to have its representatives or agents join in discussion from the floor of any prospective action, policy, or program to be implemented by the Board, any committee thereof, or the Association. The Class "B" Member, its representatives or agents shall make its concerns, thoughts, and suggestions known to the members of the subject committee and/or the Board. The Class "B" Member shall have and is hereby granted a right to disapprove any such action, policy, or program authorized by the Board of

Directors or any committee thereof and to be taken by the Board, such committee, the Association, or any individual member of the Association, if Board, committee, or Association approval is necessary for such action. This right may be exercised by the Class "B" Member, its representatives, or agents at any time within ten (10) days following the meeting held pursuant to the terms and provisions hereof. This right to disapprove may be used to block proposed actions but shall not extend to the requiring of any action or counteraction on behalf of any committee, or the Board or the Association. The Class "B" Member shall not use its right to disapprove to reduce the level of services which the Association is obligated to provide or to prevent capital repairs or any expenditure required to comply with applicable laws and regulations.

Section 4.     Number of Directors. The number of directors in the Association shall be not less than three (3) nor more than five (5), as provided in Section 6 below. The initial Board shall consist of three (3) members as identified in the Articles of Incorporation.

Section 5.     Nomination of Directors. Except with respect to directors selected by the Class "B" Member, nominations for election to the Board of Directors shall be made by a Nominating Committee. The Nominating Committee shall consist of a Chairman, who shall be a member of the Board of Directors, and three (3) or more Voting Representatives. The Nominating Committee shall be appointed by the Board of Directors not less than thirty (30) days prior to each annual meeting of the Voting Representatives to serve a term of one (1) year or until their successors are appointed, and such appointment shall be announced at each such annual meeting. The Nominating Committee shall make as many nominations for election to the Board of Directors as it shall in its discretion determine, but in no event less than the number of positions to be filled. Nominations shall also be permitted from the floor. All candidates shall have a reasonable opportunity to communicate their qualifications to the Voting Representatives and to solicit votes.

Section 6.     Election and Term of Office. Notwithstanding any other provision contained herein:

(a)     Within thirty (30) days after the time Class "A" Members, other than the Declarant or a builder holding title solely for purposes of development and sale, own fifty (50%) percent of the Units permitted for the property described on the General Land Use Plan or whenever the Class "B" Member earlier determines, the Association shall call a special meeting at which Voting Representatives shall elect one (1) of the directors. The remaining directors shall be appointees of the Class "B" Member. The director elected by the Voting Representatives shall not be subject to removal by the Class "B" Member acting alone and shall be elected for a term of two (2) years or until the happening of the event described in subsection (b) below, whichever is shorter. If such director's term expires prior to the happening of the event described in subsection (b) below, a successor shall be elected for a like term.

11.

(b)     Within thirty (30) days after the time Class "A" Members, other than the Declarant or a builder holding title solely for purposes of development and sale, own seventy-five (75%) percent of the Units permitted for the property described on the General Land Use Plan or whenever the Class "B" Member earlier determines, the Board shall be increased to five (5) directors.  The Association shall call a special meeting at which Voting Representatives representing the Class "A" Members shall elect two (2) of the five (5) directors, who shall serve as at-large directors.  The remaining three (3) directors shall be appointees of the Class "B" Member.  The directors elected by the Voting Representatives shall not be subject to removal by the Class "B" Member acting alone and shall be elected for a term of two (2) years or until the happening of the event described in subsection (c) below, whichever is shorter.  If such directors' terms expire prior to the happening of the event described in subsection (c) below, successors shall be elected for a like term.

(c)     Within thirty (30) days after termination of the Declarant Control Period, the Association shall call a special meeting at which Voting Representatives representing the Class "A" Members shall elect three (3) of the five (5) directors.  The remaining two (2) directors shall be appointees of the Class "B" Member.  The directors elected by the Voting Representatives shall not be subject to removal by the Class "B" Member acting alone and shall serve until the first annual meeting following the termination of the Declarant Control Period.  If such annual meeting is required to be held within ninety (90) days after termination of the Declarant Control Period, this subsection shall not apply and directors shall be elected in accordance with subsection (d) below.

(d)     At the first annual meeting of the membership after the termination of the Declarant Control Period, the directors shall be selected as follows: Five (5) directors shall be elected by the Voting Representatives.  Three (3) directors shall be elected for a term of one (1) year.  At the expiration of the initial term of office of each member of the Board of Directors and at each annual meeting thereafter, a successor shall be elected to serve for a term of two (2) years.

Each Voting Representative shall be entitled to cast one (1) vote with respect to each vacancy to be filled.  There shall be no cumulative voting.  The candidate(s) receiving the most votes shall be elected.  The directors elected by the Voting Representatives shall hold office until their respective successors have been elected by the Association.  Directors may be elected to serve any number of consecutive terms.

Section 7.     Removal of Directors and Vacancies.  Any director elected by the Voting Representatives may be removed, with or without cause, by the vote of Voting Representatives holding a majority of the votes entitled to be cast for the election of such director.  Any director whose removal is sought shall be given notice prior to any meeting called for that purpose.  A director who was elected solely by the votes of Voting Representatives other than the Declarant may be removed from office prior to the expiration of his or her term only by the votes of a majority of Voting Representatives other than the Declarant.  Upon removal of a director, a successor shall then and there be

12.

elected by the Voting Representatives entitled to elect the director so removed to fill the vacancy for the remainder of the term of such director.

Any director elected by the Voting Representatives who has three (3) consecutive unexcused absences from Board meetings, who is delinquent in the payment of any assessment or other charge due the Association for more than thirty (30) days, or who is in violation of the Declaration may be removed by a majority of the directors present at a regular or special meeting at which a quorum is present, and a successor may be appointed by the Board to fill the vacancy for the remainder of the term. In the event of the death, disability, or resignation of a director, a vacancy may be declared by the Board, and it may appoint a successor.

B.    Meetings.

Section 8.    Organizational Meetings.   The first meeting of the Board of Directors shall be held prior to the Association conducting business.

Section 9.    Regular Meetings.   Regular meetings of the Board of Directors may be held at such time and place as shall be determined from time to time by a majority of the directors, but at least four (4) such meetings shall be held during each fiscal year with at least one (1) per quarter. Notice of the time and place of the meeting shall be communicated to directors not less than four (4) days prior to the meeting; provided, however, notice of a meeting need not be given to any director who has signed a waiver of notice or written consent to holding of the meeting.

Section 10.    Special Meetings.   Special meetings of the Board of Directors shall be held when called by written notice signed by the President of the Association or by any three (3) directors. The notice shall specify the time and place of the meeting and the nature of any special business to be considered. The notice shall be given to each director by one of the following methods: (a) by personal delivery; (b) written notice by first class mail, postage prepaid; (c) by telephone communication, either directly to the director or to a person at the director's office or home who would reasonably be expected to communicate such notice promptly to the director; or (d) by telegram, charges prepaid. All such notices shall be given at the director's telephone number or sent to the director's address as shown on the records of the Association. Notices sent by first class mail shall be deposited into a United States mailbox at least four (4) days before the time set for the meeting. Notices given by personal delivery, telephone, or telegraph shall be delivered, telephoned, or given to the telegraph company at least seventy-two (72) hours before the time set for the meeting.

Section 11.    Waiver of Notice.   The transactions of any meeting of the Board of Directors, however called and noticed or wherever held, shall be as valid as though taken at a meeting duly held after regular call and notice if (a) a quorum is present, and (b) either before or after the meeting each of the directors not present signs a written waiver of notice, a consent to holding the meeting, or an approval of the minutes. The waiver of notice or consent need not specify the purpose of the meeting. Notice of a meeting shall

13.

also be deemed given to any director who attends the meeting without protesting before or at its commencement about the lack of adequate notice.

Section 12. <u>Quorum of Board of Directors</u>. At all meetings of the Board of Directors, a majority of the directors shall constitute a quorum for the transaction of business, and the votes of a majority of the directors present at a meeting at which a quorum is present shall constitute the decision of the Board of Directors. A meeting at which a quorum is initially present may continue to transact business, notwithstanding the withdrawal of directors, if any action taken is approved by at least a majority of the required quorum for that meeting. If any meeting of the Board cannot be held because a quorum is not present, a majority of the directors who are present at such meeting may adjourn the meeting to a time not less than five (5) nor more than thirty (30) days from the date the original meeting was called. At the reconvened meeting, if a quorum is present, any business which might have been transacted at the meeting originally called may be transacted without further notice.

Section 13. <u>Compensation</u>. No director shall receive any compensation from the Association for acting as such unless approved by Voting Representatives representing a majority of the total Class "A" vote of the Association at a regular or special meeting of the Association; provided any director may be reimbursed for expenses incurred on behalf of the Association upon approval of a majority of the other directors.

Section 14. <u>Conduct of Meetings</u>. The President shall preside over all meetings of the Board of Directors, and the Secretary or designated Managing Agent shall keep a minute book of meetings of the Board of Directors, recording therein all resolutions adopted by the Board of Directors and all transactions and proceedings occurring at such meetings.

Section 15. <u>Open Meetings</u>. Subject to the provisions of Section 16 of this Article, all meetings of the board shall be open to all Voting Representatives, but Voting Representatives other than directors may not participate in any discussion or deliberation unless permission to speak is requested on his or her behalf by a director. In such case, the President may limit the time any Voting Representative may speak. Notwithstanding the above, the President may adjourn any meeting of the Board of Directors and reconvene in executive session, excluding Voting Representatives, to discuss matters of a sensitive nature, such as pending or threatened litigation, personnel matters, etc.

Section 16. <u>Action Without a Formal Meeting</u>. Any action to be taken at a meeting of the directors or any action that may be taken at a meeting of the directors may be taken without a meeting if a consent in writing, setting forth the action so taken, shall be signed by all of the directors, and such consent shall have the same force and effect as a unanimous vote.

14.

C.   Powers and Duties.

Section 17.   Powers. The Board of Directors shall be responsible for the affairs of the Association and shall have all of the powers and duties necessary for the administration of the Association's affairs and, as provided by law, may do or cause to be done all acts and things as are not by the Declaration, Articles, or these By-Laws directed to be done and exercised exclusively by the Voting Representatives or the membership generally.

The Board of Directors shall delegate to one of its members the authority to act on behalf of the Board of Directors on all matters relating to the duties of the managing agent or manager, if any, which might arise between meetings of the Board of Directors.

In addition to the duties imposed by these By-Laws or by any resolution of the Association that may hereafter be adopted, the Board of Directors shall have the power to establish policies relating to, and shall be responsible for performing or causing to be performed, the following, in way of explanation, but not limitation:

(a)   preparation and adoption, in accordance with Article X of the Declaration, of annual budgets in which there shall be established the contribution of each Owner to the Common Expenses and Neighborhood Expenses;

(b)   making assessments to defray the Common Expenses and Neighborhood Expenses, establishing the means and methods of collecting such assessments, and establishing the payment schedule for Base Assessments and any Neighborhood Assessments, if other than annual;

(c)   providing for the operation, care, upkeep, and maintenance of all of the Area of Common Responsibility;

(d)   designating, hiring, and dismissing the personnel necessary for the operation of the Association and the maintenance, operation, repair, and replacement of its property and the Area of Common Responsibility and, where appropriate, providing for the compensation of such personnel and for the purchase of equipment, supplies, and materials to be used by such personnel in the performance of their duties;

(e)   collecting the assessments, depositing the proceeds thereof in a bank depository which it shall approve, and using the proceeds to operate the Association; provided, any reserve fund may be deposited, in the directors' best business judgment, in depositories other than banks;

(f)   making and amending rules and regulations;

(g)   opening of bank accounts on behalf of the Association and designating the signatories required;

15.

(h)     making or contacting for the making of repairs, additions, and improvements to or alterations of the Common Area in accordance with the other provisions of the Declaration and these By-Laws after damage or destruction by fire or other casualty;

(i)     enforcing by legal means the provisions of the Declaration, these By-Laws, and the rules and regulations adopted by it and bringing any proceedings which may be instituted on behalf of or against the Owners concerning the Association;

(j)     obtaining and carrying insurance against casualties and liabilities, as provided in the Declaration, and paying the premium cost thereof;

(k)     paying the costs of all services rendered to the Association or its Members and not chargeable directly to specific Owners;

(l)     keeping books with detailed accounts of the receipts and expenditures affecting the Association and its administration, specifying the maintenance and repair expenses and any other expenses incurred;

(m)     maintaining a membership register reflecting, in alphabetical order, the names, Unit addresses and mailing addresses of all Members;

(n)     making available to any prospective purchaser of a Unit, any Owner of a Unit, any first Mortgagee, and the holders, insurers, and guarantors of a first Mortgage on any Unit, current copies of the Declaration, the Articles of Incorporation, the By-Laws rules governing the Unit and all other books, records, and financial statements of the Association; and

(o)     permitting utility suppliers to use portions of the Common Area reasonably necessary to the ongoing development or operation of the Properties.

Section 18.     Management.     The Board of Directors may employ for the Association a professional management agent or agents at a compensation established by the Board of Directors to perform such duties and services as the Board of Directors shall authorize.    The Board of directors may delegate to the managing agent or manager, subject to the Board's supervision, all of the powers granted to the Board of directors by these By-Laws, other than the powers set forth in subparagraphs (a), (b), (f), (g), and (i) of Section 17 of this Article.    The Declarant, or an affiliate of the Declarant, may be employed as managing agent or manager.

Section 19.     Accounts and Reports.     The following management standards of performance will be followed unless the Board by resolution specifically determines otherwise:

(a)     accrual accounting, as defined by generally accepted accounting principles, shall be employed;

16.

(b)     accounting and controls should conform to generally accepted accounting principles;

(c)     cash accounts of the Association shall not be commingled with any other accounts;

(d)     no remuneration shall be accepted by the managing agent from vendors, independent contractors, or others providing goods or services to the Association, whether in the form of commissions, finder's fees, service fees, prizes, gifts, or otherwise; any thing of value received shall benefit the Association;

(e)     any financial or other interest which the managing agent may have in any firm providing goods or services to the Association shall be disclosed promptly to the Board of Directors;

(f)     commencing at the end of the month in which the first Unit is sold and closed, financial reports shall be prepared for the Association at least quarterly containing:

(i)     an income statement reflecting all income and expense activity for the preceding period on an accrual basis;

(ii)     a statement reflecting all cash receipts and disbursements for the preceding period;

(iii)     a variance report reflecting the status of all accounts in an "actual" versus "approved" budget format;

(iv)     a balance sheet as of the last day of the preceding period; and

(v)     a delinquency report listing all Owners who are delinquent in paying any assessments at the time of the report and describing the status of any action to collect such assessments which remain delinquent (Any assessment or installment thereof shall be considered to be delinquent on the fifteenth (15th) day following the due date unless otherwise determined by the Board of Directors); and

(g)     an annual report consisting of at least the following shall be distributed to all Members upon request within one hundred twenty (120) days after the close of the fiscal year: (1) a balance sheet; (2) an operating (income) statement; and (3) a statement of changes in financial position for the fiscal year. The annual report referred to above shall be prepared on an audited or reviewed basis as determined by the Board, by an independent public accountant; provided, upon written request of any holder, guarantor or insurer of any first Mortgage on a Unit, the Association shall provide an audited financial statement. During the Declarant Control Period, the annual report shall include certified financial statements.

17.

Section 20.  Borrowing.  The Board of Directors shall have the power to borrow money for the purpose of maintenance, repair or restoration of the Area of Common Responsibility without the approval of the Voting Representatives of the Association.  The Board shall also have the power to borrow money for other purposes; provided, the Board shall obtain Voting Representative approval in the same manner provided in Section 10.4 of the Declaration for special assessments in the event that the proposed borrowing is for the purpose of modifying, improving, or adding amenities and the total amount of such borrowing exceeds or would exceed ten (10%) percent of the budgeted gross expenses of the Association for that fiscal year.

Section 21.  Rights of the Association.  With respect to the Area of Common Responsibility, and in accordance with the Articles of Incorporation and the Declaration, the Association shall have the right to contract with any person for the performance of various duties and functions.  Without limiting the foregoing, this right shall entitle the Association to enter into common management, operational, or other agreements with trusts, condominiums, cooperatives, or neighborhood and other owners or residents associations, both within and without the Properties.  Such agreements shall require the consent of a majority of all directors of the Association.

Sections 22.  Enforcement.  The Board shall have the power to impose reasonable fines, which shall constitute a lien upon the property of the violating Owner, and to suspend an Owner's right to vote or any person's right to use the Common Area for violation of any duty imposed under the Declaration, these By-Laws, or any rules and regulations duly adopted hereunder; provided, however, nothing herein shall authorize the Association or the Board of Directors to limit ingress and egress to or from a Unit.  In addition, the Association shall be entitled to suspend any services provided by the Association to a Unit in the event that the Owner of such Unit is more than thirty (30) days delinquent in paying any assessment due to the Association.  In the event that any occupant, guest or invitee of a Unit violates the Declaration, By-Laws, or a rule or regulation and a fine is imposed, the fine shall first be assessed against the occupant; provided, however, if the fine is not paid by the occupant within the time period set by the Board, the Owner shall pay the fine upon notice from the Association.  The failure of the Board to enforce any provision of the Declaration, By-Laws, or any rule or regulation shall not be deemed a wavier of the right of the Board to do so thereafter.

(a)  Notice.  Prior to imposition of any sanction hereunder, the Board or its delegate shall serve the alleged violator with written notice describing (i) the nature of the alleged violation, (ii) the proposed sanction to be imposed, (iii) a period of not less than ten (10) days within which the alleged violator may present a written request to the Board of Directors for a hearing; and (iv) a statement that the proposed sanction shall be imposed as contained in the notice unless a challenge is begun within ten (10) days of the notice.  If a timely challenge is not made, the sanction stated in the notice shall be imposed.

(b)  Hearing.  If a hearing is requested within the allotted ten (10) day period, the hearing shall be held in executive session affording the alleged violator a reasonable

18.

opportunity to be heard. Prior to the effectiveness of any sanction hereunder, proof of proper notice shall be placed in the minutes of the meeting. Such proof shall be deemed adequate if a copy of the notice, together with a statement of the date and manner of delivery, is entered by the officer, Director, or agent who delivered such notice. The notice requirement shall be deemed satisfied if the alleged violator appears at the meeting. The minutes of the meeting shall contain a written statement of the results of the hearing and the sanction, if any, imposed. The Board of Directors may, but shall not be obligated to, suspend any proposed sanction if the violation is cured within the ten (10) day period. Such suspension shall not constitute a waiver of the right to sanction future violations of the same or other provisions and rules by any Person.

(c)     Additional Enforcement Rights. Notwithstanding anything to the contrary herein contained, the Association, acting through the Board of Directors, may elect to enforce any provision of the Declaration, these By-Laws, or the rules and regulations of the Association by self-help (specifically including, but not limited to, the towing of vehicles that are in violation of parking rules and regulations) or by suit at law or in equity to enjoin any violation or to recover monetary damages or both without the necessity of compliance with the procedure set forth above. In any such action, to the maximum extent permissible, the Owner or occupant responsible for the violation of which abatement is sought shall pay all costs, including reasonable attorney's fees actually incurred.

Article IV
Officers

Section 1.     Officers. The officers of the Association shall be a President, Vice President, Secretary, and Treasurer, to be elected from among the members of the Board. The Board of Directors may appoint such other officers, including one or more Assistant Secretaries and one or more Assistant Treasurers, as it shall deem desirable, such officers to have the authority and perform the duties prescribed from time to time by the Board of Directors. Any two (2) or more offices may be held by the same person, except the offices of President and Secretary.

Section 2.     Election, Term of Office, and Vacancies. The officers of the Association shall be elected annually by the Board of Directors at the first meeting of the Board of Directors following each annual meeting of the Voting Representatives, as herein set forth in Article III. A vacancy in any office arising because of death, resignation, removal, or otherwise may be filled by the Board of Directors for the unexpired portion of the term.

Section 3.     Removal. Any officer may be removed by the Board of Directors whenever in its judgment the best interests of the Association will be served thereby.

Section 4.     Powers and Duties. The officers of the Association shall each have such powers and duties as generally pertain to their respective offices, as well as such powers and duties as may from time to time specifically be conferred or imposed by the

Board of Directors. The President shall be the chief executive officer of the Association. The Treasurer shall have primary responsibility for the preparation of the budget as provided for in the Declaration and may delegate all or part of the preparation and notification duties to a finance committee, management agent, or both.

Section 5.     Resignation.  Any officer may resign at any time by giving written notice to the Board of Directors, the President, or the Secretary.  Such resignation shall take effect on the date of the receipt of such notice or at any later time specified therein, and unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

Section 6.     Agreements, Contracts, Deeds, Leases, Checks, Etc.     All agreements, contracts deeds, leases, checks, and other instruments of the Association shall be executed by at least two (2) officers or by such other person or persons as may be designated by resolution of the Board of Directors.

Article V
Miscellaneous

Section 1.     Fiscal Year.  The fiscal year of the Association shall be set by resolution of the Board of Directors.  In the absence of a resolution, the fiscal year shall be the calendar year.

Section 2.     Parliamentary Rules.  Except as may be modified by Board resolution, Robert's Rules of Order (current edition) shall govern the conduct of Association proceedings when not in conflict with Texas law, the Articles of Incorporation, the Declaration, or these By-Laws.

Section 3.     Conflicts.  If there are conflicts between the provisions of Texas law, the Articles of Incorporation, the Declaration, and/or these By-Laws, then the provisions of Texas law, the Declaration, the Articles of Incorporation, and the By-Laws (in that order) shall prevail.

Section 4.     Books and Records.

(a)     Inspection by Members and Mortgagees.  The Declaration, By-Laws, and Articles of incorporation, any amendments to the foregoing, the rules and regulations of the Association, the membership register, books of account, and the minutes of meetings of the Members, the Board, and committees shall be made available for inspection and copying by any holder, insurer or guarantor of a first Mortgage on a Unit, Member of the Association, or by the duly appointed representative of any of the foregoing at any reasonable time and for a purpose reasonably related to his or her interest in the Unit at the office of the Association or at such other place within the Properties as the Board shall prescribe.

(b)     Rules for Inspection.  The Board shall establish reasonable rules with

respect to:

(i)     notice to be given to the custodian of the records;

(ii)    hours and days of the week when such an inspection may be made; and

(iii)   payment of the cost of reproducing copies of documents requested.

(c)     <u>Inspection by Directors</u>.  Every director shall have the absolute right at any reasonable time to inspect all books, records, and documents of the Association and the physical properties owned or controlled by the Association.  The right of inspection by a director includes the right to make extracts and a copy of relevant documents at the expense of the Association.

Section 5.     <u>Notices</u>.  Unless otherwise provided in these By-Laws, all notices, demands, bills, statements, or other communications under these By-Laws shall be in writing and shall be deemed to have been duly given if delivered personally or if sent by United States Mail, first class postage prepaid:

(a)     if to a Member or Voting Representative, at the address which the Member or Voting Representative has designated in writing and filed with the Secretary or, if no such address has been designated, at the address of the Unit of such member or Voting Representative; or

(b)     if to the Association, the Board of Directors, or the managing agent, at the principal office of the Association or the managing agent, if any, or at such other address as shall be designated by notice in writing to the members pursuant to this Section.

Section 6.     <u>Amendment</u>.  Prior to the conveyance of the first Unit, Declarant may unilaterally amend these By-Laws.  After such conveyance, the Declarant may unilaterally amend these By-Laws at any time and from time to time if such amendment is (a) necessary to bring any provision hereof into compliance with any applicable governmental statues, rule or regulation, or judicial determination; (b) necessary to enable any reputable title insurance company to issue title insurance coverage on the Units; (c) required by an institutional or governmental lender or purchaser of mortgage loans, including, for example, the Federal National Mortgage Association or Federal Home Loan Mortgage Corporation, to enable such lender or purchaser to make or purchase mortgage loans on the Units; or (d) necessary to enable any governmental agency or reputable private insurance company to insure mortgage loans on the Units; provided, however, any such amendment shall not adversely affect the title to any Unit unless the Owner shall consent thereto in writing.  So long as it still owns property described in Exhibits "A" or "B" of the Declaration for development as part of the Properties, the Declarant may unilaterally amend these By-Laws for any other purpose, provided the amendment has no material adverse effect upon any right of any Owner.

22.

Thereafter and otherwise, these By-Laws may be amended only by the affirmative vote or written consent, or any combination thereof, of Voting Representatives representing seventy-five (75%) percent of the total Class "A" votes in the Association, including seventy-five (75%) percent of the Class "A" votes held by Members other than the Declarant, and the consent of the Class "B" Member, so long as such membership exists. In addition, the approval requirements set forth in Article XIV of the Declaration shall be met, if applicable. Notwithstanding the above, the percentage of votes necessary to amend a specific clause shall not be less than the prescribed percentage of affirmative votes required for action to be taken under that clause. Any amendment to the effective must be recorded in the public records of Travis County, Texas.

If an Owner consents to any amendment to the Declaration or these By-Laws, it will be conclusively presumed that such Owner has the authority so to consent and no contrary provision in any Mortgage or contract between the Owner and a third party will affect the validity of such amendment.

No amendment may remove, revoke, or modify any right or privilege of Declarant without the written consent of Declarant or the assignee of such right or privilege.

Community Calendar          Groups          Classifieds

Home

General Information

Weekly News & Updates

PETS - Lost and Found

RESERVATIONS FAQ

Community Events & Information

Swim Lessons

Homeowners Association

Home & Garden - In the Know

Amenities

News from Newland

Area Events

Community Sponsors

Contact Us

Terms of Use     Privacy Policy

FALCON POINTE

Newland Communities

© 2014 Falcon Pointe.
All Rights Reserved.

Falcon Pointe Community Association Voting Member Election

Instructions: Vote for ONE candidate in your neighborhood only. One will be elected as the Voting Member, the other as the alternate. ONE vote per household.
Ballots must be returned no later than 5:00 pm June 7, 2012.

*YOUR NAME AND ADDRESS MUST BE INCLUDED FOR A VALID VOTE.

**Email:** falconpointemanager@goodwintx.com

** Your Email:

** Your Name

** Your Street Address

Arbor Landing
  Shannon Study

Brookwood Trail
  Thomas Williams
  Carole Dossing

The Vistas A
  Natalie Boykin

The Vistas B
  Steven Remmert

Woodhaven
  Jennifer Meiners

Woodcreek Trail A
  Debora Harris
  Cindy Groghan

Woodcreek Trail B
  Mike Boose

Stonehill A
  Mohammed Moussa

Stonehill B
  Cedric Lloyd

Village Park
  Sara Bogan

Parkwood A
  Sherry Cowan
  Tami Martin

Parkwood B
  Michelle Myers

Somerset
  Daphne Gilbert

Code Verification:

H98ER7

24.

Submit     Reset

25.

## AFFIDAVIT OF PLAINTIFF WESLEY SPEARS

I, Wesley Spears being duly sworn deposes and says as follows:

1.      I am one of the plaintiffs in this matter and I am also counsel for the plaintiffs'.

2.      This Motion is being filed in support of Plaintiffs' Motion for Continuance of Defendant's No-Evidence and Traditional Motion for Summary Judgment.

3.      In my opinion of the plaintiffs' counsel and the defendant have purposely failed to cooperate with discovery.

4.      Plaintiffs have made numerous document requests which the defendant has refused to cooperate and/or comply with requiring the subject Motions to Compel.

5.      Thus far the defendant has only produced an insurance policy, minutes of some irrelevant Board meetings, and two Budgets. The defendants' have not even produced the requested correspondence and emails related to this matter.

6.      At the time of the Hearing of plaintiffs Motion to Compel the Deposition of Diane Bottema, defendant's failed to advise the court that Ms. Bottema was no longer the Property Manager. Ranier Ficken testified that Ms. Bottema was removed for poor performance.  Ms. Bottema testified at her recent deposition that after April, 2014 she had no access to records of the Association and she had produced none at her deposition, as I predicted she would..

7.      As I stated during the last Hearing in this matter "mark my words" she is not going to produce any documents and she didn't not even produce her own emails, Violation Notices or other correspondence sent to and received from the plaintiffs regarding this matter.

8.      Plaintiffs' have two outstanding Deposition Notices, one for William Meyers, Vice President of the Association and Member of the Board of Directors, and Member of the Architectural Control Committee of the Association.  Mr. Meyers was one of only two members who appeared at the Board Meeting related to the instant case and one of two who cast votes.  It was that Hearing that defendant basis its Motion for Summary Judgment therefore, Mr. Meyers' testimony is critical and relevant.

9.      There are three Motions to Compel, which the plaintiffs are requesting be heard as soon as reasonably possible.  The discovery cutoff in this case is now September 30, 2014.  Motion to Compel Documents, Motion to Compel Depositions and Motion to Compel Documents from Ranier Ficken's Deposition.

26.

10.	Plaintiffs have only requested four depositions and have taken two. Defendant's have only agreed to allow one deposition without moving to Quash the Notice to take Deposition of the other requested witnesses.

11.	Plaintiffs are requesting a reasonable time to complete discovery once the court rules on the three outstanding discovery Motions, Motion to Compel Documents, Motion to Compel Depositions, Motion to Compel Documents requested in the Notice to take Deposition of Rainer Ficken.

12.	Plaintiffs received the deposition transcript of Ranier Ficken last week.

13.	Plaintiffs have not received the transcript of the Diane Bottema, the former property manager. Plaintiffs request time to support its Motion for Summary Judgment and to oppose Defendant's Motion for Summary Judgment with the deposition testimony of Ms. Bottema and Mr. Ficken and the other witnesses plaintiffs are requesting to depose.

14.	Plaintiffs believes discovery could be Completed by November 15, 2014.


_____
Wesley Spears

Subscribed and sworn to before me on this 1<u>4</u> of September, 2014.

_____
Notary

JONATHAN MOISES CONCEPCION
NOTARY PUBLIC
STATE OF TEXAS
MY COMMISSION EXPIRES
APRIL 19, 2017

27.

# AFFIDAVIT

I, Vahness Swilley-Concepcion, hereby swear and affirm as follows:

1.      I live at 2920 Dusty Chisolm Trail, Pflugerville, TX 78660, which is across the Street from the home owned by Wesley Spears and Renee Jacobs at 2913 Dusty Chisolm Trail Pflugerville Texas 78660.  I am an African-American woman.

2.      Wesley Spears informed me that he was running for neighborhood voting representative.

3.      On June 7, 2014, my husband, Jonathan Concepcion and I went online to vote for Wesley Spears for our neighborhood representative.

4.      After logging onto the Falcon Pointe Community Association Website we attempted to vote for Wesley Spears but his name did not appear on the Ballot.

5.      I immediately called Renee Jacobs after learning that Wesley Spears name was not on the Ballot.

Vahness Swilley-Concepcion

Subscribed and sworn before me on this _12_ day of September, 2014.

Notary

MATT HUYNH
My Commission Expires
January 15, 2018
NOTARY PUBLIC
STATE OF TEXAS

28.

# AFFIDAVIT

I, Jonathan Concepcion, hereby swear and affirm as follows:

1.      I live at 2920 Dusty Chisolm Trail, Pflugerville, TX 78660, which is across the Street from the home owned by Wesley Spears and Renee Jacobs at 2913 Dusty Chisolm Trail Pflugerville Texas 78660.  I am a Hispanic American male.

2.      Wesley Spears informed me that he was running for neighborhood voting representative.

3.      On June 7, 2014, my wife Vahness Swilley-Concepcion and I went online to vote for Wesley Spears for our neighborhood representative.

4.      After logging onto the Falcon Pointe Community Association Website we attempted to vote for Wesley Spears but his name did not appear on the Ballot.

5.      My wife immediately called Renee Jacobs after learning that Wesley Spears name was not on the Ballot.

_____
Jonathan Concepcion

Subscribed and sworn before me on this 12 day of September, 2014.

_____
Notary



MATT HUYNH
My Commission Expires
January 15, 2018

29.



**WINSTEAD**   Austin   Charlotte   Dallas   Fort Worth   Houston   New Orleans   San Antonio   The Woodlands   Washington, D.C.

Alex S. Valdes
direct dial: (512) 370-2842
email: avaldes@winstead.com

November 26, 2013

*Via Certified Mail*
*Return Receipt Requested*
*and Via E-mail*

Wesley S. Spears, Esq.
Spears Law PLLC
401 Congress Avenue, Suite 1401
Austin, Texas 78701

> Re:   *2913 Dusty Chisholm Trail, Pflugerville, Texas 78660 (the "Property") in the Falcon Pointe Community Association, Inc. (the "Association")*

Dear Mr. Spears:

Pursuant to a letter sent on November 1, 2013, you were notified that the Association agreed to postpone the hearing previously set for November 6, 2013 at 9:00 a.m. at the Falcon Pointe Residents Club located at 19015 Falcon Pointe Boulevard, Pflugerville, Texas 78660. Per the November 1, 2013 letter, the hearing was rescheduled for 3:00 p.m. at the Falcon Pointe Residents Club located at 19015 Falcon Pointe Boulevard, Pflugerville, Texas 78660. The hearing was conducted before representatives of the Board of the Association and was held in accordance with Section 209.007 of the Texas Property Code.

Upon careful consideration of all of the facts and circumstances and in exercise of their business judgment as to the best interest of the Association, the Board has made a final determination regarding your installation of improvements and modifications that were not approved by the Association. The Board hereby reaffirms and upholds its previous decision regarding the violation as set forth in its prior correspondence to you.

This hereby concludes the hearing portion of this matter pursuant to Section 209.007 of the Texas Property Code.

30.

Please do not hesitate to call me with any additional questions you may have.

Sincerely,

**WINSTEAD PC**

Alex S. Valdes

ASV/lh

31.

# WINSTEAD

Austin  Charlotte  Dallas  Fort Worth  Houston  New Orleans  San Antonio  The Woodlands  Washington, D.C.

January 13, 2014

401 Congress Avenue
Suite 2100
Austin, Texas 78701

512.370.2800 OFFICE
512.370.2850 FAX
winstead.com

Alex S. Valdes
direct dial: 512.370.2842
avaldes@winstead.com

*Via Certified Mail*
*Return Receipt Requested*
*and Via E-mail*

Wesley S. Spears, Esq.
Spears Law PLLC
401 Congress Ave., Suite 1540
Austin, TX 78701

Re:    Correspondence Dated December 9, 2013 – 2913 Chisolm Trail

Dear Mr. Spears:

I am in receipt of the enclosed correspondence requesting copies of the dedicatory violation history as well as a summary of the fines imposed for each violation identified. I did not receive a copy of the letter from you, although I am listed as a recipient. Please direct all further requests for information related to the litigation to David Chamberlain. As I previously noted, David is lead counsel for the Association.

The Association will comply with all lawful requests for documents submitted under the Property Code. Under Section 209.005, certain records must be made available; however, a property owners' association "is not required to release or allow inspection of any books or records that identify the dedicatory instrument violation history of an individual owner of an association."

To the extent that you wish for a summary of information, I believe that should be requested through an interrogatory now that this matter is in litigation and the parties are conducting discovery. To the extent that your letter constitutes a discovery request, Falcon Pointe Community Association objects to the discovery request as vague, overbroad, unduly burdensome, and seeking information that is neither relevant nor likely to lead to the discovery of any relevant or admissible evidence. In addition, objection is made insofar as the requests seek information that is confidential under Texas law.

32.

Please do not hesitate to call me with any additional questions you may have.

Sincerely,

WINSTEAD PC

Alex S. Valdes

ASV/lh

726026v.2

**WESLEY S. SPEARS, ESQ**
**ATTORNEY AT LAW**
**SPEARS LAW PLLC**
**401 CONGRESS AVENUE, SUITE 1540**
**AUSTIN, TEXAS 78701**
**Tel: 512-696-2222**
**Fax: 512-687-3499**

Certified Mail
Return Receipt Requested

May 23, 2014

David Campbell
Chamberlain & McHaney
301 Congress Avenue, Suite 1540
Austin, Texas 78701

Re: Spears and Jacobs v. Falcon Pointe Community Association

Dear Attorney Campbell:

I would normally request this directly of the Property Manager as a homeowner but given the pending litigation I thought it was more appropriate to go through you. I wish to get copies of the financial records of the Falcon Pointe Community Association. Please advise if you will accept notice for the purpose of Texas Property Code Section 209.005 et seg.. If not I will send a copy to the Property Manager.

Please advise,

Wesley Spears

WSS

34.

CAUSE NO. C-1-CV-13-010214 ... FOR RECORD

| | | |
|---|---|---|
| WESLEY SPEARS AND RENEE JACOBS | § § § | IN THE COUNTY COURT PM 3:37 |
| V. | § § | DANA DEBEAUVOIR COUNTY CLERK AT LAW NO. 1 TRAVIS COUNTY, TEXAS |
| FALCON POINTE COMMUNITY ASSOCIATION | § § § | TRAVIS COUNTY, TEXAS |

## ORDER DENYING PLAINTIFFS' MOTION TO COMPEL THE DEPOSITION DUCES TECUM OF DIANE BOTTEMA

On this the 1st day of July, 2014, came to be heard Plaintiffs' Third Motion to Compel the Deposition Duces Tecum of Diane Bottema. Having considered the Motion, Defendant's response, Plaintiffs' reply, and the arguments of counsel, the Court is of the opinion that the Motion should be DENIED.

IT IS, THEREFORE, ORDERED that Plaintiffs' Motion to Compel the Deposition Duces Tecum of Diane Bottema is DENIED.

SIGNED on July 1, 2014.

PRESIDING JUDGE

000880090

460

35.

CAUSE NO. C-1-CV-13-010214

| WESLEY SPEARS AND RENEE JACOBS | § | IN THE COUNTY COURT |
|---|---|---|
| | § | |
| V. | § | |
| | § | AT LAW NO. 1 |
| | § | |
| FALCON POINTE COMMUNITY ASSOCIATION | § | |
| | § | TRAVIS COUNTY, TEXAS |

## ORDER DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

On this the 15th day of September, 2014, came to be heard Plaintiffs' Motion for Partial Summary Judgment and Opposition to Defendant's Motion for Summary Judgment. Having considered the briefing, the evidence, and the arguments of counsel, the Court is of the opinion that the Motion should be DENIED.

IT IS, THEREFORE, ORDERED, ADJUDGED, AND DECREED that Plaintiffs' Motion for Partial Summary Judgment and Opposition to Defendant's Motion for Summary Judgment is DENIED.

SIGNED on September 15, 2014.

_____
PRESIDING JUDGE

**EXHIBIT 5**

36.

CAUSE NO. C-1-CV-13-010214

WESLEY SPEARS AND RENEE    §     IN THE COUNTY COURT
JACOBS    §
   §
V.    §     AT LAW NO. 1
   §
FALCON POINTE COMMUNITY    §
ASSOCIATION    §     TRAVIS COUNTY, TEXAS

## FINAL JUDGMENT

On this the 15th day of September, 2014, came to be heard Defendant's First Amended Traditional and No-Evidence Motion for Summary Judgment. Having considered the briefing, the evidence, and the arguments of counsel, the Court is of the opinion that the Motion should be GRANTED.

IT IS, THEREFORE, ORDERED, ADJUDGED, AND DECREED that the "Privacy Screen in question" was built in violation of the Rules of the Association.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that all of Plaintiffs' remaining claims lack merit and are dismissed with prejudice.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Plaintiffs take nothing and pay Defendant $ 23,673.50 for the reasonable and necessary attorney fees incurred in this matter and that Plaintiffs pay Defendant's court costs incurred in this matter.

SIGNED on September 15, 2014.

_____
PRESIDING JUDGE



000903924

CAUSE NO. C-1-CV-13-010214

| | | |
|---|---|---|
| WESLEY SPEARS AND RENEE JACOBS | § § § | IN THE COUNTY COURT |
| V. | § § | AT LAW NO. 1 |
| FALCON POINTE COMMUNITY ASSOCIATION | § § § | TRAVIS COUNTY, TEXAS |

## ORDER ON DEFENDANT'S OBJECTIONS TO THE SUMMARY JUDGMENT EVIDENCE ATTACHED TO PLAINTIFFS'

On this the 15th day of September, 2014, came to be heard Defendant's objections to the summary judgment evidence attached to Plaintiffs' Brief in Opposition to Defendant's First Amended Traditional and No-Evidence Motion for Summary Judgment ("Plaintiffs' Brief"). Having considered the objections, the summary judgment evidence, and the arguments of counsel, the Court rules on the objections as follows:

1. Defendant's objection that none of the evidence attached to Plaintiffs' Brief is authenticated is

SUSTAINED: _____✔_____        OVERRULED: _____

2. Defendant's objection regarding the lack of a proper jurat in the affidavit of Wesley Spears attached to Plaintiffs' brief is

SUSTAINED: _____✔_____        OVERRULED: _____

3. Defendant's objection that Paragraph 19 (first) does not affirmatively show that the affiant is competent to testify about the matters stated in the affidavit is

SUSTAINED: _____✔_____        OVERRULED: _____

38.

000903925

4. Defendant's objection that Paragraphs 7, 17, 19 (first), and 19 (second) does not affirmatively show that the affiant is competent to testify about the matters stated in the affidavit is

SUSTAINED: _____✓_____          OVERRULED: _____

5. Defendant's objection that Paragraphs 5, 7, 11, 12, 19 (second), and 20 contain inadmissible hearsay is

SUSTAINED: _____✓_____          OVERRULED: _____

6. Defendant's objections that Paragraphs 4, 5, 6, 7, 16, 19 (second), and 20 violate the best evidence rule is

SUSTAINED: _____✓_____          OVERRULED: _____

7. Defendant's objections that Paragraphs 2, 3, 7, and 11 are not readily controvertible as the statements contained therein are vague and ambiguous is

SUSTAINED: _____✓_____          OVERRULED: _____


SIGNED on September 15, 2014.

_____
PRESIDING JUDGE

39.

## CAUSE NO. C-1-CV-13-010214

| WESLEY JACOBS AND RENEE JACOBS | IN THE COUNTY COURT |
|---|---|
| V. | AT LAW NO. 1 |
| FALCON POINE COMMUNITY ASSOCIATION | TRAVIS COUNTY, TEXAS |

## ORDER DENYING PALTINFF'S SECOND MOTION TO RECUSE JUDGE

On this the 7th day of November, 2014, came to be heard Plaintiffs' Second Verified Motion to Recuse Judge. Having considered the evidence and the arguments of counsel, the Court is of the opinion that the Motion should be DENIED.

IT IS, THEREFORE, ORDERED, ADJUDGED, AND DECREED that Plaintiffs' Second Verified Motion to Recuse Judge is denied and Judge David Phillips is not recused from this case.

Signed on this the 8th day of November 2014.

Case # C-1-CV-13-010214

_____
Judge Jon Wisser
Sitting By Assignment in County Court No. 1
Travis County, Texas

40.

CAUSE NO. C-1-CV-13-010214

| | |
|---|---|
| WESLEY SPEARS AND RENEE JACOBS, | ) IN THE COUNTY COURT |
| | ) |
| Plaintiffs, | ) |
| | ) |
| VS. | ) AT LAW NUMBER ONE |
| | ) |
| FALCON POINTE COMMUNITY ASSOCIATION, | ) |
| | ) |
| Defendant. | ) TRAVIS COUNTY, TEXAS |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ORAL DEPOSITION OF

DIANE BOTTEMA

SEPTEMBER 10, 2014

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ORAL DEPOSITION OF DIANE BOTTEMA, produced as a witness at the instance of the Plaintiff, was duly sworn, was taken in the above-styled and numbered cause on SEPTEMBER 10, 2014, from 2:05 p.m. to 4:26 p.m., before Chris Carpenter, CSR, in and for the State of Texas, reported by machine shorthand, at the offices of Goodwin Management Company, Inc., 11149 Research Blvd., Suite 100, Austin, Texas 78759, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.

**ORIGINAL**

41.

2

A P P E A R A N C E S

FOR THE PLAINTIFFS:

Mr. Wesley S. Spears
LAW OFFICE OF WESLEY S. SPEARS
401 Congress Avenue, Suite 1540
Austin, TX  78701
(512) 687-3499
wesleys@yahoo.com

FOR THE DEFENDANT:

Mr. David J. Campbell
CHAMBERLAIN*MCHANEY
301 Congress Avenue, Suite 2100
Austin, TX  78701
(512) 474-9124
dcampbell@chmc-law.com
Mr. Alex S. Valdes
WINSTEAD
401 Congress, Suite 2100
Austin, TX 78701
(512) 370-2842
avaldes@winstead.com

42.

3

INDEX

Appearances..........................................2

DIANE BOTTEMA

     Examination by Mr. Spears..................5
     Examination by Mr. Campbell.............109

Signature and Changes..........................111

Reporter's Certificate.........................113

EXHIBITS

| NO. | DESCRIPTION | PAGE MARKED |
|---|---|---|
| 1 | Violation Notice, Oct. 22, 2013 | 12 |
| 2 | E-Mail Chain, Aug. 1, 2013 | 22 |
| 3 | E-Mail, July 30, 2013 | 24 |
| 4 | E-Mail Chain, Aug. 6, 2013 | 27 |
| 5 | E-Mail Chain, Aug. 27, 2013 | 37 |
| 6 | Black and White Copy of Photo | 39 |
| 7 | E-Mail Chain, Aug. 6, 2013 | 42 |
| 8 | E-Mail Chain, Aug. 27, 2013 | 42 |
| 9 | E-Mail Chain, Sept. 28, 2013 | 43 |
| 10 | E-Mail Chain, Sept. 28, 2013 | 45 |
| 11 | Modification Request Form | 46 |
| 12 | Falcon Pointe Second Amendment to the First Amended and Restated Declaration of Protective Covenants | 49 |
| 13 | Falcon Pointe Residential Design Guidelines | 50 |
| 14 | Supplement to the First Amended and Restated Declaration of Protective Covenants for Falcon Pointe, Sect. 4N Phase II | 54 |

43.

4

15     Spears Letter, Oct. 23, 2013                84

16     Spears Letter, Dec. 9, 2013                 86

17     Notice of 3rd Violation                     95

18     Johnathan Morales Letter                    96

19     Handwritten Minutes, 11/11/13              109

DIANE BOTTEMA,

having been first duly sworn to testify the truth, the whole truth, and nothing but the truth, testified as follows:

EXAMINATION

BY MR. SPEARS:

Q.    Ms. -- is it Ms. Diane Bottema?

A.    (Witness nods head yes.)

Q.    Okay.  Ms. Bottema, you are here pursuant to a deposition notice; is that correct?

A.    Yes.

Q.    And that notice asked you to produce certain documents; is that correct?

A.    Yes.

Q.    And are there any documents that you are producing?

A.    No.

Q.    Okay.  Do you have any e-mails or any correspondence relating to this matter?

A.    No.

Q.    And is there a reason why you do not have any e-mails or correspondence relating to this matter?

A.    I don't have access to it.

Q.    And you don't have access to it why?

A.    Because my -- that e-mail is no longer valid.

6

Q.    And there's no way for you to access that e-mail?

A.    No.

Q.    Or the documents?

A.    No.

Q.    You don't have any files where you could look for the documents?

A.    There are possibly files.

Q.    Did you look in those files for the documents I requested?

A.    I don't have access to the property.

Q.    Okay.  And why don't you have access to the property?

A.    Because I don't work there anymore.

Q.    And why don't you work there anymore?

A.    Because I work in this office now.

Q.    And isn't it a fact you were removed from your position at Falcon Pointe?

A.    No, sir.

Q.    Okay.  The president of the association didn't ask for you to be removed because of poor performance?

MR. CAMPBELL:  Objection, form.

A.    No, sir.

Q.    (By Mr. Spears) Okay.  And so if he testified that he asked for you to be removed because of poor

performance, that would not be accurate?

MR. CAMPBELL: Objection, form.

A.   No.

Q.   (By Mr. Spears) No? Okay. Why don't -- is there any reason why you don't work there anymore? In other words, did the Goodwin Management people say to you they were moving you for a reason or moving you to another position?

A.   They gave me an opportunity here and I wanted it.

Q.   Okay. And it's your testimony that it had nothing to do with your performance at Falcon Pointe?

MR. CAMPBELL: Objection, form.

A.   No.

Q.   (By Mr. Spears) Okay. And again, if the president of the association, Mr. Ficken -- you're familiar with him, right --

A.   Yes.

Q.   -- testified that he asked you to be removed from your position at Falcon Pointe, that was not true?

MR. CAMPBELL: Objection, form.

A.   No.

Q.   (By Mr. Spears) Okay. Do you know of any reason Mr. Ficken would have said that he asked for you to be removed from your position if it wasn't true?

would just give a date of the July 26th as the first piece of paper that I'm familiar with, July 26, 2013, there were a number of e-mails that you had written, correct, regarding this matter?

A.    (Witness nods head yes.)

Q.    Correct?

A.    Yes.

Q.    Okay.  And your e-mail address that you used during that time was what?

A.    FalconPointeManager@GoodwinTX.

Q.    Okay.  And since you left Falcon Pointe -- could you give us the approximate date you left?

A.    April 14th, I believe.

Q.    Okay.  And after you left, who took over your position?

A.    Natalie Boykin.

Q.    Okay.  And so from April -- approximately April 15th to the present, Natalie Boykin has been the manager at Falcon Pointe?

A.    Yes.

Q.    Okay.  And during your -- how long did you work at Falcon Pointe?

A.    Eight years.

Q.    Okay.  While you were at Falcon Pointe, did you oversee elections and other activities at Falcon Pointe?

Q.     (By Mr. Spears) But in any event, this letter has a cure date that's before the date of the letter?

MR. CAMPBELL:  Objection, form.

A.     I don't know.

Q.     (By Mr. Spears) Well, what date is on there to cure by?

A.     There's not a date.

Q.     Isn't there a month?

A.     Yes.

Q.     And do you believe that that month would have been August of 2014 or August of 2013 --

A.     I don't know.

Q.     Do you give 12 months to cure a violation?

A.     No.

Q.     So if they meant 2014, that's not your practice either, correct?  August of 2014 as a cure date wouldn't be your practice?

A.     I don't know.

Q.     You don't know what your practice was as to how far you give people notice before they are found in violation to cure?

A.     I don't know.

Q.     So you give cure dates of as much as 11 months ahead of time?

MR. CAMPBELL:  Objection, form.

A.    I don't know.

Q.    (By Mr. Spears) What cure dates were you trained to put on notices of violation?

A.    I don't know.

Q.    Does it make any sense to you that a notice would have a cure date before it was written?

A.    It doesn't.

Q.    Well, if you assume that that cure date was August 2013, then it would be before the date of the letter, correct?

A.    I don't know.

Q.    Well, the date of the letter is what?

A.    The date of the letter is October 22nd.

Q.    What year?

A.    2013.

Q.    And it states a cure date of August?

A.    With no date.

Q.    And what do you believe the August they were referring to?

A.    I don't know.

Q.    So you don't even know if I still have time to cure the defect?

A.    I don't know.

Q.    So you don't know if the August date refers to 2014, correct?

A.    Right.

Q.    You don't know if the August date refers to 2015?

A.    No.

Q.    You don't know the August date refers to 2016?

A.    No.

Q.    So as far as you know, I still have time to cure?

A.    No.

Q.    So what date did I have to cure?

A.    I don't know.

Q.    Well, you just said that the cure date could have been the 2014 August, 2015 August, 2016 August. I'm asking which date it was intended to be.

A.    I don't know.

Q.    And is it your practice to give cure dates before the date of the letter?

          MR. CAMPBELL:  You don't have to answer that.  She's answered that about five times now.

          MR. SPEARS:  When the answer was "I don't know"?

          MR. CAMPBELL:  Yes.  She's --

          MR. SPEARS:  That's her answer?  I mean, I'm just trying to make sure --

          MR. CAMPBELL:  Correct.

115

FURTHER CERTIFICATION UNDER RULE 203 TRCP

The original deposition of DIANE BOTTEMA was/was not returned to the deposition officer on October 14, 2014.

If returned, the original deposition was delivered to Wesley Spears, Custodial Attorney.

That $ 430.00 is the deposition officer's charges to the Plaintiffs for preparing the original deposition transcript and any copies of exhibits;

That the deposition was delivered in accordance with Rule 203.3, and that a copy of this certificate was served on all parties shown herein and filed with the Clerk.

Certified to me this the 13th day of November, 2014.

_____
CHRIS CARPENTER, CSR NO. 1151
Expiration Date 12/31/2014
701 Brazos, Suite 380
Austin, TX   78701
(512)292-4249

Firm Registration No. 344

52.

CAUSE NO. C-1-CV-13-010214

WESLEY SPEARS AND RENEE      ) IN THE COUNTY COURT
JACOBS,                      )
        Plaintiffs,          )
                             )
                             )
VS.                          ) AT LAW NO. 1
                             )
FALCON POINTE COMMUNITY       )
ASSOCIATION,                 )
        Defendant.           ) TRAVIS COUNTY, TEXAS


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

VIDEOTAPED ORAL DEPOSITION OF

RAINER FICKEN

AUGUST 26, 2014

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

     VIDEOTAPED ORAL DEPOSITION OF RAINER FICKEN, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on the 26th of August, 2014 from 11:11 a.m. to 2:58 p.m., before Amber Kirton, CSR, in and for the State of Texas, reported by machine shorthand, at the law offices of Chamberlain McHaney, 301 Congress Avenue, 21st Floor, Austin, Texas, pursuant to the Texas Rules of Civil Procedure and the provisions attached hereto.

**ORIGINAL**

53.

APPEARANCES

FOR THE PLAINTIFFS:

Mr. Wesley S. Spears
ATTORNEY AT LAW
401 Congress Avenue
Suite 1501
Austin, Texas   78701
(512) 696-2222
EMAIL: wesleys637@yahoo.com

FOR THE DEFENDANT:

Mr. David J. Campbell
CHAMBERLAIN MCHANEY
301 Congress Avenue, 21st Floor
Austin, Texas   78701
(512) 474-9124
EMAIL: dcampbell@chmc-law.com

THE VIDEOGRAPHER:

Mr. Brent Kirby

U.S. LEGAL SUPPORT - AUSTIN, TEXAS
(800) 734-4995

3

I N D E X

Appearances..............................................    2

RAINER FICKEN

     Examination by Mr. Spears......................    5

     Examination by Mr. Campbell....................  136

Signature and Changes..............................  138

Reporter's Certificate.............................  140

Further Certification..............................  142

E X H I B I T

I N D E X

NO.  DESCRIPTION                                   PAGE

 1   Notice of Deposition..........................    5

 2   Falcon Pointe Community Association Board of
     Director's Meeting Minutes....................    6

 3   Defendant's Objections to Plaintiff's Subpoena
     Duces Tecum...................................    6

 4   Page 14 Excerpt from bylaws ..................   23

 5   Page 12 Excerpt from bylaws...................   23

 6   Falcon Pointe June 7th Election Ballot .......   40

 7   Falcon Pointe Election Form...................   43

 8   E-mail Chain..................................   47

 9   10/22/13 2nd Violation Notice.................   54

10   E-mail Chain Re: Courtesy Notice Violation....   76

11   Photo.........................................   86

12   Photo.........................................   91

13   11/26/13 Letter - Synopsis of Hearing.........  101

55.

4

I N D E X (Cont'd)

NO.  DESCRIPTION                                          PAGE

14   Falcon Pointe Brochure........................    108

15   12/3/13 3rd Violation Letter..................    111

16   Photo.........................................    126

17   Election Ballot...............................    136

18   2014 Voting Representatives...................    137

V I D E O T A P E (S)

Tape 1............................................       5
Tape 2............................................      47
Tape 3............................................      75
Tape 4............................................     120

56.

A.   With the association manager.

Q.   Who is that?

A.   Which -- well, over the course there has been a couple of managers.

Q.   At present time who is the manager?

A.   Present time it's Natalie Boykin.

Q.   What happened to Diane Bottema?

A.   Diane is -- I believe she's still with Goodwin but Natalie replaced her.

Q.   Do you know where Diane ended up going, Diane Bottema?

A.   I believe she's still with Goodwin.

Q.   No, but I meant in terms of job location, she was at Falcon Pointe and then she moved on somewhere\else?

A.   I don't know.

Q.   Okay.  Do you know any reason why she left her job at Falcon Pointe?

A.   It was a -- a staffing issue.  There were several complaints by residents just over time.

Q.   About Ms. Bottema?

A.   Yes, just --

Q.   What were the complaints?

A.   Just complaints about performance, just responsiveness.

Q.   Accuracy?  Was that one of the complaints?

A. I don't recall if that specifically was.

Q. Okay. So who asked Goodwin to replace Ms. Bottema?

A. As the board president I requested that Goodwin look at Ms. Bottema's performance and then come up with a recommendation.

Q. Okay. And so you asked to have her replaced?

A. I asked for Goodwin to look into the matter.

Q. Well, did you ask Goodwin to replace Ms. Bottema?

A. I don't recall if those were my exact words.

Q. Was it your intent that Ms. Bottema be replaced?

A. I would say so, yes.

Q. So Ms. Boykin, how long has she been on the job, approximately?

A. Oh, gosh, a few months.

Q. Okay. And was she previously with Goodwin?

A. No, she was not.

Q. Okay. And do you know where she came from?

A. I don't recall the name of her previous employer.

Q. So who at the board prov -- did you ask to work with legal to provide these documents? Was it Natalie Boykin?

A. I believe it was prior to Natalie. This matter came up well before that.

Q. Who was it, then?

Q. And do -- does Falcon Pointe maintain the board of director's meetings for the last seven years?

A. The management company maintains the records and they should be maintaining the minutes as well.

Q. And you have --

A. Now --

Q. Go ahead.

A. Certainly there has been a change in the past seven years of management companies from Real Manage to Goodwin and that happened several years ago. So I'm not sure if that transition caused any, you know, discrepancies in --

Q. Well, you certainly would agree --

MR. CAMPBELL: Hold on. Hold on. Let him finish his answer.

A. If that will cause any, you know, discrepancy in maintaining those minutes.

MR. SPEARS: He just said that.

Q. (BY MR. SPEARS) So you do have board meetings -- records of the board meetings for the last seven years at the management company --

MR. CAMPBELL: Objection; form.

Q. (BY MR. SPEARS) -- give or take whatever might not be there, a month or two here and there.

MR. CAMPBELL: Same objection.

59.

A. Without physically looking at them I couldn't tell you. I would presume so, but I -- without physically looking --

Q. (BY MR. SPEARS) So in reference to my notice to request you turned notice -- excuse me -- Deposition Notice Exhibit 1 and the duces tecum part of it, you made no effort to locate any of the documents contained on that particular record -- that particular request personally, did you?

MR. CAMPBELL: Objection; form.

A. Personally, I did not.

Q. (BY MR. SPEARS) And did you -- were you advised that it's your responsibility to attempt to comply with that request to the best of your ability?

MR. CAMPBELL: Objection. Don't answer that. It's privileged.

Q. (BY MR. SPEARS) All right. Did you understand that it was your responsibility to use your best efforts to produce the documents requested?

MR. CAMPBELL: Objection. Same objection.

MR. SPEARS: Can he answer?

MR. CAMPBELL: I mean, the only way he would know that would be attorney-client communications.

MR. SPEARS: No, he wouldn't. I'm asking him what he did. I'm not asking what you did. I'm asking

what he did.

MR. CAMPBELL: If you can answer the question without going into anything we've talked about feel free to answer. Otherwise, don't answer.

A. To the best of my ability, again, since I don't maintain the records, having someone else do that for me in this case would be to the best of my ability.

Q. (BY MR. SPEARS) Could you go to where the records are maintained physically?

MR. CAMPBELL: Objection; form.

A. I could.

Q. (BY MR. SPEARS) And when you got there, wherever they're maintained, would the people who have the -- who have the physical control of the records allow you to look through your own records?

MR. CAMPBELL: Objection; form.

A. Yes.

Q. (BY MR. SPEARS) Okay. And did you attempt to look through your records in order to comply with my deposition notice request?

MR. CAMPBELL: Objection; form.

A. I specifically did not go to the Website, no.

Q. (BY MR. SPEARS) So you don't know from a personal standpoint whether or not you've complied with the request in that deposition notice, do you?

61.

MR. CAMPBELL: Objection; form.

A. Can you repeat the question?

Q. (BY MR. SPEARS) You -- you cannot sit -- can you sit here as a matter of your own personal knowledge and say that you are -- are -- no, strike the question. Let me try to rephrase it.

Can you say as a matter of personal knowledge that all documents responsive to this request -- well, strike that.

Do you know what exactly the people at Goodwin Management did to locate these documents?

MR. CAMPBELL: Objection; form.

A. Not personally, no.

Q. (BY MR. SPEARS) So you can't be sure that they have actually searched for the documents on that particular list that's attached to Deposition Exhibit 1?

MR. CAMPBELL: Objection; form.

A. I could not be 100 percent certain whether or not they overlooked a document or so. So to answer your question -- what I believe to be your question is without 100 percent certainty I could not say that every single document is here.

Q. (BY MR. SPEARS) Okay. Is it fair to say that you can say that every document that is responsive even from your limited review is not here?

62.

representative --

Q. Yes.

A. -- or neighborhood representative?  The term is interchangeable.

Q. Well, voting representative.  That's what I applied for, voting representative.

A. Again, not a board of director.

MR. CAMPBELL:  Objection.  Sidebar.

Q. (BY MR. SPEARS)  Voting representative.

A. Okay.

Q. Would my name appear on that document?

MR. CAMPBELL:  Objection; form.

A. I would -- I would -- I would say so.

Q. (BY MR. SPEARS)  And if I had applied for that position and my name was not on that document could you offer any explanation why it would not be there?

MR. CAMPBELL:  Objection; form.

A. No.

Q. (BY MR. SPEARS)  And are you aware that I did apply for that position and was confirmed in writing by Goodwin Management; my name did not appear on that ballot?

MR. CAMPBELL:  Objection; form.

A. I would not know why your name would not be on this list.

MR. SPEARS:  Can I have this marked?

(Exhibit No. 7 marked.)

Q.   (BY MR. SPEARS)   I'll show you what's been marked as Deposition Exhibit 7 and just ask you to take a look at it.   No question but just to take a look at it.

A.   Okay.

Q.   And as you sit here before you, this is the first time you became aware that I applied to be a voting member and was not included in the ballot?

MR. CAMPBELL:  Objection; form.

A.   I certainly am unaware that you were not included in the ballot.

Q.   (BY MR. SPEARS)   And why would you be unaware of that?

A.   Why would I be unaware?

Q.   That I wasn't included in the ballot if you knew I applied.

MR. CAMPBELL:  Objection; form.

A.   I personally did not check the ballot so I don't know that you were included or weren't.

Q.   (BY MR. SPEARS)   Well, you're looking at the ballot now.  Do you see my name on the ballot?

A.   Which neighborhood do you live in?

Q.   Somerset.

MR. CAMPBELL:  Objection; form.

A.   And I don't -- you know, this is a document that

64.

was handed to me. I don't know if this was the final copy of the ballot.

Q. (BY MR. SPEARS) It's still on your Website. It's still live and well on your Website, the election form from this last election. It was alive and well on your Website the last I looked.

MR. CAMPBELL: Objection. Sidebar.

Q. (BY MR. SPEARS) Do you have any reason to dispute that that's the election form?

A. I can -- I can't confirm or deny that this is the election form.

Q. Does it look like the election form?

A. It looks like the typical election form, yes.

Q. Did it come off of your Website if you look up at the top from the information that's contained on the first or second page?

A. It appears that it did.

Q. And did it appear that it came on your -- from your Website at a date after -- than June 7th?

MR. CAMPBELL: Objection; form.

A. I don't -- I don't see a date. Is there a date on here?

Q. (BY MR. SPEARS) I'm sure there is.

MR. CAMPBELL: Same objection.

A. Okay.

Q.   (BY MR. SPEARS)   And does it appear now after you've looked at -- does it appear that that was, in fact, the ballot that was on your Website now that you've had a chance to look at the notations on the top and the bottom?

MR. CAMPBELL:   Objection; form.

A.   It appears that this is the ballot.

Q.   (BY MR. SPEARS)   And you don't know of any reason why I would have been left off of that ballot, do you?

A.   Well, I mean, the Exhibit 7 that you handed me, it shows some correspondence between Renee and I believe Renee lives at your residence.

Q.   Yep.

A.   Where Renee and you both wanted to apply for the position and the manager indicated that you had already applied and that only one of you could be on the ballot and so --

Q.   We said okay, put my name on it.

A.   I mean, that's --

Q.   And so from that correspondence --

A.   This is the only knowledge I have of this is, what you're showing me.

Q.   From that correspondence -- and does the correspondence -- do you have any reason to dispute the person that sent the correspondence from Falcon Pointe or from Goodwin?

66.

MR. CAMPBELL: Objection; form.

A. I don't.

Q. (BY MR. SPEARS) Okay. And so to the best of your knowledge there would have been no reason for me to have been left off the ballot?

MR. CAMPBELL: Objection; form.

A. I would not be aware of any reason, no.

Q. (BY MR. SPEARS) Now that you found that I -- well, now that I -- at least I've told you and shown you some documentation that indicates that I had applied to be on the -- as a voting representative, what actions do you intend to take to rectify that situation?

A. Well, certainly I would discuss the matter with the manager to see if that, in fact, is the case. I would need to verify that with that individual first to see if that, in fact, is this case.

Q. If in fact -- if it is, in fact, the case, which I think you've had some evidence that it is, in fact, the case, what action do you intend to take in regards to it?

MR. CAMPBELL: Objection; form.

A. I'm not sure I could answer that at this moment because I don't know what available actions would be -- I'd have to consult with the association attorney to see if there is some recourse for that.

MR. SPEARS: Could I have this one marked?

67.

says -- oh, where is it? Yes, the fence in the attached photo needs to be moved forward to screen the pool pump and the lattice removed from the fence. In a situation such as this, the board president may speak on behalf of the board of directors when the home is in direct violation of the deed restriction. What I'm asking you is, is that an accurate statement?

MR. CAMPBELL: Objection; form.

A. I would not speak on behalf of the board, no.

Q. (BY MR. SPEARS) So that is not an accurate statement?

A. Not the way I understand that, no.

Q. And do you realize that I took down the fence because of that statement?

MR. CAMPBELL: Objection; form.

Q. (BY MR. SPEARS) The lattice that is attached to the fence?

MR. CAMPBELL: Objection; form.

A. I don't know what was the specific reason why you took the lattice down.

Q. (BY MR. SPEARS) So it was mis -- it's a misrepresentation to say that you can speak on behalf of the board. You don't have any power to speak on behalf of the board, do you?

MR. CAMPBELL: Objection; form.

68.

A. No.

Q. (BY MR. SPEARS) In any context you don't have any power to speak on behalf of the board?

MR. CAMPBELL: Objection; form.

A. No, not on behalf of the board.

Q. (BY MR. SPEARS) So this statement by Ms. Bottema was inaccurate in response to my request for a hearing?

MR. CAMPBELL: Objection; form.

A. I would say so, yes.

MR. SPEARS: Oops. I took that. You gave me that dirty look.

Q. (BY MR. SPEARS) Now, there did come a time when you did come to the property, my home, correct?

A. Yes.

Q. And do you know if that was at my request or Ms. Bottema's request -- Bottema, excuse me?

A. I don't recall specifically whose request it was.

Q. Okay. So it could have been my request or it could have been her request?

A. It may have been.

Q. Okay. And we did meet on the property, correct?

A. That's correct.

Q. And how many times did you come to the property, once or twice?

A. Once.

69.

CAUSE NO. C-1-CV-13-010214

WESLEY SPEARS AND RENEE JACOBS, ) IN THE COUNTY COURT
)
         Plaintiffs, )
)
VS. )
) AT LAW NO. 1
)
FALCON POINTE COMMUNITY )
ASSOCIATION, )
         Defendant. ) TRAVIS COUNTY, TEXAS

REPORTER'S CERTIFICATION
VIDEOTAPED DEPOSITION OF
RAINER FICKEN
AUGUST 26, 2014

I, AMBER KIRTON, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, RAINER FICKEN, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness:

That the deposition transcript was submitted on _9. 10. 14_ to the witness or to the attorney for Defendant for examination, signature and return to U.S. Legal Support, Inc. by _10. 3. 14_;

That the amount of time used by each party at the deposition is as follows:

Mr. Wesley S. Spears - 02 hour(s): 58 minute(s)
Mr. David J. Campbell - 00 hour(s): 02 minute(s)

That pursuant to information given to the deposition

**70.**

141

officer at the time said testimony was taken, the following includes all parties of record:

Mr. Wesley S. Spears, Attorney for Plaintiffs
Mr. David J. Campbell, Attorney for Defendant

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorney in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Further certification requirements pursuant to Rule 203 of TRCP will be certified to after they have occurred.

Certified to by me this ___10___ day of September, 2014.

_Amber Kirton_
Amber Kirton, CSR
Texas CSR #8110
Expiration Date: 12/31/15
Firm Registration No. 344
U.S. Legal Support, Inc.
701 Brazos, Suite 380
Austin, Texas 78701
(512) 292-4249
(512) 292-3866 Fax

71.

# FALCON POINTE COMMUNITY ASSOCIATION, INC.
## BOARD OF DIRECTORS MEETING MINUTES
### Jan. 10, 2013
### Newland Communities Office
### 13809 Research Blvd., Suite 475
### Austin, TX 78750

**Call to order**

Board President Rainer Ficken called the meeting to order at 10:00 a.m. Jan. 10, 2013.

**Attendance:**

Board Members - Rainer Ficken, Bill Meyer, Vaike O'Grady, Alyssa Douglass
Absent: Joetta Houghton
Diane Bottema, Randy Vogel – Goodwin Management

**Approval of Agenda and Minutes**

A motion was made by Director O'Grady to approve the November 8, 2012, meeting minutes; motion was seconded by President Ficken. Minutes were approved as submitted. Motion passed.

**Management Report**

Diane Bottema gave a report on the financials and delinquency status. Randy Vogel offered a breakdown of the delinquent accounts. He explained that there were currently 133 units with a past due balance. Of the 133, 28 were at legal - $78,000. 23 more accounts are scheduled to be sent to legal.

Ms. Bottema reviewed the recent Winter Wonderland event, stating that was a huge success. The next events planned are the Daddy, Daughter Dance on Feb. 9 and Casino Night on March 2.

**Old Business**

None.

**New Business/Directors Report**

Director Connie Hentosh seat on the board has been replaced by Alyssa Douglass. (Document filed) President Ficken discussed the potential development of an age-restricted apartment community south of Central Park. This development is in the pre-application stage. If built the apartments will have their own amenities and residents will not have access to the Falcon Pointe Resident's Club facilities. President Ficken also stated the construction on Colorado Sand Drive and Lone Star Boulevard is scheduled to begin very soon.

**Action Items**

Ms. Bottema will follow up with the City of Pflugerville Parks Department, on Director Houghton's previous request to add permanent soccer goals in the field next to the Dog Park.

**Adjournment**

Motion to adjourn made by Director Meyer and seconded by Director O'Grady.
Meeting adjourned at 10:25 a.m.

_____
Rainer Ficken, President

4-10-13
_____
Date

72.

Ficken
DEPOSITION
EXHIBIT
2
PENGAD 800-631-6989

FPCA 44

# FALCON POINTE COMMUNITY ASSOCIATION, INC.
## BOARD OF DIRECTORS MEETING MINUTES
### April 10, 2013
### Newland Communities Office
### 13809 Research Blvd., Suite 475
### Austin, TX 78750

## Call to order
Board President Rainer Ficken called the meeting to order at 10:10 a.m. April 10, 2013.

## Attendance:
Board Members - Rainer Ficken, Bill Meyer, Joetta Houghton, Alyssa Douglass, Vaike O'Grady
Diane Bottema, Randy Vogel – Goodwin Management

## Approval of Agenda and Minutes
A motion was made by Director Douglass to approve the January 10, 2013 meeting minutes; motion was seconded by Director O'Grady. Minutes were approved as submitted. Motion passed.

## Management Report
Diane Bottema gave a report on the financials and the current status of the collection accounts. President Ficken has discussed with the Association attorney to begin ordering a Judgment against homeowners with a delinquent account rather than moving into Foreclosure. Attorney Carey Helm will prepare a document outlining the steps we will follow with our collection accounts. Ms. Bottema discussed Senate Bill 198 which would allow homeowners to install drought resistant landscaping or water conserving turf, but it would still allow HOAs to require that homeowners submit their plans for approval. The bill passed the committee unanimously, and now it heads to the Senate. This change would be effective Sept. 1, 2013. Ms. Bottema reminded the Board of upcoming meeting dates and the Voting Representatives Election to be held on May 21, 2013.

## Directors Report
President Ficken gave a status update on the legal issue concerning the home on Mallard Pond. Mr. Ficken also touched on the status of the Senior Living Apartment Community. Mr. Ficken explained that it is still in the approval process. The community will only allow seniors (55 and over) on a limited income. The property owner will receive a tax credit to build. Residents must earn no more than 60% of the median income.

## Old Business
President Ficken and Ms. Bottema met with city of Pflugerville Parks Director, James Bowlin in March to discuss the addition of soccer goals to the field next to the Bark Park. The goals will be added by the HOA.

## New Business
Director Meyer called for a motion to approve partial assignment of the Declarant and Association rights. Director Houghton made the motion to approve. The motion was seconded by Director O'Grady.

Ms. Houghton asked if there was a possibility of builders offering a higher price point of homes coming into Falcon Pointe. President Ficken answered that there were new builders being considered.

## Adjournment
Motion to adjourn made by Director Meyer and seconded by President Ficken. Meeting adjourned at 11:15 a.m.

_____
Rainer Ficken, President

73.

7 - 10 - 13
_____
Date

FPCA 45

# FALCON POINTE COMMUNITY ASSOCIATION, INC.
## BOARD OF DIRECTORS MEETING MINUTES
### July 10, 2013
### Newland Communities Office
### 13809 Research Blvd., Suite 475
### Austin, TX 78750

**Call to order**

Board President Rainer Ficken called the meeting to order at 10:00 a.m. July 10, 2013.

**Attendance:**

Board Members - Rainer Ficken, Bill Meyer and Alyssa Douglass
Diane Bottema, Matt Gibson – Goodwin Management

**Approval of Agenda and Minutes**

A motion was made by Director Meyer to approve April 10, 2013 meeting minutes; motion was seconded by Director Douglass. Minutes were approved as submitted. Motion passed.

**Management Report**

Diane Bottema gave a report on the financials and the current status of the collection accounts. 20% of the collections amount is due to the account currently in litigation. Ms. Bottema discussed adding Zoysia grass to the approved grasses at Falcon Pointe (Bermuda grass is currently the only type of grass allowed). Director Meyer made a motion to approve the addition of Zoysia grass, the motion was seconded by Director O'Grady. Senate Bill 198 will allow Xeriscaping will be effective Sept. 1st. The motion was made by Director O'Grady to create the policy for Xeriscaping within the community. Director Douglass seconded the motion. Attorney Carrie Gunn will be updating the Community Manual to include this verbiage. The plan would allow homeowners to install drought resistant landscaping or water conserving turf, but it would still allow HOAs to require that homeowners submit their plans for approval.

**Directors Report**

President Ficken reported that the HOA will revise the current ACC guidelines to allow Xeriscaping. The guidelines will become part of the Falcon Pointe Community Manual. Director O'Grady moved to have the Xeriscaping policy created for Falcon Pointe. Motion was seconded by Director Douglass and approved. Attorney Carey Gunn of Winstead PC, is in the process of writing these new guidelines, to be presented at the October 9th meeting.

**Old Business**

The soccer goals have been installed in the open space area near the Bark Park. The water filtration system has been completed at the main splash park, per new city guidelines.

**New Business**

ValleyCrest has started an aggressive weed treatment program along with changing detail and mowing crews at Falcon Pointe in effort to provide better service. ValleyCrest is currently under probation at Falcon Pointe.

**Adjournment**

Motion to adjourn made by Director Meyer and seconded by Director Douglass. Meeting adjourned at 11:25 a.m.

_____
Rainer Ficken, President

74.

_10-9-13_____
Date

**FALCON POINTE COMMUNITY ASSOCIATION, INC.**
**BOARD OF DIRECTORS MEETING MINUTES**
October 9, 2013
**Newland Communities Office**
**13809 Research Blvd., Suite 475**
**Austin, TX 78750**

**Call to order**
Board President Rainer Ficken called the meeting to order at 10:10 a.m. October 9, 2013. President Ficken explained the Affirmation of Board Composition; the Board shall be composed of 3 directors and 2 officers. (Affirmation is included as Exhibit A). Vice President Meyer called for a motion to approve the Affirmation of Board Composition. The motion was seconded by Secretary Houghton and approved.

**Attendance**
Board Members - Rainer Ficken, Bill Meyer and Joetta Houghton
Officers – Vaike O'Grady and Alyssa Douglass
Diane Bottema, Randy Vogel – Goodwin Management

**Approval of Agenda and Minutes**
A motion was made by Director Meyer to approve July 10, 2013 meeting minutes; motion was seconded by President Ficken. Minutes were approved as submitted. Motion passed.

**Management Report**
Diane Bottema provided the September financials for review. We currently have 1046 homeowners in Falcon Pointe. Ms. Bottema gave a summary of the 2013 violations in comparison to the 2012 violations. The number has decreased significantly. Ms. Bottema discussed the community activities for the year, and some plans for next years events. 2013 Projects and Repairs summary was discussed in addition to some upcoming projects for 2014.

**Directors Report**
President Ficken reported that Central Park has been dedicated to the City of Pflugerville; however, the HOA will continue to maintain it.

**Review of 2014 Budget**
Vice President Meyer called for a motion to approve the 2014 budget. The motion was seconded by Secretary Houghton. The motion passed.

**Review of new Facilities Reservation Agreement**
Currently the agreement is being revised to allow residents more free time at the pool and clubhouse facilities on the weekends. President Ficken asked for a motion to approve the new agreement pending any revisions made after presenting this to the Voting Representatives at the upcoming 10/15 meeting. The motion was made by Joetta Houghton and seconded by Bill Meyer. The motion was approved.

**Adjournment**
Motion to adjourn made by Director Meyer and seconded by President Ficken. Meeting adjourned at 11:40 a.m.

_____
Rainer Ficken, President

1-9-14
_____
Date

75.

# MINUTES OF THE ANNUAL MEETING OF THE VOTING REPRESENTATIVES OF THE FALCON POINTE COMMUNITY ASSOCIATION, INC.

## June 25, 2013

The undersigned, President of the Falcon Pointe Community Association, Inc. (the "Association"), hereby certifies that at 6:30 PM on June 25, 2013, the Annual Meeting of the Voting Members of the Association was held at the Residents' Club located at 19015 Falcon Pointe Blvd., in Pflugerville, Texas. President Rainer Ficken, Director Alyssa Douglass of the Board of Directors were present. Also present were Association Manager Diane Bottema, Assistant Association Manager Janelle Hurley and Matt Gibson of Goodwin Management. The Meeting was called to order by President Ficken at 6:30 PM and the following business was conducted:

**Items 1 – Call to Order and Quorum Verification**

| Section | Class A Votes | Representative | Neighborhood |
|---------|---------------|----------------|--------------|
| 3 | 160 | Lee Lara | The Vistas |
| 12 | 100 | James Owens | Lost Creek |
| 4N | 76 | Jennifer Meiners | Woodhaven |
| 5A | 49 | Debora Harris | Woodcreek Trail A |
| 5B | 76 | Doug Weiss | Woodcreek Trail B |
| 6A | 54 | Mari Hunziker | Stonehill A |
| 6B | 71 | Steven Stroud | Stonehill B |
| 8A&C | 67 | Sherry Cowan | Parkwood A & C |
| 8B&D | 51 | Michelle Myers | Parkwood B & D |
| 9E&W | 114 | Daphne Gilbert | Somerset |
| Total | 818 | | |
| 50% Quorum | 409 | | |

The sign-in sheet for the Voting Members of the Association is attached as Exhibit A.

**Item 2 – Proof of Notice of Meeting and Verification of Quorum**
The quorum of at least 50% of the votes entitled to be cast at the meeting was established. A total of 818 Class A votes were entitled to be cast at the meeting. The table above shows the Representatives present and the total of Class A votes they represent. With the members of the Declarant group present, the Class B quorum requirement was also met. Diane Bottema explained that the proper notice was mailed to all of the Voting Members in accordance to the Bylaws. That document is attached as Exhibit B.

**Item 3 – Review and Acceptance of the 2012 Annual Meeting Minutes**
All of the Voting Members were presented a draft of the minutes from the June 26, 2012 meeting with their meeting packets. Jennifer Meiners motioned to approve the minutes as presented, Mari Hunziker seconded that motion and the minutes were unanimously approved.

76.
1

<u>Item 4- Guest Speaker Simone</u> Barnes of Capitol Metro gave an update on "Project Connect North". Project Connect is the vision for Central Texas high capacity transit system.

<u>Item 5 – Management Report</u>
Diane Bottema's management report included a summary of the 2013 Budget; the anticipated income is $1.089 million in income with Operating Expenses of $1.029 million and the planned Reserve of $32,450. Status of Lots: 1,009 Resident owned, 104 Builder owned and 1,235 Declarant owned. Total number of Lots at build-out is 2,348. The Fine Policy is currently being enforced. Inspections are done twice a month. Current 2013 YTD violations: 55% landscape maintenance, 26% Trash cans, 11% other, 5% recreational vehicle parking and 3% unsightly.

<u>Item 6 – Community Events</u>
Janelle Hurley gave an overview of the events of 2013. This year's Casino Night had a "Gangster Theme", with prizes for the best costumes. The next big event will be the "Parrot Head Party". We'll have cheese burgers in paradise for all! A calendar of events was included in each meeting packet.

<u>Item 7 – Report from Board of Directors</u>
President Ficken presented the Board of Directors Report, which included the following:
I. Construction of the southern entrance including the extension of Colorado Sand Drive expected to be completed November 2013.
II. Construction of Kelly Lane will begin after Colorado Sand Drive is completed. Kelly Lane will be expanded to a 4 lane road (to the 2nd Falcon Pointe Blvd. entrance). There will be a traffic light added at Falcon Pointe Blvd. ( 1st entrance)
III. The Senior Living Apartments are still in the approval process. If approved the design of the apartments will blend with the design of the neighborhood. The apartments would pay into the Master Association of the HOA, however would have their own amenities and would not have access to the Resident's Club and amenities. This land is zoned for a multi-family project.

<u>Item 8 – Other Business</u>
There was no other business to be discussed.

<u>Item 9 - Adjourn Association Meeting</u>
Debora Harris motioned to adjourn the meeting. Mari Hunziker seconded the motion. There being no objections, the Annual Meeting of the Voting Representatives of Falcon Pointe Community Association, Inc. was thusly adjourned at 7:20pm.

_____
Rainer Ficken, President

_____
Bill Meyer, Director

_____
Vaike O'Grady, Director

FPCA 49

# FALCON POINTE COMMUNITY ASSOCIATION, INC.
## BOARD OF DIRECTORS MEETING MINUTES
### January 14, 2014
### Newland Communities Office
### 13809 Research Blvd., Suite 475
### Austin, TX 78750

## Call to order
Board President Rainer Ficken called the meeting to order at 10:05 a.m. January 9, 2014.

## Attendance
Board Members - Rainer Ficken, Bill Meyer and Joetta Houghton
Diane Bottema– Goodwin Management

## Approval of Agenda and Minutes
A motion was made by Director Meyer to approve October 9, 2013 meeting minutes; motion was seconded by director Houghton. Minutes were approved as submitted. Motion passed.

## Management Report
Diane Bottema provided the December financials for review. We currently have 1102 homeowners in Falcon Pointe. Ms. Bottema discussed the 2014 meeting dates for the Board and for the Voting Representatives. The 2014 Activities calendar was also distributed. Upcoming projects for 2014 are to begin soon, specifically the resurfacing of the main splash pad and the replacement of the water features.

## Directors Report
New Sections coming online: Section 15 and 16. President Ficken deferred discussion of pending legal matters to the Executive Session.

## Adjournment
Motion to adjourn made by Director Meyer and seconded by Director Houghton. Meeting adjourned at 10:40 a.m.

_____
Rainer Ficken, President

APRIL 22, 2014
Date

78.

FPCA 50

# FALCON POINTE COMMUNITY ASSOCIATION, INC.
## BOARD OF DIRECTORS MEETING MINUTES
### April 9, 2014
### Newland Communities Office
### 13809 Research Blvd., Suite 475
### Austin, TX 78750

**Call to order**
Board President Rainer Ficken called the meeting to order at 10:12 a.m. April 9, 2014.

**Attendance**
Board Members - Rainer Ficken and Bill Meyer
Diane Bottema– Goodwin Management

**Approval of Agenda and Minutes**
A motion was made by Director Meyer to amend the January 9, 2014 meeting minutes to include notation regarding Executive Session in Directors Report; motion was seconded by director Ficken. Minutes were approved as amended.

**Management Report**
Diane Bottema provided the March financials for review. There are currently 1138 homeowners in Falcon Pointe. Ms. Bottema discussed several common area issues, including windscreens to be replaced later in the month and upgrades to landscape beds in Somerset & Lost Creek. Common area projects recently completed include resurfacing of the main splash pad, replacement of splash pad tumble buckets, replacement of pool sun shades, and pressure washing on the Resident's Club roof.

Voting Rep election will begin May 21, 2014. Annual Voting Rep meeting is scheduled for June 24, 2014.

**Directors Report**
None

**Adjournment**
Motion to adjourn made by Director Meyer and seconded by Director Ficken. Meeting adjourned at 10:45 a.m.

_____
Rainer Ficken, President

7 - 15 - 14
_____
Date

79.

FPCA 51

# FALCON POINTE COMMUNITY ASSOCIATION, INC.
## BOARD OF DIRECTORS MEETING MINUTES
### July 9, 2014
### Newland Communities Office
### 13809 Research Blvd., Suite 475
### Austin, TX 78750



## Call to order
Vice President Bill Meyer called the meeting to order at 10:05 a.m. July 9, 2014.

## Attendance
Board Member - Bill Meyer
Resident Board Member- Debora Harris
Goodwin Management- Natalie Boykin and Matt Gibson

## Approval of Agenda and Minutes
A motion was made by Vice President Meyer to table the approval of the April 9, 2014 meeting minutes to include Board President Rainer Ficken since he was absent today.

## Management Report
Natalie Boykin provided the June financials for review. There are currently 1168 homeowners in Falcon Pointe. Ms. Boykin discussed the mailbox kiosks solar light install project that's almost complete, only seven remaining. Amenity center carpets, tile and grout cleaned and sealed included pool restrooms. A new backboard was purchased for the tennis courts. We're pressure washing the pool decking weekly. Rock wall repairs are being made in Woodcreek trail.

## Executive Session
Legal matters were discussed

## Directors Report
Vice President Bill Meyer asked to be updated on builder violations as they need to be held accountable like residents. The logistics of adding the additional resident board member is in the works with our legal council.

## Adjournment
Motion to adjourn made by Vice President Meyer and seconded by Debora Harris. Meeting adjourned at 10:30 a.m.


_____
Rainer Ficken, President

_____
Date

80.

FPCA 52

# Budget Detail (Cash)
## Falcon Pointe Community Assoc. - (FPC)
### Jan 2013 - Dec 2013

Page 1
10/25/2012
11:01 AM

| count | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | | | | | | | |
| **LIABILITIES & EQ** | | | | | | | | | | | | | |
| **INCOME** | | | | | | | | | | | | | |
| **INCOME** | | | | | | | | | | | | | |
| Owner Assessm | 56,434 | 57,130 | 57,826 | 58,522 | 59,218 | 59,914 | 60,610 | 61,306 | 62,002 | 62,698 | 63,394 | 64,090 | 723,144 |
| Builder Assessm | 3,248 | 3,538 | 3,828 | 4,118 | 4,408 | 4,698 | 4,988 | 5,278 | 5,568 | 5,858 | 6,148 | 6,438 | 58,116 |
| Total Assessmen | 59,682 | 60,668 | 61,654 | 62,640 | 63,626 | 64,612 | 65,598 | 66,584 | 67,570 | 68,556 | 69,542 | 70,528 | 781,260 |
| **OTHER INCOME** | | | | | | | | | | | | | |
| Late Fees | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 7,800 |
| Fines | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 1,500 |
| Miscl Income | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 720 |
| Interest Income | 121 | 121 | 121 | 121 | 121 | 121 | 121 | 121 | 121 | 121 | 121 | 121 | 1,451 |
| Amenity Ctr Rent | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 6,000 |
| Architectural Rev | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 15,600 |
| Declarant Contri | 68,700 | | | 68,700 | | | 68,700 | | | 68,700 | | | 274,800 |
| TOTAL OTHE | 71,456 | 2,756 | 2,756 | 71,456 | 2,756 | 2,756 | 71,456 | 2,756 | 2,756 | 71,456 | 2,756 | 2,756 | 307,871 |
| TOTAL INCOM | 131,138 | 63,424 | 64,410 | 134,096 | 66,382 | 67,368 | 137,054 | 69,340 | 70,326 | 140,012 | 72,298 | 73,284 | 1,089,13 |
| **EXPENSE** | | | | | | | | | | | | | |
| **DIRECT OPER E** | | | | | | | | | | | | | |
| Electricity | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 36,000 |
| Water/Sewer | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 156,000 |
| Telephone | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 5,400 |
| Cable/Internet | 199 | 199 | 199 | 199 | 199 | 199 | 199 | 199 | 199 | 199 | 199 | 199 | 2,388 |
| Gas | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 120 |
| Trash Removal | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 4,200 |
| Landscape Maint | 18,490 | 18,490 | 18,490 | 18,490 | 18,490 | 18,490 | 18,490 | 18,490 | 18,490 | 18,490 | 18,490 | 18,490 | 221,880 |
| cape-Mate | 165 | 165 | 9,950 | 6,875 | 6,928 | 5,630 | 1,030 | 1,030 | 1,030 | 325 | 380 | 380 | 33,888 |
| scape-Irriga | 1,867 | 217 | | 1,867 | 217 | | 1,867 | 217 | | 1,867 | 217 | | 8,336 |
| Pool Maintenanc | 1,430 | 1,430 | 1,430 | 2,051 | 2,051 | 2,051 | 2,051 | 2,051 | 2,051 | 2,051 | 1,430 | 1,430 | 21,507 |
| Pool Repairs/Imp | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 9,000 |
| Pool-Monitors/Lif | | | | | 4,800 | 4,800 | 4,800 | 4,800 | 4,800 | | | | 19,200 |
| Pool-Furn/Miscl | 2,422 | 172 | 171 | 172 | 172 | 171 | 172 | 172 | 171 | 172 | 172 | 171 | 4,310 |
| Repairs/Maint | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 | 21,600 |
| Repair/Maint-Sig | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 6,000 |
| Repair/Maint-Irrig | 715 | 390 | 2,000 | 715 | 890 | 1,040 | 4,115 | 4,115 | 4,550 | 4,455 | 2,000 | 890 | 25,875 |
| Repair/Maint-Wa | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 15,000 |
| Repair/Maint-Fla | 225 | 225 | 225 | 225 | 225 | 225 | 225 | 225 | 225 | 225 | 225 | 225 | 2,700 |
| Repair/Maint-Am | 1,350 | 1,350 | 1,350 | 1,350 | 1,350 | 1,350 | 1,350 | 1,350 | 1,350 | 1,350 | 1,350 | 1,350 | 16,200 |
| Repair/Maint-Am | 450 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 2,100 |
| Repair/Maint-Fitn | | 165 | | 165 | | 165 | | 165 | | 165 | | 165 | 990 |
| Repair/Maint-Par | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 4,500 | 25 | 25 | 25 | 25 | 4,775 |
| Repair/Maint-Po | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 38,400 |
| Repair/Maint-Lig | 130 | 130 | 130 | 130 | 130 | 130 | 130 | 130 | 130 | 130 | 130 | 130 | 1,560 |
| Custodian Srvcs/ | 3,100 | 3,100 | 3,100 | 3,100 | 3,100 | 3,100 | 3,100 | 3,100 | 3,100 | 3,100 | 3,100 | 3,100 | 37,200 |
| Exterminator/Pes | 173 | | | 173 | | | 173 | | 250 | 173 | | | 942 |
| Security & Patrol | 4,538 | 4,538 | 4,538 | 4,538 | 4,538 | 4,538 | 4,538 | 4,538 | 4,538 | 4,538 | 4,538 | 4,538 | 54,453 |
| Taxes-Property | | | | | | | | | | | | 400 | 400 |
| TOTAL DIR OP | 59,589 | 55,056 | 66,068 | 64,535 | 62,775 | 66,374 | 66,725 | 69,792 | 65,119 | 61,725 | 56,716 | 55,953 | 750,424 |
| **GEN/ADM EXPEN** | | | | | | | | | | | | | |
| Professional-Leg | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 48,000 |
| Professional-Arc | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 | 21,600 |
| Professional-Acc | | | 235 | | | | | | | | | | 235 |
| Homeowner Acti | 1,775 | 1,775 | 1,775 | 1,775 | 1,775 | 1,775 | 1,775 | 1,775 | 1,775 | 1,775 | 1,775 | 10,000 | 29,525 |
| Ins-Prop/Liability | 5,238 | 2,148 | 2,148 | 2,148 | 2,148 | 2,148 | 2,148 | 2,148 | 2,148 | 2,148 | 2,148 | | 26,718 |
| Mgmt Fee-Base | 2,441 | 2,491 | 2,540 | 2,590 | 2,639 | 2,689 | 2,738 | 2,788 | 2,837 | 2,887 | 2,936 | 2,986 | 32,562 |
| Mgmt Fee-Onsite | 8,100 | 8,100 | 8,100 | 8,100 | 8,100 | 8,100 | 8,100 | 8,100 | 8,100 | 8,100 | 8,100 | 9,100 | 98,200 |
| Adm-Copies | 475 | 475 | 475 | 475 | 475 | 475 | 475 | 475 | 475 | 475 | 475 | 475 | 5,700 |
| Adm-Postage | 375 | 375 | 375 | 375 | 375 | 375 | 375 | 375 | 375 | 375 | 375 | 375 | 4,500 |
| Adm-Office Supp | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 3,600 |
| Adm-Coupons | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 2,986 | 3,283 |
| Adm Mileage | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 360 |
| A ebsite | 219 | 219 | 219 | 219 | 219 | 219 | 219 | 219 | 219 | 219 | 219 | 219 | 2,628 |
| Adm-Miscl | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 2,100 |

81.

# Budget Detail (Cash)
## Falcon Pointe Community Assoc. - (FPC)
### Jan 2013 - Dec 2013

Page 2
10/25/2012
11:01 AM

| count | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TOTAL GEN/A | 24,955 | 21,915 | 22,199 | 22,014 | 22,063 | 22,113 | 22,162 | 22,212 | 22,261 | 22,311 | 22,360 | 32,446 | 279,011 |
| TOTAL OPER | 84,544 | 76,971 | 88,267 | 86,549 | 84,838 | 88,487 | 88,887 | 92,004 | 87,380 | 84,036 | 79,076 | 88,399 | 1,029,43 |
| NET OPERATI | 46,594 | -13,547 | -23,857 | 47,547 | -18,456 | -21,119 | 48,167 | -22,664 | -17,054 | 55,976 | -6,778 | -15,115 | 59,696 |
| NON-RECURRIN | | | | | | | | | | | | | |
| CAPITAL EXPEN | | | | | | | | | | | | | |
| Capital Expendit | 4,950 | | | | | | | | | | | | 4,950 |
| Resident's Club | | 16,500 | | | | | | | | | | | 16,500 |
| Pool Repairs/Imp | | | 11,000 | | | | | | | | | | 11,000 |
| TOTAL CAPIT | 4,950 | 16,500 | 11,000 | | | | | | | | | | 32,450 |
| TRAN PROOF | | | | | | | | | | | | | |
| Tran fr Oper to R | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 27,000 |
| TRANSFER P | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 27,000 |
| TOTAL NON-REC | 7,200 | 18,750 | 13,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 59,450 |
| NET FUND CHAN | 39,394 | -32,297 | -37,107 | 45,297 | -20,706 | -23,369 | 45,917 | -24,914 | -19,304 | 53,726 | -9,028 | -17,365 | 246 |

FPCA 54

# Falcon Pointe
## 12 Month Budget
## Budget FPC 2014 Budget

Date: 1/1/2014 - 12/31/2014
Operating

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **INCOME** | | | | | | | | | | | | | |
| Assessments | | | | | | | | | | | | | |
| Assessments | 65,357 | 66,067 | 66,778 | 67,488 | 68,198 | 68,909 | 69,619 | 70,330 | 71,040 | 71,750 | 72,461 | 73,171 | 831,168 |
| Builder Assessments | 5,062 | 5,654 | 6,246 | 6,838 | 7,430 | 8,022 | 8,614 | 9,206 | 9,798 | 10,390 | 10,982 | 11,574 | 99,816 |
| TOTAL Assessments | 70,419 | 71,721 | 73,024 | 74,326 | 75,628 | 76,931 | 78,233 | 79,536 | 80,838 | 82,140 | 83,443 | 84,745 | 930,984 |
| Other Income | | | | | | | | | | | | | |
| Amenity Center Rental | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 6,000 |
| Arch Review Fee | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 15,600 |
| Declarant Contributions | 58,900 | 0 | 0 | 58,900 | 0 | 0 | 58,900 | 0 | 0 | 58,900 | 0 | 0 | 235,600 |
| Interest Income | 102 | 102 | 102 | 102 | 102 | 102 | 102 | 102 | 102 | 102 | 102 | 102 | 1,224 |
| Late Fee | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 7,800 |
| Miscl Income | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 720 |
| Violation Fine | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 3,000 |
| TOTAL Other Income | 61,762 | 2,862 | 2,862 | 61,762 | 2,862 | 2,862 | 61,762 | 2,862 | 2,862 | 61,762 | 2,862 | 2,862 | 269,944 |
| TOTAL INCOME | 132,181 | 74,583 | 75,886 | 136,088 | 78,490 | 79,793 | 139,995 | 82,398 | 83,700 | 143,902 | 86,305 | 87,607 | 1,200,928 |
| **EXPENSE** | | | | | | | | | | | | | |
| Direct Oper Expenses | | | | | | | | | | | | | |
| Cable/Internet | 206 | 206 | 206 | 206 | 206 | 206 | 206 | 206 | 206 | 206 | 206 | 206 | 2,472 |
| Custodian Svcs/Supplies | 3,700 | 3,700 | 3,700 | 3,700 | 3,700 | 3,700 | 3,700 | 3,700 | 3,700 | 3,700 | 3,700 | 3,700 | 44,400 |
| Electricity | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 38,400 |
| Exterminator/Pest | 173 | 0 | 0 | 173 | 0 | 0 | 173 | 250 | 0 | 173 | 0 | 0 | 942 |
| Gas | 24 | 24 | 24 | 24 | 24 | 24 | 24 | 24 | 24 | 24 | 24 | 24 | 288 |
| Landscape Maintenance | 18,490 | 18,490 | 18,490 | 18,490 | 18,490 | 18,490 | 18,490 | 18,490 | 18,490 | 18,490 | 18,490 | 18,490 | 221,880 |
| Landscape-Irrigation System | 2,000 | 250 | 250 | 2,000 | 250 | 250 | 2,000 | 250 | 250 | 2,000 | 250 | 250 | 10,000 |
| Landscape-Materials | 500 | 500 | 9,950 | 6,875 | 7,000 | 6,000 | 1,030 | 1,030 | 1,030 | 500 | 500 | 500 | 35,415 |
| Pool Maintenance | 2,630 | 2,630 | 2,630 | 3,251 | 3,251 | 3,251 | 3,251 | 3,251 | 3,251 | 3,251 | 2,630 | 2,630 | 35,907 |
| Pool Repairs/Improvements | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 1,200 |
| Pool-Monitors/Lifeguards | 0 | 0 | 0 | 0 | 0 | 5,000 | 5,000 | 5,000 | 5,000 | 0 | 0 | 0 | 20,000 |
| Repair/Maint-Amen Access S | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 600 |
| Repair/Maint-Amenity Ctr | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 8,400 |
| Repair/Maint-Fitness Center | 0 | 165 | 0 | 165 | 0 | 165 | 0 | 165 | 0 | 165 | 0 | 165 | 990 |
| Repair/Maint-Flags/flagpoles | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 6,000 |
| Repair/Maint-Irrigation | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 36,000 |
| Repair/Maint-Lights/Electrical | 130 | 130 | 130 | 130 | 130 | 130 | 130 | 130 | 130 | 130 | 130 | 130 | 1,560 |
| Repair/Maint-Parks & Trails | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 4,500 | 25 | 25 | 25 | 25 | 4,775 |
| Repair/Maint-Pond | 1,400 | 1,400 | 1,400 | 1,400 | 1,400 | 1,400 | 1,400 | 1,400 | 1,400 | 1,400 | 1,400 | 1,400 | 16,800 |
| Repair/Maint-Signage | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 6,000 |
| Repair/Maint-Walls & Fences | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 24,000 |
| Repairs/Maint | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 12,000 |

83.

FPCA 55

# Falcon Pointe
## 12 Month Budget
### Budget FPC 2014 Budget

| Account | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Security & Patrols | 4,750 | 4,750 | 4,750 | 4,750 | 4,750 | 4,750 | 4,750 | 4,750 | 4,750 | 4,750 | 4,750 | 4,750 | 57,000 |
| Taxes-Property | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 400 |
| Telephone | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 5,400 |
| Trash Removal | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 4,800 |
| Water/Sewer | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 144,000 |
| TOTAL Direct Oper Expenses | 56,570 | 56,005 | 58,714 | 62,156 | 67,046 | 64,079 | 67,291 | 63,126 | 65,089 | 65,455 | 56,170 | 57,928 | 739,629 |
| **General/Admin Expenses** | | | | | | | | | | | | | |
| Adm-Copies | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 4,320 |
| Adm-Coupons | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 2,781 | 3,078 |
| Adm-Mileage | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 420 |
| Adm-Miscl | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 2,100 |
| Adm-Office Supplies | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 3,600 |
| Adm-Postage | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 2,100 |
| Adm-Website | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 3,000 |
| Homeowner Activities | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 36,000 |
| Ins-Prop & Liability | 2,508 | 2,148 | 2,148 | 2,148 | 2,148 | 2,148 | 2,148 | 2,148 | 2,148 | 2,398 | 2,148 | 5,238 | 26,719 |
| Mgmt Fee - On-site Staff | 8,183 | 8,183 | 8,183 | 8,183 | 8,183 | 8,183 | 8,183 | 8,183 | 8,183 | 8,183 | 8,183 | 8,183 | 98,200 |
| Mgmt Fee- Base | 3,661 | 3,589 | 3,517 | 3,445 | 3,373 | 3,301 | 3,229 | 3,157 | 3,085 | 3,013 | 2,942 | 2,869 | 39,181 |
| Professional-Acctg | 250 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 250 |
| Professional-Architectural | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 | 21,600 |
| Professional-Legal | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 48,000 |
| TOTAL General/Admin Exper | 24,724 | 24,042 | 23,970 | 23,898 | 23,826 | 23,754 | 23,682 | 23,610 | 23,538 | 23,716 | 23,395 | 26,412 | 288,568 |
| **Non-Recurring Expenses** | | | | | | | | | | | | | |
| NR-Capital Expenditures | 0 | 14,250 | 0 | 0 | 14,250 | 0 | 0 | 14,250 | 4,400 | 2,275 | 14,250 | 5,000 | 68,675 |
| NR-Pool | 0 | 0 | 0 | 0 | 0 | 0 | 1,376 | 2,814 | 0 | 7,900 | 12,570 | 0 | 24,660 |
| NR-Resident's Club | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3,000 | 16,000 | 0 | 0 | 0 | 19,000 |
| TOTAL Non-Recurring Exper | 0 | 14,250 | 0 | 0 | 14,250 | 0 | 1,376 | 20,064 | 20,400 | 10,175 | 26,820 | 5,000 | 112,335 |
| **Transfer Proof** | | | | | | | | | | | | | |
| Tran fr Oper to Res | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 27,000 |
| TOTAL Transfer Proof | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 27,000 |
| TOTAL EXPENSE | 83,544 | 96,547 | 84,934 | 88,304 | 107,372 | 90,083 | 94,599 | 109,050 | 111,277 | 101,596 | 108,635 | 91,590 | 1,167,532 |

(2) the restrictive covenant is referenced in the owner's title insurance policy obtained by the owner when the property was purchased.

Added by Acts 1999, 76th Leg., ch. 871, § 2, eff. June 18, 1999. Renumbered from V.T.C.A., Property Code § 207.009 by Acts 2001, 77th Leg., ch. 1420, § 21.001(98), eff. Sept. 1, 2001.

# CHAPTER 209.   TEXAS RESIDENTIAL PROPERTY OWNERS PROTECTION ACT

§ 209.001.      Short Title.
§ 209.002.      Definitions.
§ 209.003.      Applicability of Chapter.
§ 209.004.      Management Certificates.
§ 209.0041.     Adoption or Amendment of Certain Dedicatory Instruments.
§ 209.005.      Association Records.
§ 209.0051.     Open Board Meetings.
§ **209.0052.**     **Association Contracts.**
§ 209.0055.     Voting.
§ 209.0056.     Notice of Election or Association Vote.
§ 209.0057.     Recount of Votes.
§ 209.0058.     Ballots.
§ 209.0059.     Right to Vote.
§ 209.00591.    Board Membership.
§ 209.00592.    Voting; Quorum.
§ 209.00593.    Election of Board Members.
§ 209.00594.    Tabulation of and Access to Ballots.
§ 209.006.      Notice Required Before Enforcement Action.
§ 209.0062.     Alternative Payment Schedule for Certain Assessments.
§ 209.0063.     Priority of Payments.
§ 209.0064.     Third Party Collections.
§ 209.007.      Hearing Before Board;  Alternative Dispute Resolution.
§ 209.008.      Attorney's Fees.
§ 209.009.      Foreclosure Sale Prohibited in Certain Circumstances.
§ 209.0091.     Prerequisites to Foreclosure:  Notice and Opportunity to Cure for Certain Other
                  Lienholders.
§ 209.0092.     Judicial Foreclosure Required.
§ 209.0093.     Removal or Adoption of Foreclosure Authority.
§ 209.0094.     Assessment Lien Filing.
§ 209.010.      Notice After Foreclosure Sale.
§ 209.011.      Right of Redemption After Foreclosure.
§ 209.012.      Restrictive Covenants Granting Easements to Certain Property Owners' Associa-
                  tions.
§ 209.013.      Authority of Association to Amend Dedicatory Instrument.
§ 209.014.      Mandatory Election Required After Failure to Call Regular Meeting.
§ **209.015.**      **Regulation of Land Use:  Residential Purpose.**

## § 209.001.   Short Title

This chapter may be cited as the Texas Residential Property Owners Protection Act.

Added by Acts 2001, 77th Leg., ch. 926, § 1, eff. Jan. 1, 2002.

### Commentary

Chapter 209 of the Texas Property Code comprises the Texas Residential Property Owners Protection Act. Tex. Prop. Code Ann. §§ 209.001 et seq. The Act applies only to a residential subdivision that is subject to restrictions or provisions in a declaration that authorize the property owners' association to collect regular or special assessments on all or a majority of the property in the subdivision. Tex. Prop. Code Ann. § 209.003(a).

Except as otherwise provided by the Act, the Act applies only to a property owners' association that requires mandatory membership in the association for all or a majority of the owners of

**932**

residential property within the subdivision subject to the association's dedicatory instruments. Tex. Prop. Code Ann. § 209.003(b). The Act applies to a residential property owners' association regardless of whether the entity is designated as a "homeowners' association," "community association," or a similar designation in the restrictions or dedicatory instrument. Tex. Prop. Code Ann. § 209.003(c).

The Act does not apply to a condominium development governed by Chapter 82 of the Property Code. Tex. Prop. Code Ann. § 209.003(d). For a discussion of condominium unit owners' associations, see Chapter 12, Condominiums.

### Leading Cases

*Anderson v. New Property Owners' Ass'n of Newport, Inc., 122 S.W.3d 378 (Tex. App.— Texarkana 2003, pet. denied)* (Property owner's association action against subdivision property owner for breach of restrictive covenant will not prevail where the assignment paragraph in which the association assumed rights did not address the right to approve or reject construction plans or transfer rights of an architectural control committee).

### Leading CLE/Law Review Publications

Hailey, New day for Texas HOAs: Overview of 2011 reform legislation for condos and owners associations, State Bar of Texas (2011).

## § 209.002. Definitions

In this chapter:

(1) "Assessment" means a regular assessment, special assessment, or other amount a property owner is required to pay a property owners' association under the dedicatory instrument or by law.

(2) "Board" means the governing body of a property owners' association.

(3) "Declaration" means an instrument filed in the real property records of a county that includes restrictive covenants governing a residential subdivision.

(4) "Dedicatory instrument" means each governing instrument covering the establishment, maintenance, and operation of a residential subdivision. The term includes restrictions or similar instruments subjecting property to restrictive covenants, by-laws, or similar instruments governing the administration or operation of a property owners' association, to properly adopted rules and regulations of the property owners' association, and to all lawful amendments to the covenants, bylaws, rules, or regulations.

(4-a) "Development period" means a period stated in a declaration during which a declarant reserves:

(A) a right to facilitate the development, construction, and marketing of the subdivision; and

(B) a right to direct the size, shape, and composition of the subdivision.

(5) "Lot" means any designated parcel of land located in a residential subdivision, including any improvements on the designated parcel.

(6) "Owner" means a person who holds record title to property in a residential subdivision and includes the personal representative of a person who holds record title to property in a residential subdivision.

(7) "Property owners' association" or "association" means an incorporated or unincorporated association that:

(A) is designated as the representative of the owners of property in a residential subdivision;

(B) has a membership primarily consisting of the owners of the property covered by the dedicatory instrument for the residential subdivision; and

(C) manages or regulates the residential subdivision for the benefit of the owners of property in the residential subdivision.

(8) "Regular assessment" means an assessment, a charge, a fee, or dues that each owner of property within a residential subdivision is required to pay to the property owners' association on a regular basis and that is designated for use by the property owners' association for the benefit of the residential subdivision as provided by the restrictions.

(9) "Residential subdivision" or "subdivision" means a subdivision, planned unit development, townhouse regime, or similar planned development in which all land has been divided into two or more parts and is subject to restrictions that:

(A) limit a majority of the land subject to the dedicatory instruments, excluding streets, common areas, and public areas, to residential use for single-family homes, townhomes, or duplexes only;

(B) are recorded in the real property records of the county in which the residential subdivision is located; and

(C) require membership in a property owners' association that has authority to impose regular or special assessments on the property in the subdivision.

(10) "Restrictions" means one or more restrictive covenants contained or incorporated by reference in a properly recorded map, plat, replat, declaration, or other instrument filed in the real property records or map or plat records. The term includes any amendment or extension of the restrictions.

(11) "Restrictive covenant" means any covenant, condition, or restriction contained in a dedicatory instrument, whether mandatory, prohibitive, permissive, or administrative.

(12) "Special assessment" means an assessment, a charge, a fee, or dues, other than a regular assessment, that each owner of property located in a residential subdivision is required to pay to the property owners' association, according to procedures required by the dedicatory instruments, for:

(A) defraying, in whole or in part, the cost, whether incurred before or after the assessment, of any construction or reconstruction, unexpected repair, or replacement of a capital improvement in common areas owned by the property owners' association, including the necessary fixtures and personal property related to the common areas;

(B) maintenance and improvement of common areas owned by the property owners' association; or

(C) other purposes of the property owners' association as stated in its articles of incorporation or the dedicatory instrument for the residential subdivision.

Added by Acts 2001, 77th Leg., ch. 926, § 1, eff. Jan. 1, 2002. Amended by Acts 2013, 83rd Leg., ch. 863 (H.B. 503), § 1, eff. Sept. 1, 2013.

## Leading Cases

*Khyber Holdings, LLC v. BAC Home Loans Servicing, LP, 349 S.W.3d 178 (Tex. App.—Dallas 2011, no pet. h.)* (the Texas Residential Property Owners Act does not define "person" but using the definition required by the Code Construction Act, "person" includes corporations, organizations, and other legal entities; therefore, a mortgage lender was a person entitled to redeem property).

**934**

## § 209.003. Applicability of Chapter

(a) This chapter applies only to a residential subdivision that is subject to restrictions or provisions in a declaration that authorize the property owners' association to collect regular or special assessments on all or a majority of the property in the subdivision.

(b) Except as otherwise provided by this chapter, this chapter applies only to a property owners' association that requires mandatory membership in the association for all or a majority of the owners of residential property within the subdivision subject to the association's dedicatory instruments.

(c) This chapter applies to a residential property owners' association regardless of whether the entity is designated as a "homeowners' association," "community association," or similar designation in the restrictions or dedicatory instrument.

(d) This chapter does not apply to a condominium development governed by Chapter 82.

(e) The following provisions of this chapter do not apply to a property owners' association that is a mixed-use master association that existed before January 1, 1974, and that does not have the authority under a dedicatory instrument or other governing document to impose fines:

(1) Section 209.005(c);

(2) Section 209.0056;

(3) Section 209.0057;

(4) Section 209.0058;

(5) Section 209.00592; and

(6) Section 209.0062.

Added by Acts 2001, 77th Leg., ch. 926, § 1, eff. Jan. 1, 2002. Amended by Acts 2007, 80th Leg., ch. 1367, § 7, eff. Sept. 1, 2007; Acts 2011, 82nd Leg., ch. 1026 (H.B. 2761), § 1, eff. Jan. 1, 2012; Acts 2011, 82nd Leg., ch. 1142 (H.B. 1821), § 6, eff. Jan. 1, 2012; Acts 2011, 82nd Leg., ch. 1217 (S.B. 472), § 1, eff. Sept. 1, 2011; Acts 2011, 82nd Leg., ch. 1282 (H.B. 1228), § 1, eff. Jan. 1, 2012; Acts 2013, 83rd Leg., ch. 161 (S.B. 1093), § 17.002(a), eff. Sept. 1, 2013.

### Leading Cases

*Duarte v. Disanti,* 292 S.W.3d 733 *(Tex. App.—Dallas 2009, no pet.)* (redemption rights provided for in the Texas Residential Property Owners Act do not apply to condominiums because redemption rights for condominiums are provided for in the Uniform Condominium Act).

## § 209.004. Management Certificates

(a) A property owners' association shall record in each county in which any portion of the residential subdivision is located a management certificate, signed and acknowledged by an officer or the managing agent of the association, stating:

(1) the name of the subdivision;

(2) the name of the association;

(3) the recording data for the subdivision;

(4) the recording data for the declaration;

(5) the name and mailing address of the association;

(6) the name and mailing address of the person managing the association or the association's designated representative; and

(7) other information the association considers appropriate.

(a–1) **The county clerk of each county in which a management certificate is filed as required by this section shall record the management certificate in the real property records of the county and index the document as a "Property Owners' Association Management Certificate."**

(b) The property owners' association shall record an amended management certificate not later than the 30th day after the date the association has notice of a change in any information in the recorded certificate required by Subsection (a).

(c) Except as provided under Subsections (d) and (e), the property owners' association and its officers, directors, employees, and agents are not subject to liability to any person for a delay in recording or failure to record a management certificate, unless the delay or failure is wilful or caused by gross negligence.

(d) If a property owners' association fails to record a management certificate or an amended management certificate under this section, the purchaser, lender, or title insurance company or its agent in a transaction involving property in the property owners' association is not liable to the property owners' association for:

(1) any amount due to the association on the date of a transfer to a bona fide purchaser; and

(2) any debt to or claim of the association that accrued before the date of a transfer to a bona fide purchaser.

(e) A lien of a property owners' association that fails to file a management certificate or an amended management certificate under this section to secure an amount due on the effective date of a transfer to a bona fide purchaser is enforceable only for an amount incurred after the effective date of sale.

(f) For purposes of this section, "bona fide purchaser" means:

(1) a person who pays valuable consideration without notice of outstanding rights of others and acts in good faith; or

(2) a third-party lender who acquires a security interest in the property under a deed of trust.

Added by Acts 2001, 77th Leg., ch. 926, § 1, eff. Jan. 1, 2002. Amended by Acts 2009, 81st Leg., ch. 148, § 1, eff. Sept. 1, 2009; Acts 2013, 83rd Leg., ch. 1108 (H.B. 3800), § 1, eff. Sept. 1, 2013.

### Commentary

The 2009 Legislature provided motivation for property owners' associations to comply with the requirement that they file management certificates. A purchaser, lender, or title insurance company will escape liability for amounts due the association and claims that accrued before that date of a transfer to a bona fide purchaser if the certificate is not properly filed.

## § 209.0041. Adoption or Amendment of Certain Dedicatory Instruments

(a) In this section, "development period" means a period stated in a declaration during which a declarant reserves:

(1) a right to facilitate the development, construction, and marketing of the subdivision; and

(2) a right to direct the size, shape, and composition of the subdivision.

(b) This section applies to a residential subdivision in which property owners are subject to mandatory membership in a property owners' association.

(c) This section does not apply to a property owners' association that is subject to Chapter 552, Government Code, by application of Section 552.0036, Government Code.

**936**

(d) This section does not apply to the amendment of a declaration during a development period.

(e) This section applies to a dedicatory instrument regardless of the date on which the dedicatory instrument was created.

(f) This section supersedes any contrary requirement in a dedicatory instrument.

(g) To the extent of any conflict with another provision of this title, this section prevails.

(h) Except as provided by this subsection, a declaration may be amended only by a vote of 67 percent of the total votes allocated to property owners in the property owners' association, in addition to any governmental approval required by law. If the declaration contains a lower percentage, the percentage in the declaration controls.

(i) A bylaw may not be amended to conflict with the declaration.

Added by Acts 2011, 82nd Leg., ch. 1217 (S.B. 472), § 2, eff. Sept. 1, 2011.

## § 209.005. Association Records

(a) Except as provided by Subsection (b), this section applies to all property owners' associations and controls over other law not specifically applicable to a property owners' association.

(b) This section does not apply to a property owners' association that is subject to Chapter 552, Government Code, by application of Section 552.0036, Government Code.

(c) Notwithstanding a provision in a dedicatory instrument, a property owners' association shall make the books and records of the association, including financial records, open to and reasonably available for examination by an owner, or a person designated in a writing signed by the owner as the owner's agent, attorney, or certified public accountant, in accordance with this section. An owner is entitled to obtain from the association copies of information contained in the books and records.

(d) Except as provided by this subsection, an attorney's files and records relating to the property owners' association, excluding invoices requested by an owner under Section 209.008(d), are not records of the association and are not subject to inspection by the owner or production in a legal proceeding. If a document in an attorney's files and records relating to the association would be responsive to a legally authorized request to inspect or copy association documents, the document shall be produced by using the copy from the attorney's files and records if the association has not maintained a separate copy of the document. This subsection does not require production of a document that constitutes attorney work product or that is privileged as an attorney-client communication.

(e) An owner or the owner's authorized representative described by Subsection (c) must submit a written request for access or information under Subsection (c) by certified mail, with sufficient detail describing the property owners' association's books and records requested, to the mailing address of the association or authorized representative as reflected on the most current management certificate filed under Section 209.004. The request must contain an election either to inspect the books and records before obtaining copies or to have the property owners' association forward copies of the requested books and records and:

(1) if an inspection is requested, the association, on or before the 10th business day after the date the association receives the request, shall send written notice of dates during normal business hours that the owner may inspect the requested books and

records to the extent those books and records are in the possession, custody, or control of the association; or

(2) if copies of identified books and records are requested, the association shall, to the extent those books and records are in the possession, custody, or control of the association, produce the requested books and records for the requesting party on or before the 10th business day after the date the association receives the request, except as otherwise provided by this section.

(f) If the property owners' association is unable to produce the books or records requested under Subsection (e) on or before the 10th business day after the date the association receives the request, the association must provide to the requestor written notice that:

(1) informs the requestor that the association is unable to produce the information on or before the 10th business day after the date the association received the request; and

(2) states a date by which the information will be sent or made available for inspection to the requesting party that is not later than the 15th business day after the date notice under this subsection is given.

(g) If an inspection is requested or required, the inspection shall take place at a mutually agreed on time during normal business hours, and the requesting party shall identify the books and records for the property owners' association to copy and forward to the requesting party.

(h) A property owners' association may produce books and records requested under this section in hard copy, electronic, or other format reasonably available to the association.

(i) A property owners' association board must adopt a records production and copying policy that prescribes the costs the association will charge for the compilation, production, and reproduction of information requested under this section. The prescribed charges may include all reasonable costs of materials, labor, and overhead but may not exceed costs that would be applicable for an item under 1 T.A.C. Section 70.3. The policy required by this subsection must be recorded as a dedicatory instrument in accordance with Section 202.006. An association may not charge an owner for the compilation, production, or reproduction of information requested under this section unless the policy prescribing those costs has been recorded as required by this subsection. An owner is responsible for costs related to the compilation, production, and reproduction of the requested information in the amounts prescribed by the policy adopted under this subsection. The association may require advance payment of the estimated costs of compilation, production, and reproduction of the requested information. If the estimated costs are lesser or greater than the actual costs, the association shall submit a final invoice to the owner on or before the 30th business day after the date the information is delivered. If the final invoice includes additional amounts due from the owner, the additional amounts, if not reimbursed to the association before the 30th business day after the date the invoice is sent to the owner, may be added to the owner's account as an assessment. If the estimated costs exceeded the final invoice amount, the owner is entitled to a refund, and the refund shall be issued to the owner not later than the 30th business day after the date the invoice is sent to the owner.

(j) A property owners' association must estimate costs under this section using amounts prescribed by the policy adopted under Subsection (i).

(k) Except as provided by Subsection (l) and to the extent the information is provided in the meeting minutes, the property owners' association is not required to release or

938

allow inspection of any books or records that identify the dedicatory instrument violation history of an individual owner of an association, an owner's personal financial information, including records of payment or nonpayment of amounts due the association, an owner's contact information, other than the owner's address, or information related to an employee of the association, including personnel files. Information may be released in an aggregate or summary manner that would not identify an individual property owner.

(*l*) The books and records described by Subsection (k) shall be released or made available for inspection if:

(1) the express written approval of the owner whose records are the subject of the request for inspection is provided to the property owners' association; or

(2) a court orders the release of the books and records or orders that the books and records be made available for inspection.

(m) A property owners' association composed of more than 14 lots shall adopt and comply with a document retention policy that includes, at a minimum, the following requirements:

(1) certificates of formation, bylaws, restrictive covenants, and all amendments to the certificates of formation, bylaws, and covenants shall be retained permanently;

(2) financial books and records shall be retained for seven years;

(3) account records of current owners shall be retained for five years;

(4) contracts with a term of one year or more shall be retained for four years after the expiration of the contract term;

(5) minutes of meetings of the owners and the board shall be retained for seven years; and

(6) tax returns and audit records shall be retained for seven years.

(n) A member of a property owners' association who is denied access to or copies of association books or records to which the member is entitled under this section may file a petition with the justice of the peace of a justice precinct in which all or part of the property that is governed by the association is located requesting relief in accordance with this subsection. If the justice of the peace finds that the member is entitled to access to or copies of the records, the justice of the peace may grant one or more of the following remedies:

(1) a judgment ordering the property owners' association to release or allow access to the books or records;

(2) a judgment against the property owners' association for court costs and attorney's fees incurred in connection with seeking a remedy under this section; or

(3) a judgment authorizing the owner or the owner's assignee to deduct the amounts awarded under Subdivision (2) from any future regular or special assessments payable to the property owners' association.

(o) If the property owners' association prevails in an action under Subsection (n), the association is entitled to a judgment for court costs and attorney's fees incurred by the association in connection with the action.

(p) On or before the 10th business day before the date a person brings an action against a property owners' association under this section, the person must send written notice to the association of the person's intent to bring the action. The notice must:

(1) be sent certified mail, return receipt requested, or delivered by the United States Postal Service with signature confirmation service to the mailing address of the

**939**

92.

association or authorized representative as reflected on the most current management certificate filed under Section 209.004; and

(2) describe with sufficient detail the books and records being requested.

(q) For the purposes of this section, "business day" means a day other than Saturday, Sunday, or a state or federal holiday.

Added by Acts 2001, 77th Leg., ch. 926, § 1, eff. Jan. 1, 2002. Amended by Acts 2007, 80th Leg., ch. 1367, § 6, eff. Sept. 1, 2007; Acts 2011, 82nd Leg., ch. 1026 (H.B. 2761), § 2, eff. Jan. 1, 2012.

## § 209.0051.  Open Board Meetings

(a) This section does not apply to a property owners' association that is subject to Chapter 551, Government Code, by application of Section 551.0015, Government Code.

(b) In this section:

(1) "Board meeting":

(A) means a deliberation between a quorum of the voting board of the property owners' association, or between a quorum of the voting board and another person, during which property owners' association business is considered and the board takes formal action; and

(B) does not include the gathering of a quorum of the board at a social function unrelated to the business of the association or the attendance by a quorum of the board at a regional, state, or national convention, ceremonial event, or press conference, if formal action is not taken and any discussion of association business is incidental to the social function, convention, ceremonial event, or press conference.

(2) "Development period" means a period stated in a declaration during which a declarant reserves:

(A) a right to facilitate the development, construction, and marketing of the subdivision; and

(B) a right to direct the size, shape, and composition of the subdivision.

(c) Regular and special board meetings must be open to owners, subject to the right of the board to adjourn a board meeting and reconvene in closed executive session to consider actions involving personnel, pending or threatened litigation, contract negotiations, enforcement actions, confidential communications with the property owners' association's attorney, matters involving the invasion of privacy of individual owners, or matters that are to remain confidential by request of the affected parties and agreement of the board. Following an executive session, any decision made in the executive session must be summarized orally and placed in the minutes, in general terms, without breaching the privacy of individual owners, violating any privilege, or disclosing information that was to remain confidential at the request of the affected parties. The oral summary must include a general explanation of expenditures approved in executive session.

(c–1) Except for a meeting held by electronic or telephonic means under Subsection (h), a board meeting must be held in a county in which all or part of the property in the subdivision is located or in a county adjacent to that county.

(d) The board shall keep a record of each regular or special board meeting in the form of written minutes of the meeting. The board shall make meeting records, including approved minutes, available to a member for inspection and copying on the member's written request to the property owners' association's managing agent at the address

**940**

appearing on the most recently filed management certificate or, if there is not a managing agent, to the board.

(e) Members shall be given notice of the date, hour, place, and general subject of a regular or special board meeting, including a general description of any matter to be brought up for deliberation in executive session. The notice shall be:

(1) mailed to each property owner not later than the 10th day or earlier than the 60th day before the date of the meeting; or

(2) provided at least 72 hours before the start of the meeting by:

(A) posting the notice in a conspicuous manner reasonably designed to provide notice to property owners' association members:

(i) in a place located on the association's common property or, with the property owner's consent, on other conspicuously located privately owned property within the subdivision; or

(ii) on any Internet website maintained by the association or other Internet media; and

(B) sending the notice by e-mail to each owner who has registered an e-mail address with the association.

(f) It is an owner's duty to keep an updated e-mail address registered with the property owners' association under Subsection (e)(2)(B).

(g) If the board recesses a regular or special board meeting to continue the following regular business day, the board is not required to post notice of the continued meeting if the recess is taken in good faith and not to circumvent this section. If a regular or special board meeting is continued to the following regular business day, and on that following day the board continues the meeting to another day, the board shall give notice of the continuation in at least one manner prescribed by Subsection (e)(2)(A) within two hours after adjourning the meeting being continued.

(h) A board may meet by any method of communication, including electronic and telephonic, without prior notice to owners under Subsection (e), if each director may hear and be heard by every other director, or the board may take action by unanimous written consent to consider routine and administrative matters or a reasonably unforeseen emergency or urgent necessity that requires immediate board action. Any action taken without notice to owners under Subsection (e) must be summarized orally, including an explanation of any known actual or estimated expenditures approved at the meeting, and documented in the minutes of the next regular or special board meeting. The board may not, without prior notice to owners under Subsection (e), consider or vote on:

(1) fines;

(2) damage assessments;

(3) initiation of foreclosure actions;

(4) initiation of enforcement actions, excluding temporary restraining orders or violations involving a threat to health or safety;

(5) increases in assessments;

(6) levying of special assessments;

(7) appeals from a denial of architectural control approval; or

(8) a suspension of a right of a particular owner before the owner has an opportunity to attend a board meeting to present the owner's position, including any defense, on the issue.

(i) This section applies to a meeting of a property owners' association board during the development period only if the meeting is conducted for the purpose of:

(1) adopting or amending the governing documents, including declarations, bylaws, rules, and regulations of the association;

(2) increasing the amount of regular assessments of the association or adopting or increasing a special assessment;

(3) electing non-developer board members of the association or establishing a process by which those members are elected; or

(4) changing the voting rights of members of the association.

Added by Acts 2011, 82nd Leg., ch. 1026 (H.B. 2761), § 3, eff. Jan. 1, 2012.

## § 209.0052. Association Contracts

**(a) This section does not apply to a contract entered into by an association during the development period.**

**(b) An association may enter into an enforceable contract with a current association board member, a person related to a current association board member within the third degree by consanguinity or affinity, as determined under Chapter 573, Government Code, a company in which a current association board member has a financial interest in at least 51 percent of profits, or a company in which a person related to a current association board member within the third degree by consanguinity or affinity, as determined under Chapter 573, Government Code, has a financial interest in at least 51 percent of profits only if the following conditions are satisfied:**

**(1) the board member, relative, or company bids on the proposed contract and the association has received at least two other bids for the contract from persons not associated with the board member, relative, or company, if reasonably available in the community;**

**(2) the board member:**

**(A) is not given access to the other bids;**

**(B) does not participate in any board discussion regarding the contract; and**

**(C) does not vote on the award of the contract;**

**(3) the material facts regarding the relationship or interest with respect to the proposed contract are disclosed to or known by the association board and the board, in good faith and with ordinary care, authorizes the contract by an affirmative vote of the majority of the board members who do not have an interest governed by this subsection; and**

**(4) the association board certifies that the other requirements of this subsection have been satisfied by a resolution approved by an affirmative vote of the majority of the board members who do not have an interest governed by this subsection.**

Added by Acts 2013, 83rd Leg., ch. 863 (H.B. 503), § 2, eff. Sept. 1, 2013.

## § 209.0055. Voting

(a) This section applies only to a property owners' association that:

(1) provides maintenance, preservation, and architectural control of residential and commercial property within a defined geographic area in a county with a population of

**942**

2.8 million or more or in a county adjacent to a county with a population of 2.8 million or more; and

(2) is a corporation that:

(A) is governed by a board of trustees who may employ a general manager to execute the association's bylaws and administer the business of the corporation;

(B) does not require membership in the corporation by the owners of the property within the defined area; and

(C) was incorporated before January 1, 2006.

(b) A property owners' association described by Subsection (a) may not bar a property owner from voting in an association election solely based on the fact that:

(1) there is a pending enforcement action against the property owner; or

(2) the property owner owes the association any delinquent assessments, fees, or fines.

Added by Acts 2007, 80th Leg., ch. 1367, § 8, eff. Sept. 1, 2007.

### Commentary

The 2007 legislature added this section. This section disallows certain property owners' associations described in Tex. Prop. Code Ann. § 209.0055(a), to bar an owner from voting in an association election based solely on the fact that (1) there is a pending enforcement action against the property owner; or (2) the property owner owes the association delinquent assessments, fees, or fines.

## § 209.0056. Notice of Election or Association Vote

(a) Not later than the 10th day or earlier than the 60th day before the date of an election or vote, a property owners' association shall give written notice of the election or vote to:

(1) each owner of property in the property owners' association, for purposes of an association-wide election or vote; or

(2) each owner of property in the property owners' association entitled under the dedicatory instruments to vote in a particular representative election, for purposes of a vote that involves election of representatives of the association who are vested under the dedicatory instruments of the property owners' association with the authority to elect or appoint board members of the property owners' association.

(b) This section supersedes any contrary requirement in a dedicatory instrument.

(c) This section does not apply to a property owners' association that is subject to Chapter 552, Government Code, by application of Section 552.0036, Government Code.

Added by Acts 2011, 82nd Leg., ch. 1026 (H.B. 2761), § 3, eff. Jan. 1, 2012.

## § 209.0057. Recount of Votes

(a) This section does not apply to a property owners' association that is subject to Chapter 552, Government Code, by application of Section 552.0036, Government Code.

(b) Any owner may, not later than the 15th day after the date of the meeting at which the election was held, require a recount of the votes. A demand for a recount must be submitted in writing either:

(1) by certified mail, return receipt requested, or by delivery by the United States Postal Service with signature confirmation service to the property owners' associa-

**943**

96.

tion's mailing address as reflected on the latest management certificate filed under Section 209.004; or

(2) in person to the property owners' association's managing agent as reflected on the latest management certificate filed under Section 209.004 or to the address to which absentee and proxy ballots are mailed.

(c) The property owners' association shall, at the expense of the owner requesting the recount, retain for the purpose of performing the recount, the services of a person qualified to tabulate votes under this subsection. The association shall enter into a contract for the services of a person who:

(1) is not a member of the association or related to a member of the association board within the third degree by consanguinity or affinity, as determined under Chapter 573, Government Code; and

(2) is:

(A) a current or former:

(i) county judge;

(ii) county elections administrator;

(iii) justice of the peace; or

(iv) county voter registrar; or

(B) a person agreed on by the association and the persons requesting the recount.

(d) Any recount under Subsection (b) must be performed on or before the 30th day after the date of receipt of a request and payment for a recount in accordance with Subsections (b) and (c). If the recount changes the results of the election, the property owners' association shall reimburse the requesting owner for the cost of the recount. The property owners' association shall provide the results of the recount to each owner who requested the recount. Any action taken by the board in the period between the initial election vote tally and the completion of the recount is not affected by any recount.

Added by Acts 2011, 82nd Leg., ch. 1026 (H.B. 2761), § 3, eff. Jan. 1, 2012.

## § 209.0058. Ballots

(a) Any vote cast in an election or vote by a member of a property owners' association must be in writing and signed by the member.

(b) Electronic votes cast under Section 209.00592 constitute written and signed ballots.

(c) In an association-wide election, written and signed ballots are not required for uncontested races.

Added by Acts 2011, 82nd Leg., ch. 1026 (H.B. 2761), § 3, eff. Jan. 1, 2012.

## § 209.0059. Right to Vote

(a) A provision in a dedicatory instrument that would disqualify a property owner from voting in a property owners' association election of board members or on any matter concerning the rights or responsibilities of the owner is void.

(b) This section does not apply to a property owners' association that is subject to Chapter 552, Government Code, by application of Section 552.0036, Government Code.

Added by Acts 2011, 82nd Leg., ch. 1026 (H.B. 2761), § 3, eff. Jan. 1, 2012.

## § 209.00591. Board Membership

(a) Except as provided by this section, a provision in a dedicatory instrument that restricts a property owner's right to run for a position on the board of the property owners' association is void.

(b) If a board is presented with written, documented evidence from a database or other record maintained by a governmental law enforcement authority that a board member has been convicted of a felony or crime involving moral turpitude, the board member is immediately ineligible to serve on the board of the property owners' association, automatically considered removed from the board, and prohibited from future service on the board.

(c) The declaration may provide for a period of declarant control of the association during which a declarant, or persons designated by the declarant, may appoint and remove board members and the officers of the association, other than board members or officers elected by members of the property owners' association. Regardless of the period of declarant control provided by the declaration, on or before the 120th day after the date 75 percent of the lots that may be created and made subject to the declaration are conveyed to owners other than a declarant, at least one-third of the board members must be elected by owners other than the declarant. If the declaration does not include the number of lots that may be created and made subject to the declaration, at least one-third of the board members must be elected by owners other than the declarant not later than the 10th anniversary of the date the declaration was recorded.

Added by Acts 2011, 82nd Leg., ch. 1026 (H.B. 2761), § 3, eff. Jan. 1, 2012.

## § 209.00592. Voting; Quorum

(a) The voting rights of an owner may be cast or given:

(1) in person or by proxy at a meeting of the property owners' association;

(2) by absentee ballot in accordance with this section;

(3) by electronic ballot in accordance with this section; or

(4) by any method of representative or delegated voting provided by a dedicatory instrument.

(b) An absentee or electronic ballot:

(1) may be counted as an owner present and voting for the purpose of establishing a quorum only for items appearing on the ballot;

(2) may not be counted, even if properly delivered, if the owner attends any meeting to vote in person, so that any vote cast at a meeting by a property owner supersedes any vote submitted by absentee or electronic ballot previously submitted for that proposal; and

(3) may not be counted on the final vote of a proposal if the motion was amended at the meeting to be different from the exact language on the absentee or electronic ballot.

(c) A solicitation for votes by absentee ballot must include:

(1) an absentee ballot that contains each proposed action and provides an opportunity to vote for or against each proposed action;

(2) instructions for delivery of the completed absentee ballot, including the delivery location; and

(3) the following language: "By casting your vote via absentee ballot you will forgo the opportunity to consider and vote on any action from the floor on these proposals,

if a meeting is held. This means that if there are amendments to these proposals your votes will not be counted on the final vote on these measures. If you desire to retain this ability, please attend any meeting in person. You may submit an absentee ballot and later choose to attend any meeting in person, in which case any in-person vote will prevail."

(d) For the purposes of this section, "electronic ballot" means a ballot:

    (1) given by:

        (A) e-mail;

        (B) facsimile; or

        (C) posting on an Internet website;

    (2) for which the identity of the property owner submitting the ballot can be confirmed; and

    (3) for which the property owner may receive a receipt of the electronic transmission and receipt of the owner's ballot.

(e) If an electronic ballot is posted on an Internet website, a notice of the posting shall be sent to each owner that contains instructions on obtaining access to the posting on the website.

(f) This section supersedes any contrary provision in a dedicatory instrument.

(g) This section does not apply to a property owners' association that is subject to Chapter 552, Government Code, by application of Section 552.0036, Government Code.

Added by Acts 2011, 82nd Leg., ch. 1026 (H.B. 2761), § 3, eff. Jan. 1, 2012.

## § 209.00593. Election of Board Members

(a) Notwithstanding any provision in a dedicatory instrument, any board member whose term has expired must be elected by owners who are members of the property owners' association. A board member may be appointed by the board only to fill a vacancy **on the board** caused by a resignation, death, or disability. A board member appointed to fill a vacant position shall serve **for the remainder of** the unexpired term of the **position** predecessor board member.

(b) The board of a property owners' association may amend the bylaws of the property owners' association to provide for elections to be held as required by Subsection (a).

(c) The appointment of a board member in violation of this section is void.

(d) This section does not apply to the appointment of a board member during a development period. In this subsection, "development period" means a period stated in a declaration during which a declarant reserves:

    (1) a right to facilitate the development, construction, and marketing of the subdivision; and

    (2) a right to direct the size, shape, and composition of the subdivision.

(e) This section does not apply to a representative board whose members or delegates are elected or appointed by representatives of a property owners' association who are elected by owner members of a property owners' association.

Added by Acts 2011, 82nd Leg., ch. 1026 (H.B. 2761), § 3, eff. Jan. 1, 2012. Amended by Acts 2013, 83rd Leg., ch. 1062 (H.B. 3176), § 1, eff. June 14, 2013.

## § 209.00594. Tabulation of and Access to Ballots

(a) Notwithstanding any other provision of this chapter or any other law, a person who is a candidate in a property owners' association election or who is otherwise the subject of an association vote, or a person related to that person within the third degree by consanguinity or affinity, as determined under Chapter 573, Government Code, may not tabulate or otherwise be given access to the ballots cast in that election or vote except as provided by this section.

(b) A person other than a person described by Subsection (a) may tabulate votes in an association election or vote but may not disclose to any other person how an individual voted.

(c) Notwithstanding any other provision of this chapter or any other law, a person other than a person who tabulates votes under Subsection (b), including a person described by Subsection (a), may be given access to the ballots cast in the election or vote only as part of a recount process authorized by law.

Added by Acts 2011, 82nd Leg., ch. 1217 (S.B. 472), § 3, eff. Sept. 1, 2011.

## § 209.006. Notice Required Before Enforcement Action

(a) Before a property owners' association may suspend an owner's right to use a common area, file a suit against an owner other than a suit to collect a regular or special assessment or foreclose under an association's lien, charge an owner for property damage, or levy a fine for a violation of the restrictions or bylaws or rules of the association, the association or its agent must give written notice to the owner by certified mail, return receipt requested.

(b) The notice must:

(1) describe the violation or property damage that is the basis for the suspension action, charge, or fine and state any amount due the association from the owner; and

(2) inform the owner that the owner:

(A) is entitled to a reasonable period to cure the violation and avoid the fine or suspension unless the owner was given notice and a reasonable opportunity to cure a similar violation within the preceding six months;

(B) may request a hearing under Section 209.007 on or before the 30th day after the date the owner receives the notice; and

(C) may have special rights or relief related to the enforcement action under federal law, including the Servicemembers Civil Relief Act (50 U.S.C. app. Section 501 et seq.), if the owner is serving on active military duty.

Added by Acts 2001, 77th Leg., ch. 926, § 1, eff. Jan. 1, 2002. Amended by Acts 2011, 82nd Leg., ch. 252 (H.B. 1127), § 3, eff. Jan. 1, 2012.

### Commentary

The 2011 Legislature expanded the contents of the required notice to explain that certain members of the military may be entitled to special rights or relief. The notice and hearing provisions of this section do not apply if the association files a suit seeking a temporary restraining order or temporary injunctive relief or files a suit that includes foreclosure as a cause of action. Tex. Prop. Code Ann. § 209.007(d). If a suit is filed relating to a matter to which those sections apply, a party to the suit may file a motion to compel mediation. Tex. Prop. Code Ann. § 209.007(d). The notice and hearing provisions of this section do not apply to a temporary suspension of a person's right to use common areas if the temporary suspension is the result of a violation that occurred in a common area and involved a significant and immediate risk of harm to others in the subdivision. The temporary suspension is effective until the board makes a final

determination on the suspension action after following the procedures prescribed by Section 209.007. Tex. Prop. Code Ann. § 209.007(d).

## Leading Cases

*Haas v. Ashford Hollow Community Improvement Ass'n, Inc.,* 209 S.W.3d 875 *(Tex. App.— Houston [14th Dist.] 2006, no pet.)* (written notice informing property owner that community association seeks attorney fees for expenses arising from the collection of dues in restrictive covenant is not required even when expressed in covenant, because the property code exempts such foreclosure suits from the notice requirements).

## Commentary

The 2011 Legislature expanded the contents of the required notice to explain that certain members of the military may be entitled to special rights or relief.

## § 209.0062. Alternative Payment Schedule for Certain Assessments

(a) A property owners' association composed of more than 14 lots shall adopt reasonable guidelines to establish an alternative payment schedule by which an owner may make partial payments to the property owners' association for delinquent regular or special assessments or any other amount owed to the association without accruing additional monetary penalties. For purposes of this section, monetary penalties do not include reasonable costs associated with administering the payment plan or interest.

(b) The minimum term for a payment plan offered by a property owners' association is three months.

(c) A property owners' association may not allow a payment plan for any amount that extends more than 18 months from the date of the owner's request for a payment plan. The association is not required to enter into a payment plan with an owner who failed to honor the terms of a previous payment plan during the two years following the owner's default under the previous payment plan.

(d) A property owners' association shall file the association's guidelines under this section in the real property records of each county in which the subdivision is located.

(e) A property owners' association's failure to file as required by this section the association's guidelines in the real property records of each county in which the subdivision is located does not prohibit a property owner from receiving an alternative payment schedule by which the owner may make partial payments to the property owners' association for delinquent regular or special assessments or any other amount owed to the association without accruing additional monetary penalties, as defined by Subsection (a).

Added by Acts 2011, 82nd Leg., ch. 1282 (H.B. 1228), § 2, eff. Jan. 1, 2012.

## Commentary

A property owners' association lots must establish alternative payment guidelines for certain assessments and file them in the county real property records. Two bills, HB 1228 and HB 1821 provide different rules for how this is to be done.

## § 209.0063. Priority of Payments

(a) Except as provided by Subsection (b), a payment received by a property owners' association from the owner shall be applied to the owner's debt in the following order of priority:

(1) any delinquent assessment;

(2) any current assessment;

**948**

(3) any attorney's fees or third party collection costs incurred by the association associated solely with assessments or any other charge that could provide the basis for foreclosure;

(4) any attorney's fees incurred by the association that are not subject to Subdivision (3);

(5) any fines assessed by the association; and

(6) any other amount owed to the association.

(b) If, at the time the property owners' association receives a payment from a property owner, the owner is in default under a payment plan entered into with the association:

(1) the association is not required to apply the payment in the order of priority specified by Subsection (a); and

(2) in applying the payment, a fine assessed by the association may not be given priority over any other amount owed to the association.

Added by Acts 2011, 82nd Leg., ch. 1282 (H.B. 1228), § 2, eff. Jan. 1, 2012.

## § 209.0064. Third Party Collections

(a) In this section, "collection agent" means a debt collector, as defined by Section 803 of the federal Fair Debt Collection Practices Act (15 U.S.C. Section 1692a).

(b) A property owners' association may not hold an owner liable for fees of a collection agent retained by the property owners' association unless the association first provides written notice to the owner by certified mail, return receipt requested, that:

(1) specifies each delinquent amount and the total amount of the payment required to make the account current;

(2) describes the options the owner has to avoid having the account turned over to a collection agent, including information regarding availability of a payment plan through the association; and

(3) provides a period of at least 30 days for the owner to cure the delinquency before further collection action is taken.

(c) An owner is not liable for fees of a collection agent retained by the property owners' association if:

(1) the obligation for payment by the association to the association's collection agent for fees or costs associated with a collection action is in any way dependent or contingent on amounts recovered; or

(2) the payment agreement between the association and the association's collection agent does not require payment by the association of all fees to a collection agent for the action undertaken by the collection agent.

(d) The agreement between the property owners' association and the association's collection agent may not prohibit the owner from contacting the association board or the association's managing agent regarding the owner's delinquency.

(e) A property owners' association may not sell or otherwise transfer any interest in the association's accounts receivables for a purpose other than as collateral for a loan.

Added by Acts 2011, 82nd Leg., ch. 1282 (H.B. 1228), § 2, eff. Jan. 1, 2012.

**949**

102.

## § 209.007. Hearing Before Board; Alternative Dispute Resolution

(a) If the owner is entitled to an opportunity to cure the violation, the owner has the right to submit a written request for a hearing to discuss and verify facts and resolve the matter in issue before a committee appointed by the board of the property owners' association or before the board if the board does not appoint a committee.

(b) If a hearing is to be held before a committee, the notice prescribed by Section 209.006 must state that the owner has the right to appeal the committee's decision to the board by written notice to the board.

(c) The association shall hold a hearing under this section not later than the 30th day after the date the board receives the owner's request for a hearing and shall notify the owner of the date, time, and place of the hearing not later than the 10th day before the date of the hearing. The board or the owner may request a postponement, and, if requested, a postponement shall be granted for a period of not more than 10 days. Additional postponements may be granted by agreement of the parties. The owner or the association may make an audio recording of the meeting.

(d) The notice and hearing provisions of Section 209.006 and this section do not apply if the association files a suit seeking a temporary restraining order or temporary injunctive relief or files a suit that includes foreclosure as a cause of action. If a suit is filed relating to a matter to which those sections apply, a party to the suit may file a motion to compel mediation. The notice and hearing provisions of Section 209.006 and this section do not apply to a temporary suspension of a person's right to use common areas if the temporary suspension is the result of a violation that occurred in a common area and involved a significant and immediate risk of harm to others in the subdivision. The temporary suspension is effective until the board makes a final determination on the suspension action after following the procedures prescribed by this section.

(e) An owner or property owners' association may use alternative dispute resolution services.

Added by Acts 2001, 77th Leg., ch. 926, § 1, eff. Jan. 1, 2002.

### Cross References

Attorney's Fees, see V.T.C.A., Property Code § 209.008.

Notice Required Before Enforcement Action, see V.T.C.A., Property Code § 209.006.

### Commentary

The notice and hearing provisions of this section do not apply if the association files a suit seeking a temporary restraining order or temporary injunctive relief or files a suit that includes foreclosure as a cause of action. Tex. Prop. Code Ann. § 209.007(d). If a suit is filed relating to a matter to which those sections apply, a party to the suit may file a motion to compel mediation. Tex. Prop. Code Ann. § 209.007(d). The notice and hearing provisions of this section do not apply to a temporary suspension of a person's right to use common areas if the temporary suspension is the result of a violation that occurred in a common area and involved a significant and immediate risk of harm to others in the subdivision. The temporary suspension is effective until the board makes a final determination on the suspension action after following the procedures prescribed by Section 209.007. Tex. Prop. Code Ann. § 209.007(d).

## § 209.008. Attorney's Fees

(a) A property owners' association may collect reimbursement of reasonable attorney's fees and other reasonable costs incurred by the association relating to collecting amounts, including damages, due the association for enforcing restrictions or the bylaws or rules of the association only if the owner is provided a written notice that attorney's

950

fees and costs will be charged to the owner if the delinquency or violation continues after a date certain.

(b) An owner is not liable for attorney's fees incurred by the association relating to a matter described by the notice under Section 209.006 if the attorney's fees are incurred before the conclusion of the hearing under Section 209.007 or, if the owner does not request a hearing under that section, before the date by which the owner must request a hearing. The owner's presence is not required to hold a hearing under Section 209.007.

(c) All attorney's fees, costs, and other amounts collected from an owner shall be deposited into an account maintained at a financial institution in the name of the association or its managing agent. Only members of the association's board or its managing agent or employees of its managing agent may be signatories on the account.

(d) On written request from the owner, the association shall provide copies of invoices for attorney's fees and other costs relating only to the matter for which the association seeks reimbursement of fees and costs.

(e) The notice provisions of Subsection (a) do not apply to a counterclaim of an association in a lawsuit brought against the association by a property owner.

(f) If the dedicatory instrument or restrictions of an association allow for nonjudicial foreclosure, the amount of attorney's fees that a property owners' association may include in a nonjudicial foreclosure sale for an indebtedness covered by a property owners' association's assessment lien is limited to the greater of:

(1) one-third of the amount of all actual costs and assessments, excluding attorney's fees, plus interest and court costs, if those amounts are permitted to be included by law or by the restrictive covenants governing the property; or

(2) $2,500.

(g) Subsection (f) does not prevent a property owners' association from recovering or collecting attorney's fees in excess of the amounts prescribed by Subsection (f) by other means provided by law.

Added by Acts 2001, 77th Leg., ch. 926, § 1, eff. Jan. 1, 2002.

### Leading Cases

*Haas v. Ashford Hollow Community Improvement Ass'n, Inc.*, 209 S.W.3d 875 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (written notice informing property owner that community association seeks attorney fees for expenses arising from the collection of dues in restrictive covenant is not required even when expressed in covenant, because the property code exempts such foreclosure suits from the notice requirements).

## § 209.009. Foreclosure Sale Prohibited in Certain Circumstances

A property owners' association may not foreclose a property owners' association's assessment lien if the debt securing the lien consists solely of:

(1) fines assessed by the association;

(2) attorney's fees incurred by the association solely associated with fines assessed by the association; or

(3) amounts added to the owner's account as an assessment under Section 209.005(i).

Added by Acts 2001, 77th Leg., ch. 926, § 1, eff. Jan. 1, 2002. Amended by Acts 2011, 82nd Leg., ch. 1026 (H.B. 2761), § 4, eff. Jan. 1, 2012.

**951**

## § 209.0091.　Prerequisites to Foreclosure:　Notice and Opportunity to Cure for Certain Other Lienholders

(a) A property owners' association may not foreclose a property owners' association assessment lien on real property by giving notice of sale under Section 51.002 or commencing a judicial foreclosure action unless the association has:

(1) provided written notice of the total amount of the delinquency giving rise to the foreclosure to any other holder of a lien of record on the property whose lien is inferior or subordinate to the association's lien and is evidenced by a deed of trust; and

(2) provided the recipient of the notice an opportunity to cure the delinquency before the 61st day after the date the recipient receives the notice.

(b) Notice under this section must be sent by certified mail, return receipt requested, to the address for the lienholder shown in the deed records relating to the property that is subject to the property owners' association assessment lien.

Added by Acts 2011, 82nd Leg., ch. 1282 (H.B. 1228), § 2, eff. Jan. 1, 2012.

## § 209.0092.　Judicial Foreclosure Required

(a) Except as provided by Subsection (c) and subject to Section 209.009, a property owners' association may not foreclose a property owners' association assessment lien unless the association first obtains a court order in an application for expedited foreclosure under the rules adopted by the supreme court under Subsection (b). A property owners' association may use the procedure described by this subsection to foreclose any lien described by the association's dedicatory instruments.

(b) The supreme court, as an exercise of the court's authority under Section 74.024, Government Code, shall adopt rules establishing expedited foreclosure proceedings for use by a property owners' association in foreclosing an assessment lien of the association. The rules adopted under this subsection must be substantially similar to the rules adopted by the supreme court under Section 50(r), Article XVI, Texas Constitution.

(c) Expedited foreclosure is not required under this section if the owner of the property that is subject to foreclosure agrees in writing at the time the foreclosure is sought to waive expedited foreclosure under this section. A waiver under this subsection may not be required as a condition of the transfer of title to real property.

Added by Acts 2011, 82nd Leg., ch. 1282 (H.B. 1228), § 2.

## § 209.0093.　Removal or Adoption of Foreclosure Authority

A provision granting a right to foreclose a lien on real property for unpaid amounts due to a property owners' association may be removed from a dedicatory instrument or adopted in a dedicatory instrument by a vote of at least 67 percent of the total votes allocated to property owners in the property owners' association. Owners holding at least 10 percent of all voting interests in the property owners' association may petition the association and require a special meeting to be called for the purposes of taking a vote for the purposes of this section.

Added by Acts 2011, 82nd Leg., ch. 1282 (H.B. 1228), § 2, eff. Jan. 1, 2012.

## § 209.0094.　Assessment Lien Filing

A lien, lien affidavit, or other instrument evidencing the nonpayment of assessments or other charges owed to a property owners' association and filed in the official public records of a county is a legal instrument affecting title to real property.

Added by Acts 2011, 82nd Leg., ch. 1282 (H.B. 1228), § 2, eff. Jan. 1, 2012.

## § 209.010. Notice After Foreclosure Sale

(a) A property owners' association that conducts a foreclosure sale of an owner's lot must send to the lot owner and to each lienholder of record, not later than the 30th day after the date of the foreclosure sale, a written notice stating the date and time the sale occurred and informing the lot owner and each lienholder of record of the right of the lot owner and lienholder to redeem the property under Section 209.011.

(b) The notice must be sent by certified mail, return receipt requested, to:

(1) the lot owner's last known mailing address, as reflected in the records of the property owners' association;

(2) the address of each holder of a lien on the property subject to foreclosure evidenced by the most recent deed of trust filed of record in the real property records of the county in which the property is located; and

(3) the address of each transferee or assignee of a deed of trust described by Subdivision (2) who has provided notice to a property owners' association of such assignment or transfer. Notice provided by a transferee or assignee to a property owners' association shall be in writing, shall contain the mailing address of the transferee or assignee, and shall be mailed by certified mail, return receipt requested, or United States mail with signature confirmation to the property owners' association according to the mailing address of the property owners' association pursuant to the most recent management certificate filed of record pursuant to Section 209.004.

(b–1) If a recorded instrument does not include an address for the lienholder, the association does not have a duty to notify the lienholder as provided by this section.

(b–2) For purposes of this section, the lot owner is deemed to have given approval for the association to notify the lienholder.

(c) Not later than the 30th day after the date the association sends the notice required by Subsection (a), the association must record an affidavit in the real property records of the county in which the lot is located, stating the date on which the notice was sent and containing a legal description of the lot. Any person is entitled to rely conclusively on the information contained in the recorded affidavit.

(d) The notice requirements of this section also apply to the sale of an owner's lot by a sheriff or constable conducted as provided by a judgment obtained by the property owners' association.

Added by Acts 2001, 77th Leg., ch. 926, § 1, eff. Jan. 1, 2002. Amended by Acts 2009, 81st Leg., ch. 1176, § 2, eff. Sept. 1, 2009.

### Cross References

Right of Redemption After Foreclosure, see V.T.C.A., Property Code § 209.011.

### Commentary

The 2009 Legislature added the requirement that each lienholder of record be given notice of a foreclosure sale by a property owner's association. The new language provides extensive guidelines regarding this notice.

## § 209.011. Right of Redemption After Foreclosure

(a) A property owners' association or other person who purchases occupied property at a sale foreclosing a property owners' association's assessment lien must commence and prosecute a forcible entry and detainer action under Chapter 24 to recover possession of the property.

**953**

(b) The owner of property in a residential subdivision or a lienholder of record may redeem the property from any purchaser at a sale foreclosing a property owners' association's assessment lien not later than the 180th day after the date the association mails written notice of the sale to the owner and the lienholder under Section 209.010. A lienholder of record may not redeem the property as provided herein before 90 days after the date the association mails written notice of the sale to the lot owner and the lienholder under Section 209.010, and only if the lot owner has not previously redeemed.

(c) A person who purchases property at a sale foreclosing a property owners' association's assessment lien may not transfer ownership of the property to a person other than a redeeming lot owner during the redemption period.

(d) To redeem property purchased by the property owners' association at the foreclosure sale, the lot owner or lienholder must pay to the association:

(1) all amounts due the association at the time of the foreclosure sale;

(2) interest from the date of the foreclosure sale to the date of redemption on all amounts owed the association at the rate stated in the dedicatory instruments for delinquent assessments or, if no rate is stated, at an annual interest rate of 10 percent;

(3) costs incurred by the association in foreclosing the lien and conveying the property to the lot owner, including reasonable attorney's fees;

(4) any assessment levied against the property by the association after the date of the foreclosure sale;

(5) any reasonable cost incurred by the association, including mortgage payments and costs of repair, maintenance, and leasing of the property; and

(6) the purchase price paid by the association at the foreclosure sale less any amounts due the association under Subdivision (1) that were satisfied out of foreclosure sale proceeds.

(e) To redeem property purchased at the foreclosure sale by a person other than the property owners' association, the lot owner or lienholder:

(1) must pay to the association:

(A) all amounts due the association at the time of the foreclosure sale less the foreclosure sales price received by the association from the purchaser;

(B) interest from the date of the foreclosure sale through the date of redemption on all amounts owed the association at the rate stated in the dedicatory instruments for delinquent assessments or, if no rate is stated, at an annual interest rate of 10 percent;

(C) costs incurred by the association in foreclosing the lien and conveying the property to the redeeming lot owner, including reasonable attorney's fees;

(D) any unpaid assessments levied against the property by the association after the date of the foreclosure sale; and

(E) taxable costs incurred in a proceeding brought under Subsection (a); and

(2) must pay to the person who purchased the property at the foreclosure sale:

(A) any assessments levied against the property by the association after the date of the foreclosure sale and paid by the purchaser;

(B) the purchase price paid by the purchaser at the foreclosure sale;

(C) the amount of the deed recording fee;

(D) the amount paid by the purchaser as ad valorem taxes, penalties, and interest on the property after the date of the foreclosure sale; and

(E) taxable costs incurred in a proceeding brought under Subsection (a).

(f) If a lot owner or lienholder redeems the property under this section, the purchaser of the property at foreclosure shall immediately execute and deliver to the redeeming party a deed transferring the property to the lot owner. If a purchaser fails to comply with this section, the lot owner or lienholder may file an action against the purchaser and may recover reasonable attorney's fees from the purchaser if the lot owner or the lienholder is the prevailing party in the action.

(g) If, before the expiration of the redemption period, the redeeming lot owner or lienholder fails to record the deed from the foreclosing purchaser or fails to record an affidavit stating that the lot owner or lienholder has redeemed the property, the lot owner's or lienholder's right of redemption as against a bona fide purchaser or lender for value expires after the redemption period.

(h) The purchaser of the property at the foreclosure sale or a person to whom the person who purchased the property at the foreclosure sale transferred the property may presume conclusively that the lot owner or a lienholder did not redeem the property unless the lot owner or a lienholder files in the real property records of the county in which the property is located:

(1) a deed from the purchaser of the property at the foreclosure sale; or

(2) an affidavit that:

(A) states that the property has been redeemed;

(B) contains a legal description of the property; and

(C) includes the name and mailing address of the person who redeemed the property.

(i) If the property owners' association purchases the property at foreclosure, all rent and other income collected by the association from the date of the foreclosure sale to the date of redemption shall be credited toward the amount owed the association under Subsection (d), and if there are excess proceeds, they shall be refunded to the lot owner. If a person other than the association purchases the property at foreclosure, all rent and other income collected by the purchaser from the date of the foreclosure sale to the date of redemption shall be credited toward the amount owed the purchaser under Subsection (e), and if there are excess proceeds, those proceeds shall be refunded to the lot owner.

(j) If a person other than the property owners' association is the purchaser at the foreclosure sale, before executing a deed transferring the property to the lot owner, the purchaser shall obtain an affidavit from the association or its authorized agent stating that all amounts owed the association under Subsection (e) have been paid. The association shall provide the purchaser with the affidavit not later than the 10th day after the date the association receives all amounts owed to the association under Subsection (e). Failure of a purchaser to comply with this subsection does not affect the validity of a redemption.

(k) Property that is redeemed remains subject to all liens and encumbrances on the property before foreclosure. Any lease entered into by the purchaser of property at a sale foreclosing an assessment lien of a property owners' association is subject to the right of redemption provided by this section and the lot owner's right to reoccupy the property immediately after redemption.

(*l*) If a lot owner makes partial payment of amounts due the association at any time before the redemption period expires but fails to pay all amounts necessary to redeem the property before the redemption period expires, the association shall refund any

**955**

108.

partial payments to the lot owner by mailing payment to the owner's last known address as shown in the association's records not later than the 30th day after the expiration date of the redemption period.

(m) If a lot owner or lienholder sends by certified mail, return receipt requested, a written request to redeem the property on or before the last day of the redemption period, the lot owner's or lienholder's right of redemption is extended until the 10th day after the date the association and any third party foreclosure purchaser provides written notice to the redeeming party of the amounts that must be paid to redeem the property.

(n) After the redemption period and any extended redemption period provided by Subsection (m) expires without a redemption of the property, the association or third party foreclosure purchaser shall record an affidavit in the real property records of the county in which the property is located stating that the lot owner or a lienholder did not redeem the property during the redemption period or any extended redemption period.

(o) The association or the person who purchased the property at the foreclosure sale may file an affidavit in the real property records of the county in which the property is located that states the date the citation was served in a suit under Subsection (a) and contains a legal description of the property. Any person may rely conclusively on the information contained in the affidavit.

(p) The rights of a lot owner and a lienholder under this section also apply if the sale of the lot owner's property is conducted by a constable or sheriff as provided by a judgment obtained by the property owners' association.

Added by Acts 2001, 77th Leg., ch. 926, § 1, eff. Jan. 1, 2002. Amended by Acts 2009, 81st Leg., ch. 1176, § 3, eff. Sept. 1, 2009.

## Cross References

Notice After Foreclosure Sale, see V.T.C.A., Property Code § 209.010.

## Commentary

If a property owners' association conducts a foreclosure sale of an owner's lot, it must send written notice within 30 days of the foreclosure sale stating the date of and time the sale occurred, and informing the lot owner of the owner's rights to redeem the property under Section 209.011 of the Property Code. Tex. Prop. Code Ann. § 209.010(a). The notice must be sent by certified mail, return received requested to the lot owner and each lienholder of record.

The 2009 Legislature provided that a lienholder may not exercise its right to redeem before 90 days after the date the association mailed written notice of the sale to the lot owner. Tex. Prop. Code Ann. § 209.011(b).

Not later than the 30th day after the date the association sends the required notice, the association must record an affidavit in the real property records of the county in which the lot is located, stating the date on which the notice was sent and containing a legal description of the lot. Tex. Prop. Code Ann. § 209.010(c). Any person is entitled to rely conclusively on the information contained in the recorded affidavit. Tex. Prop. Code Ann. § 209.010(c).

These notice requirements also apply to the sale of an owner's lot by a sheriff or constable conducted as provided by a judgment obtained by the property owners' association. Tex. Prop. Code Ann. § 209.010(d).

## Leading Cases

*Duarte v. Disanti*, 292 S.W.3d 733 *(Tex. App.—Dallas 2009, no pet.)* (redemption rights provided for in the Texas Residential Property Owners Act do not apply to condominiums because redemption rights for condominiums are provided for in the Uniform Condominium Act).

**956**

## § 209.012. Restrictive Covenants Granting Easements to Certain Property Owners' Associations

(a) A property owners' association may not amend a dedicatory instrument to grant the property owners' association an easement through or over an owner's lot without the consent of the owner.

(b) This section does not prohibit a property owners' association from adopting or enforcing a restriction in a dedicatory instrument that allows the property owners' association to access an owner's lot to remedy a violation of the dedicatory instrument.

Added by Acts 2007, 80th Leg., ch. 887, § 1, eff. Sept. 1, 2007.

## § 209.013. Authority of Association to Amend Dedicatory Instrument

(a) A dedicatory instrument created by a developer of a residential subdivision or by a property owners' association in which the developer has a majority of the voting rights or that the developer otherwise controls under the terms of the dedicatory instrument may not be amended during the period between the time the developer loses the majority of the voting rights or other form of control of the property owners' association and the time a new board of directors of the association assumes office following the loss of the majority of the voting rights or other form of control.

(b) A provision in a dedicatory instrument that violates this section is void and unenforceable.

Added by Acts 2007, 80th Leg., ch. 887, § 2(a), eff. Sept. 1, 2007.

## § 209.014. Mandatory Election Required After Failure to Call Regular Meeting

(a) Notwithstanding any provision in a dedicatory instrument, a board of a property owners' association shall call an annual meeting of the members of the association.

(b) If a board of a property owners' association does not call an annual meeting of the association members, an owner may demand that a meeting of the association members be called not later than the 30th day after the date of the owner's demand. The owner's demand must be made in writing and sent by certified mail, return receipt requested, to the registered agent of the property owners' association and to the association at the address for the association according to the most recently filed management certificate. A copy of the notice must be sent to each property owner who is a member of the association.

(c) If the board does not call a meeting of the members of the property owners' association on or before the 30th day after the date of a demand under Subsection (b), three or more owners may form an election committee. The election committee shall file written notice of the committee's formation with the county clerk of each county in which the subdivision is located.

(d) A notice filed by an election committee must contain:

(1) a statement that an election committee has been formed to call a meeting of owners who are members of the property owners' association for the sole purpose of electing board members;

(2) the name and residential address of each committee member; and

(3) the name of the subdivision over which the property owners' association has jurisdiction under a dedicatory instrument.

**957**

(e) Each committee member must sign and acknowledge the notice before a notary or other official authorized to take acknowledgments.

(f) The county clerk shall enter on the notice the date the notice is filed and record the notice in the county's real property records.

(g) Only one committee in a subdivision may operate under this section at one time. If more than one committee in a subdivision files a notice, the first committee that files a notice, after having complied with all other requirements of this section, is the committee with the power to act under this section. A committee that does not hold or conduct a successful election within four months after the date the notice is filed with the county clerk is dissolved by operation of law. An election held or conducted by a dissolved committee is ineffective for any purpose under this section.

(h) The election committee may call meetings of the owners who are members of the property owners' association for the sole purpose of electing board members. Notice, quorum, and voting provisions contained in the bylaws of the property owners' association apply to any meeting called by the election committee.

Added by Acts 2011, 82nd Leg., ch. 1026 (H.B. 2761), § 5, eff. Jan. 1, 2012.

## § 209.015. Regulation of Land Use: Residential Purpose

(a) In this section:

(1) "Adjacent lot" means:

(A) a lot that is contiguous to another lot that fronts on the same street;

(B) with respect to a corner lot, a lot that is contiguous to the corner lot by either a side property line or a back property line; or

(C) if permitted by the dedicatory instrument, any lot that is contiguous to another lot at the back property line.

(2) "Residential purpose" with respect to the use of a lot:

(A) means the location on the lot of any building, structure, or other improvement customarily appurtenant to a residence, as opposed to use for a business or commercial purpose; and

(B) includes the location on the lot of a garage, sidewalk, driveway, parking area, children's swing or playscape, fence, septic system, swimming pool, utility line, or water well and, if otherwise specifically permitted by the dedicatory instrument, the parking or storage of a recreational vehicle.

(b) Except as provided by this section, a property owners' association may not adopt or enforce a provision in a dedicatory instrument that prohibits or restricts the owner of a lot on which a residence is located from using for residential purposes an adjacent lot owned by the property owner.

(c) An owner must obtain the approval of the property owners' association or, if applicable, an architectural committee established by the association or the association's dedicatory instruments, based on criteria prescribed by the dedicatory instruments specific to the use of a lot for residential purposes, including reasonable restrictions regarding size, location, shielding, and aesthetics of the residential purpose, before the owner begins the construction, placement, or erection of a building, structure, or other improvement for the residential purpose on an adjacent lot.

958

**(d)** An owner who elects to use an adjacent lot for residential purposes under this section shall, on the sale or transfer of the lot containing the residence:

(1) include the adjacent lot in the sales agreement and transfer the lot to the new owner under the same dedicatory conditions; or

(2) restore the adjacent lot to the original condition before the addition of the improvements allowed under this section to the extent that the lot would again be suitable for the construction of a separate residence as originally platted and provided for in the conveyance to the owner.

**(e)** An owner may sell the adjacent lot separately only for the purpose of the construction of a new residence that complies with existing requirements in the dedicatory instrument unless the lot has been restored as described by Subsection (d)(2).

**(f)** A provision in a dedicatory instrument that violates this section is void.

Added by Acts 2013, 83rd Leg., ch. 219 (H.B. 35), § 1, eff. June 14, 2013.

# CHAPTER 210. EXTENSION OR MODIFICATION OF RESIDENTIAL RESTRICTIVE COVENANTS BY PETITION IN CERTAIN SUBDIVISIONS

§ 210.001.   Definitions.
§ 210.002.   Applicability of Chapter.
§ 210.003.   Findings and Purpose.
§ 210.004.   Extension or Modification of Restrictions.
§ 210.005.   Petition Procedure.
§ 210.006.   Vote on Proposal.
§ 210.007.   Subdivision Consisting of Multiple Sections.
§ 210.008.   Resolution Certifying Results of Vote.
§ 210.009.   Additional Procedures.

*Acts 2011, 82nd Leg., ch. 954 (H.B. 1071), § 1, added "by Petition in Certain Subdivisions" to the Chapter 210 heading.*

## § 210.001. Definitions

In this chapter:

(1) "Dedicatory instrument" has the meaning assigned by Section 202.001.

(2) "Owner" has the meaning assigned by Section 201.003.

(3) "Property owners' association" has the meaning assigned by Section 202.001.

(4) "Residential real estate subdivision" or "subdivision" has the meaning assigned by Section 201.003, except that in a county described by Section 210.002(1) a subdivision that is a gated community with private streets need not be located in a city, town, or village or within the extraterritorial jurisdiction of a city, town, or village.

(5) "Restrictions" has the meaning assigned by Section 201.003.

Added by Acts 2005, 79th Leg., ch. 1180, § 1, eff. Sept. 1, 2005. Amended by Acts 2009, 81st Leg., ch. 821, § 2, eff. June 19, 2009.

## § 210.002. Applicability of Chapter

This chapter applies to a residential real estate subdivision that is located in a county with a population of:

**959**

§ 17.50. Relief for Consumers

Vernon's Texas Statutes and Codes Annotated    Business and Commerce Code    Effective: September 1, 2005    *(Approx. 3 pages)*

Part:    1    of 5

Vernon's Texas Statutes and Codes Annotated

Business and Commerce Code (Refs & Annos)

Title 2. Competition and Trade Practices

Chapter 17. Deceptive Trade Practices (Refs & Annos)

Subchapter E. Deceptive Trade Practices and Consumer Protection (Refs & Annos)

**Unconstitutional or Preempted**  Limited on Preemption Grounds by  Mills v. Warner-Lambert Co.  E.D.Tex.  Sep. 30, 2008

Effective: September 1, 2005

V.T.C.A., Bus. & C. § 17.50

§ 17.50. Relief for Consumers

Currentness

(a) A consumer may maintain an action where any of the following constitute a producing cause of economic damages or damages for mental anguish:

(1) the use or employment by any person of a false, misleading, or deceptive act or practice that is:

(A) specifically enumerated in a subdivision of Subsection (b) of Section 17.46 of this subchapter; and

(B) relied on by a consumer to the consumer's detriment;

(2) breach of an express or implied warranty;

(3) any unconscionable action or course of action by any person; or

(4) the use or employment by any person of an act or practice in violation of Chapter 541, Insurance Code.

(b) In a suit filed under this section, each consumer who prevails may obtain:

(1) the amount of economic damages found by the trier of fact. If the trier of fact finds that the conduct of the defendant was committed knowingly, the consumer may also recover damages for mental anguish, as found by the trier of fact, and the trier of fact may award not more than three times the amount of economic damages; or if the trier of fact finds the conduct was committed intentionally, the consumer may recover damages for mental anguish, as found by the trier of fact, and the trier of fact may award not more than three times the amount of damages for mental anguish and economic damages;

(2) an order enjoining such acts or failure to act;

(3) orders necessary to restore to any party to the suit any money or property, real or personal, which may have been acquired in violation of this subchapter; and

(4) any other relief which the court deems proper, including the appointment of a receiver or the revocation of a license or certificate authorizing a person to engage in business in this state if the judgment has not been satisfied within three months of the date of the final judgment. The court may not revoke or suspend a license to do business in this state or appoint a receiver to take over the affairs of a person who has failed to satisfy a judgment if the person is a licensee of or regulated by a state agency which has statutory authority to revoke or suspend a license or to appoint a receiver or trustee. Costs and fees of such receivership or other relief shall be assessed against the defendant.

(c) On a finding by the court that an action under this section was groundless in fact or law or brought in bad faith, or brought for the purpose of harassment, the court shall award to

§ 17.46. Deceptive Trade Practices Unlawful
Vernon's Texas Statutes and Codes Annotated    Business and Commerce Code    Effective: September 1, 2007    (Approx. 4 pages)

Part:    1    of 3

Vernon's Texas Statutes and Codes Annotated
  Business and Commerce Code (Refs & Annos)
    Title 2. Competition and Trade Practices
      Chapter 17. Deceptive Trade Practices (Refs & Annos)
        Subchapter E. Deceptive Trade Practices and Consumer Protection (Refs & Annos)

**Unconstitutional or Preempted** Limited on Preemption Grounds by Lewkut v Stryker Corp. S.D.Tex. Apr. 16, 2010

**Proposed Legislation**

Effective: September 1, 2007

V.T.C.A., Bus. & C. § 17.46

## § 17.46. Deceptive Trade Practices Unlawful

Currentness

(a) False, misleading, or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful and are subject to action by the consumer protection division under Sections 17.47, 17.58, 17.60, and 17.61 of this code.

(b) Except as provided in Subsection (d) of this section, the term "false, misleading, or deceptive acts or practices" includes, but is not limited to, the following acts:

(1) passing off goods or services as those of another;

(2) causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

(3) causing confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another;

(4) using deceptive representations or designations of geographic origin in connection with goods or services;

(5) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he does not;

(6) representing that goods are original or new if they are deteriorated, reconditioned, reclaimed, used, or secondhand;

(7) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

(8) disparaging the goods, services, or business of another by false or misleading representation of facts;

(9) advertising goods or services with intent not to sell them as advertised;

(10) advertising goods or services with intent not to supply a reasonable expectable public demand, unless the advertisements disclosed a limitation of quantity;

(11) making false or misleading statements of fact concerning the reasons for, existence of, or amount of price reductions;

(12) representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law;

114.

(13) knowingly making false or misleading statements of fact concerning the need for

**Subject:** Fw: C-1-CV-13-010214 SPEARS VS FALCON POINT COMMUNITY ASSOC.

**From:** Wesley Spears (wesleys637@yahoo.com)

**To:** dchamberlain@chmc-law.com;

**Date:** Tuesday, June 17, 2014 10:40 AM

Wesley Spears

On Wednesday, May 21, 2014 10:30 AM, Wesley Spears <wesleys637@yahoo.com> wrote:

Hi Mr. Sanders:

I filed a Plaintiffs' Second Motion to Compel the Deposition of Diane Bottema which Counsel for Defendant agreed could heard on May 28, 2014. Please advise if this is okay with the Court.

Sincerely,

Wesley Spears

On Wednesday, May 21, 2014 10:13 AM, Darryl Sanders <Darryl.Sanders@co.travis.tx.us> wrote:

Counsel, please be advised the D/Motion For Summary Judgment set for Wednesday, May 28, 2014 9AM is canceled by the Court, specifically, the Honorable Judge Eric M. Shepperd, Presiding Judge County Court at Law No. 2. However, the M/Compel will remain on the Court's docket for the setting on the above mentioned date and time.

Monday, May 19, 2014 Mr. Campbell, via email, submitted and order per the Court's instruction at the 5/15/2014 2PM hearing. The Court has reviewed the order and is satisfied the order comports with the instruction. If there are concerns or questions you should advise myself and Jeff Johnson, staff attorney, otherwise the order will be signed and entered by the Court.

Thank you,
Darryl L Sanders

# Darryl L. Sanders

*Court Operations Officer to the Honorable Judge Eric M. Shepperd*
*County Court at Law No. 2*
*Travis County, Austin, TX*
**Direct: 512-854-9249**
**Fax: 512-854-4724**
**Email: Darryl.Sanders@co.travis.tx.us**

115.

**Subject:**    C-1-CV-13-010214 SPEARS VS FALCON POINT COMMUNITY ASSOC.

**From:**    Darryl Sanders (Darryl.Sanders@co.travis.tx.us)

**To:**    wesleys637@yahoo.com;

**Cc:**    dcampbell@chmc-law.com;

**Date:**    Wednesday, June 18, 2014 3:35 PM

Mr. Spears, to avoid any appearance of ex parte communication with the Court you should communicate with this office via email and copy the opposing side on all communique. Any settings request in this cause you should confer with the opposing side as to an agreed date and time per the Local Rules. Your request for a hearing this week does not, unless the opposing side agrees a date and time this week, comport to the TRCP 3 day notice rule. The week of June 23, 2014 is a jury week and non-jury matters are not typically set on a jury week.

Your cooperation is sincerely appreciated.

Thank you,

Darryl L Sanders

# Darryl L. Sanders

*Court Operations Officer to the Honorable Judge Eric M. Shepperd*

*County Court at Law No. 2*

*Travis County, Austin, TX*

*Direct: 512-854-9249*

*Fax: 512-854-4724*

*Email: Darryl.Sanders@co.travis.tx.us*

116.

paragraph of the letter.

A.   Okay.

Q.   Could I have it back now?  I've got to look at it myself.  What are the covenant -- covenant -- Conditions, Covenants and Restrictions, CCRs?  What are those?

A.   It's a group of documents that list guidelines within the community.

Q.   And it's a relatively lengthy document?

A.   Yes, and it's one of the documents.  Obviously there are several documents within the community.

Q.   And so from this letter could you tell me which particular regulation it is that I was alleged to have -- the plaintiffs were alleged to have violated?

A.   The letter just lists in violation of the CCRs.

Q.   How would someone know what regulation they were in violation of with that notice letter?

A.   Relative to this particular letter I don't see the specific regulation.

Q.   And in past letters have you seen specific regulations inserted in the letter?

A.   I don't recall.  I mean, there are hundreds of letters that go out.  I obviously do not see --

Q.   Right.  You've seen many of them, correct?

A.   I've seen some of them.  I don't --

Q.   Have you ever seen any that gave a specific

a typographical error in one of these dates. I couldn't tell you which one.

Q. Couldn't tell me whether it was the letter or the -- or the date of the -- you couldn't tell me if it was the date of the letter that was incorrect or the inspection?

A. No, I would not know.

Q. And you even came to my house; isn't that correct?

A. Yes.

Q. Do you recall what month you came to my house?

A. It's over a year ago. I don't.

Q. Let's assume that letter is dated correctly for the purposes of this question.

A. Okay.

Q. Then the cure date would have been wrong, correct, if that date was right?

A. Well, certainly August comes before October, yes.

Q. Is this one of the reasons that you asked for Diane to be reassigned, lack of accuracy in her work?

A. That particular letter, no, because I wasn't even aware of that inaccuracy until you pointed it out.

Q. Okay. You never saw this letter before?

A. I don't believe I have.

Q. I also direct your attention to the first

118.

3/3/2015     A Century of Lawmaking for a New Nation: U.S. Congressional Documents and Debates, 1774 - 1875

The Library of Congress



A Century of Lawmaking for a New Nation: U.S. Congressional Documents and Debates, 1774 - 1875

Statutes at Large, 39th Congress, 1st Session

Page 358 of 969   Turn to image   358     PREV IMAGE | NEXT IMAGE

A Century of Lawmaking | Higher Quality Image (TIFF - 74K)

358     THIRTY–NINTH CONGRESS. Sess. I. Res. 46, 47, 48. 1866.

**was a freeman at the time of enlistment, when nothing to the contrary appears.**
**1864, ch. 124, § 4.**
**Vol. xiii. p. 129.**

which he is entitled, and which is now or may hereafter be withheld by reason of such omission, but where nothing appears on the muster-roll or of record to show that a colored soldier was not a freeman at the date aforesaid, under the provision of the fourth section of the "Act making appropriations for the support of the army, for the year ending the thirtieth of June, eighteen hundred and sixty-five," the presumption shall be that the person was free at the time of his enlistment.

**What to be sufficient proof of marriage of colored soldier, to secure arrears of pay, &c. due at his death.**
**Issue of such marriage to be lawful heirs.**

Sec. 2. *And be it further resolved,* That in determining who is or was the wife, widow, or heirs of any colored soldier, evidence that he and the woman claimed to be his wife or widow were joined in marriage by some ceremony deemed by them obligatory, followed by their living together as husband and wife up to the time of enlistment, shall be deemed sufficient proof of such marriage for the purpose of securing any arrears of pay, pension or other allowances due any colored soldier at the time of his death; and the children born of any such marriage shall be held and taken to be the lawful children and heirs of such soldier.

Approved, June 15, 1866.

---

**June 15, 1866.**

[No. 47.] *A Resolution making an Appropriation to enable the President to negotiate Treaties with certain Indian Tribes.*

**Appropriation for negotiating treaties with certain Indian tribes.**

Resolved *by the Senate and House of Representatives of the United States of America in Congress assembled,* That one hundred and twenty-one thousand seven hundred and eighty-five dollars and seventy-seven cents, or so much thereof as may be necessary, be, and the same is hereby, appropriated, to be paid out of any money in the Treasury not otherwise appropriated, to enable the President to negotiate treaties with the Indian tribes of the Upper Missouri, and the Upper Platte rivers; said sum to be expended by the commissioner of Indian affairs, under the direction of the Secretary of the Interior.

Approved, June 15, 1866.

---

**June 16, 1866.**

[No. 48.] *Joint Resolution proposing an Amendment to the Constitution of the United States.*

**Proposed amendment to the Constitution of the United States.**

Be it resolved *by the Senate and House of Representatives of the United States of America in Congress assembled,* (two thirds of both Houses concurring.) That the following article be proposed to the legislatures of the several States as an amendment to the Constitution of the United States, which, when ratified by three fourths of said legislatures, shall be valid as part of the Constitution, namely : —

## ARTICLE XIV.

Article xiv.

Who are citizens of the United States and of the States; their privileges and immunities.

SEC. 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws.

Apportionment of representatives.

SEC. 2. Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed. But when the right to vote at any election for the choice of electors for President and Vice-President of the United States, representatives in Congress, the executive and judicial officers of a State, or the members of the legislature thereof, is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion or other crime, the basis of representation therein shall be reduced in the proportion which

---

120.

WestlawNext

**§ 19. Deprivation of life, liberty, etc.; due course of law**
Vernon's Texas Statutes and Codes Annotated     Constitution of the State of Texas 1876   *(Approx. 2 pages)*

**NOTES OF DECISIONS** (2829)

IN GENERAL
CIVIL PRACTICE AND PROCEEDINGS
CRIMINAL PROCEDURE
PROPERTY
TAXATION

> Vernon's Texas Statutes and Codes Annotated
>   Constitution of the State of Texas 1876 (Refs & Annos)
>     Article I. Bill of Rights (Refs & Annos)

Vernon's Ann.Texas Const. Art. 1, § 19

## § 19. Deprivation of life, liberty, etc.; due course of law

Currentness

Sec. 19. No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land.

**Editors' Notes**

### INTERPRETIVE COMMENTARY

#### 2007 Main Volume

Section 19 of the Texas Bill of Rights is a due process of law provision and has been included in all of the Texas Constitutions. The words "due process of law" or "due course of the law of the land" are the equivalent of the phrase "law of the land" in Magna Carta.

This provision has been construed by the courts as affording several types of protection. It has been said that "when the great barons of England wrung from King John, at the point of the sword, the concession that neither their lives nor their property should be disposed of by the crown, except as provided by the law of the land, they meant by 'law of the land' the ancient and customary laws of the English people, or laws enacted by the Parliament. . . .. It was not in their minds, therefore, to protect themselves against enactment of laws by the Parliament of England." Davidson v. New Orleans, 96 U.S. 97, 24 L.Ed. 616 (1878).

Therefore, originally the due process clause was construed as applying to the method of making a judicial or administrative decision. It applied directly to the machinery or procedure by which people were tried for crime, by which property rights were adjudicated, by which the powers of eminent domain and taxation were exercised. In short, legal proceedings were and are required to be conducted by the rules and forms established for the protection of private rights. Otherwise, life, liberty or property would be taken without due process of law so as to be violative of the fundamental principles. See Steddum v. Kirby Lumber Co., 110 T. 513, 221 S.W. 920 (1920).

As applied to procedure, due process requires a fair and impartial trial before a competent tribunal. Vogt v. Bexar County, 5 Tex.App. 272, 23 S.W. 1044 (1893). Included within this requisite is an opportunity to be heard, and reasonable opportunity to prepare for the hearing, which, of course, encompasses reasonable notice of the claim or charge against an individual so as to advise him of the nature thereof, and of the relief sought. State ex rel. Merriman v. Ball, 116 T. 527, 296 S.W. 1085 (1927), Steddum v. Kirby Lumber Co. *supra.*

The right to a hearing requires a judicial examination of every issue that, according to established procedure, may affect the attainment of a legal trial, and in such a trial determine the cause according to law. Freeman v. Ortiz, 106 T. 1, 153 S.W. 304 (1913). There should be opportunity given to cross examine witnesses and to produce witnesses and to be heard on questions of law. Steddum v. Kirby Lumber Co., *supra.*

**121.**

Due process of law not only includes procedural protection, but also substantive protection. It is a direct constitutional restraint upon the substance of legislation and means that a legislative curtailment of personal or property rights must be justified by a resultant benefit to the public welfare. Thus the due process

guaranty does not restrain the state in the exercise of its legitimate police powers. See City of New Braunfels v. Waldschmit, 109 T. 302, 207 S.W. 303 (1918). Houston & Tex. Cent. Ry. Co. v. Dallas, 98 T. 396, 84 S.W. 648 (1905). Both liberty and property are subject to the exercise of these powers.

Nevertheless, the exercise of the police powers is not unrestricted, but is limited to enactments having reference to the public health, comfort, safety and welfare. It must not be arbitrary, unreasonable, or patently beyond the necessities of the case, and the means which it employs must have a real and substantial relation to the object sought to be attained. See Spann v. City of Dallas, 111 T. 350, 235 S.W. 513 (1921), Houston & T.C. Ry. Co. v. City of Dallas, *supra*; American Federation of Labor v. Mann, Civ.App., 188 S.W.2d 276 (1945).

In substantive due process cases, the courts balance the gain to the public welfare resulting from the legislation against the severity of its effect on personal and property rights. Every exercise of the police power involves a restraint upon individual freedom of action or the free use of property based upon some social need which presumably justifies the restraint. Hence, a law is unconstitutional as violating due process when it is arbitrary or unreasonable, and the later occurs when the social necessity the law is to serve is not a sufficient justification of the restriction of liberty involved.

For example, the police power may be constitutionally exercised to destroy property where the social necessity or interest involved is the prevention of the spread of disease or conflagration. Chambers v. Gilbert, 17 Tex.App. 106, 42 S.W. 630, error refused (1897); Keller v. City of Corpus Christi, 50 T. 614 (1879). Again the liberty of contract between employers and employees may be regulated under the police power by limiting the hours of labor in order to promote the public health. See Bunting v. State of Oregon, 37 S.Ct. 435, 243 U.S. 426, 61 L.Ed. 830 (1916).

The Federal Constitution, in the fifth and fourteenth amendments, also provides against deprivation of life, liberty or property without due process of law, the fourteenth amendment by its language being applicable to prevent the states from carrying out such a deprivation. It has been held by Texas courts that the clause of the Texas Constitution, to the extent that it is identical with the fourteenth amendment, has placed upon the powers of the state legislature the same restrictions as those which have been held to be imposed by the language of that amendment of the Federal Constitution. Mellinger v. City of Houston, 68 T. 37, 3 S.W. 249 (1887).

### Notes of Decisions (2829)

Vernon's Ann. Texas Const. Art. 1, § 19, TX CONST Art. 1, § 19
Current through the end of the 2013 Third Called Session of the 83rd Legislature

**End of Document**      © 2015 Thomson Reuters. No claim to original U.S. Government Works.



WestlawNext™

**Rule 166a. Summary Judgment**

Vernon's Texas Rules Annotated    Texas Rules of Civil Procedure    *(Approx. 2 pages)*

Part:    1   of 3

Vernon's **Texas** Rules Annotated
  **Texas** Rules of Civil Procedure
    Part II. Rules of Practice in District and County Courts
      Section 8. Pre-Trial Procedure (Refs & Annos)

TX Rules of Civil Procedure, Rule 166a

## Rule 166a. Summary Judgment

Currentness

**(a) For Claimant.** A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may, at any time after the adverse party has appeared or answered, move with or without supporting affidavits for a summary judgment in his favor upon all or any part thereof. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to amount of damages.

**(b) For Defending Party.** A party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in his favor as to all or any part thereof.

**(c) Motion and Proceedings Thereon.** The motion for summary judgment shall state the specific grounds therefor. Except on leave of court, with notice to opposing counsel, the motion and any supporting affidavits shall be filed and served at least twenty-one days before the time specified for hearing. Except on leave of court, the adverse party, not later than seven days prior to the day of hearing may file and serve opposing affidavits or other written response. No oral testimony shall be received at the hearing. The judgment sought shall be rendered forthwith if (i) the deposition transcripts, interrogatory answers, and other discovery responses referenced or set forth in the motion or response, and (ii) the pleadings, admissions, affidavits, stipulations of the parties, and authenticated or certified public records, if any, on file at the time of the hearing, or filed thereafter and before judgment with permission of the court, show that, except as to the amount of damages, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law on the issues expressly set out in the motion or in an answer or any other response. Issues not expressly presented to the trial court by written motion, answer or other response shall not be considered on appeal as grounds for reversal. A summary judgment may be based on uncontroverted testimonial evidence of an interested witness, or of an expert witness as to subject matter concerning which the trier of fact must be guided solely by the opinion testimony of experts, if the evidence is clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted.

**(d) Appendices, References and Other Use of Discovery Not Otherwise on File.** Discovery products not on file with the clerk may be used as summary judgment evidence if copies of the material, appendices containing the evidence, or a notice containing specific references to the discovery or specific references to other instruments, are filed and served on all parties together with a statement of intent to use the specified discovery as summary judgment proofs: (i) at least twenty-one days before the hearing if such proofs are to be used to support the summary judgment; or (ii) at least seven days before the hearing if such proofs are to be used to oppose the summary judgment.

**(e) Case not Fully Adjudicated on Motion.** If summary judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the judge may at the hearing examine the pleadings and the evidence on file, interrogate counsel, ascertain what material fact issues exist and make an order specifying the facts that are established as a matter of law, and directing such further proceedings in the action as are just.

**(f) Form of Affidavits; Further Testimony.** Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in

123

evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions or by further affidavits. Defects in the form of affidavits or attachments will not be grounds for reversal unless specifically pointed out by objection by an opposing party with opportunity, but refusal, to amend.

**(g) When Affidavits Are Unavailable.** Should it appear from the affidavits of a party opposing the motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

**(h) Affidavits Made in Bad Faith.** Should it appear to the satisfaction of the court at any time that any of the affidavits presented pursuant to this rule are presented in bad faith or solely for the purpose of delay, the court shall forthwith order the party employing them to pay to the other party the amount of the reasonable expenses which the filing of the affidavits caused him to incur, including reasonable attorney's fees, and any offending party or attorney may be adjudged guilty of contempt.

**(i) No-Evidence Motion.** After adequate time for discovery, a party without presenting summary judgment evidence may move for summary judgment on the ground that there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial. The motion must state the elements as to which there is no evidence. The court must grant the motion unless the respondent produces summary judgment evidence raising a genuine issue of material fact.

### Credits

Oct. 12, 1949, eff. March 1, 1950. Amended by orders of Oct. 1, 1951, eff. March 1, 1952; July 20, 1966, eff. Jan. 1, 1967; July 21, 1970, eff. Jan. 1, 1971; July 11, 1977, eff. Jan. 1, 1978; June 10, 1980, eff. Jan. 1, 1981; Dec. 5, 1983, eff. April 1, 1984; July 15, 1987, eff. Jan. 1, 1988; April 24, 1990, eff. Sept. 1, 1990; Aug. 15, 1997, eff. Sept. 1, 1997.

### Editors' Notes

#### COMMENT--1990

This amendment provides a mechanism for using previously non-filed discovery in summary judgment practice. Such proofs must all be filed in advance of the hearing in accordance with Rule 166a. Paragraphs (d) through (g) are renumbered (e) through (h).

#### COMMENT--1997

This comment is intended to inform the construction and application of the rule. Paragraph (i) authorizes a motion for summary judgment based on the assertion that, after adequate opportunity for discovery, there is no evidence to support one or more specified elements of an adverse party's claim or defense. A discovery period set by pretrial order should be adequate opportunity for discovery unless there is a showing to the contrary, and ordinarily a motion under paragraph (i) would be permitted after the period but not before. The motion must be specific in challenging the evidentiary support for an element of a claim or defense; paragraph (i) does not authorize conclusory motions or general no-evidence challenges to an opponent's case. Paragraph (i) does not apply to ordinary motions for summary judgment under paragraphs (a) or (b), in which the movant must prove it is entitled to judgment by establishing each element of its own claim or defense as a matter of law or by negating an element of the respondent's claim or defense as a matter of law. To defeat a motion made under paragraph (i), the respondent is not required to marshal its proof; its response need only point out evidence that raises a fact issue on the challenged elements. The existing rules continue to govern the general requirements of summary judgment practice. A motion under paragraph (i) is subject to sanctions provided by existing law (**Tex** Civ.Prac. & Rem. Code §§ 9.001-10.006) and rules (Tex.R.Civ.P. 13). The denial of a motion under paragraph (i) is no more reviewable by appeal or mandamus than the denial of a motion under paragraph (c).

124.

#### FEDERAL RULES--1966

The 1952 amendment to subd. (a) corresponds to a 1948 amendment to Federal Rule 56(c).

WestlawNext™

**192.3. Scope of Discovery**
Vernon's Texas Rules Annotated    Texas Rules of Civil Procedure    *(Approx. 2 pages)*

Vernon's **Texas** Rules Annotated
  **Texas** Rules of Civil Procedure
    Part II. Rules of Practice in District and County Courts
      Section 9. Evidence and Discovery (Refs & Annos)
        B. Discovery
          Rule 192. Permissible Discovery: Forms and Scope; Work Product;
        Protective Orders; Definitions (Refs & Annos)

TX Rules of Civil Procedure, Rule **192.3**

**192.3.** Scope of Discovery

Currentness

(a) *Generally.* In general, a party may obtain discovery regarding any matter that is not privileged and is relevant to the subject matter of the pending action, whether it relates to the claim or defense of the party seeking discovery or the claim or defense of any other party. It is not a ground for objection that the information sought will be inadmissible at trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

(b) *Documents and Tangible Things.* A party may obtain discovery of the existence, description, nature, custody, condition, location, and contents of documents and tangible things (including papers, books, accounts, drawings, graphs, charts, photographs, electronic or videotape recordings, data, and data compilations) that constitute or contain matters relevant to the subject matter of the action. A person is required to produce a document or tangible thing that is within the person's possession, custody, or control.

(c) *Persons with Knowledge of Relevant Facts.* A party may obtain discovery of the name, address, and telephone number of persons having knowledge of relevant facts, and a brief statement of each identified person's connection with the case. A person has knowledge of relevant facts when that person has or may have knowledge of any discoverable matter. The person need not have admissible information or personal knowledge of the facts. An expert is "a person with knowledge of relevant facts" only if that knowledge was obtained first-hand or if it was not obtained in preparation for trial or in anticipation of litigation.

(d) *Trial Witnesses.* A party may obtain discovery of the name, address, and telephone number of any person who is expected to be called to testify at trial. This paragraph does not apply to rebuttal or impeaching witnesses the necessity of whose testimony cannot reasonably be anticipated before trial.

(e) *Testifying and Consulting Experts.* The identity, mental impressions, and opinions of a consulting expert whose mental impressions and opinions have not been reviewed by a testifying expert are not discoverable. A party may discover the following information regarding a testifying expert or regarding a consulting expert whose mental impressions or opinions have been reviewed by a testifying expert:

(1) the expert's name, address, and telephone number;

(2) the subject matter on which a testifying expert will testify;

(3) the facts known by the expert that relate to or form the basis of the expert's mental impressions and opinions formed or made in connection with the case in which the discovery is sought, regardless of when and how the factual information was acquired;

(4) the expert's mental impressions and opinions formed or made in connection with the case in which discovery is sought, and any methods used to derive them;

(5) any bias of the witness;                          125.

(6) all documents, tangible things, reports, models, or data compilations that have been provided to, reviewed by, or prepared by or for the expert in anticipation of a testifying expert's testimony;

**NOTES OF DECISIONS** (166)

In general
Bias evidence
Burdensome and overbroad
Contentions
Depositions
Discretion of court
Documents and tangible things
Expert witnesses
Insurance policies
Irrelevance
Limitations
Mandamus
Non-parties
Objections
Other lawsuits
Outside jury influence
Partial disclosures
Persons with knowledge of relevant facts
Physical possession
Presumptions and burden of proof
Privileges
Relevance, generally
Safety procedures
Settlements
Single business enterprise
Substantial need or undue hardship
Trade secrets
Trial witnesses
Waiver
Waiver of objections

(7) the expert's current resume and bibliography.

(f) *Indemnity and Insuring Agreements.* Except as otherwise provided by law, a party may obtain discovery of the existence and contents of any indemnity or insurance agreement under which any person may be liable to satisfy part or all of a judgment rendered in the action or to indemnify or reimburse for payments made to satisfy the judgment. Information concerning the indemnity or insurance agreement is not by reason of disclosure admissible in evidence at trial.

(g) *Settlement Agreements.* A party may obtain discovery of the existence and contents of any relevant portions of a settlement agreement. Information concerning a settlement agreement is not by reason of disclosure admissible in evidence at trial.

(h) *Statements of Persons with Knowledge of Relevant Facts.* A party may obtain discovery of the statement of any person with knowledge of relevant facts--a "witness statement"-- regardless of when the statement was made. A witness statement is (1) a written statement signed or otherwise adopted or approved in writing by the person making it, or (2) a stenographic, mechanical, electrical, or other type of recording of a witness's oral statement, or any substantially verbatim transcription of such a recording. Notes taken during a conversation or interview with a witness are not a witness statement. Any person may obtain, upon written request, his or her own statement concerning the lawsuit, which is in the possession, custody or control of any party.

(i) *Potential Parties.* A party may obtain discovery of the name, address, and telephone number of any potential party.

(j) *Contentions.* A party may obtain discovery of any other party's legal contentions and the factual bases for those contentions.

### Credits
Aug. 5, 1998 and amended Nov. 9, 1998, eff. Jan. 1, 1999.

### Editors' Notes

#### LAW REVIEW COMMENTARIES
Annual survey of **Texas** law: Civil evidence. Angela C. Zambrano, Margaret H. Allen, and John O'Connor, 61 SMU L. Rev. 611 (2008).
Annual survey of **Texas** law: Civil procedure; pre-trial and trial. Donald Colleluori, Gary D. Eisenstat, and Bill E. Davidoff, 60 SMU L.Rev. 767 (2007); 61 SMU L. Rev. 633 (2008).
Depositions of attorneys in **Texas**. David K. Bissinger, 64 **Texas** Bar J. 247 (2001).
Ending evasive responses to written discovery: A guide for properly responding (and objecting) to interrogatories and document requests under the **Texas** Discovery Rules. Robert K. Wise, 65 Baylor L. Rev. 510 (2013).
A guide to properly using and responding to requests for admission under the **Texas** discovery rules. Robert K. Wise and Katherine Hendler Fayne, 45 St.Mary's L.J. 655 (2014).
Standards of review in **Texas**. W. Wendelll Hall, 38 St.Mary's L.J. 47 (2006).

#### RESEARCH REFERENCES

#### Forms
**Texas** Jurisprudence Pleading & Practice Forms 2d Ed § 95:2, Scope of Discovery.
**Texas** Jurisprudence Pleading & Practice Forms 2d Ed § 95:5, Limits on Discovery--Work Product Privilege.
**Texas** Jurisprudence Pleading & Practice Forms 2d Ed § 95:18, Asserting Privilege.
**Texas** Jurisprudence Pleading & Practice Forms 2d Ed § 95:22, Request Requirements.
**Texas** Jurisprudence Pleading & Practice Forms 2d Ed § 95:25, Request for Production or Inspection of Documents and Tangible Things.
**Texas** Jurisprudence Pleading & Practice Forms 2d Ed § 95:52, Scope of Expert Discovery.
**Texas** Jurisprudence Pleading & Practice Forms 2d Ed § 95:57, Motions to Compel or for Sanctions.
**Texas** Jurisprudence Pleading & Practice Forms 2d Ed § 95:91, Response--By Party Claiming Privilege--To Request for Identification of Information Withheld as Privileged.
**Texas** Jurisprudence Pleading & Practice Forms 2d Ed § 95:93, Request for Disclosure-- Rule Format.
**Texas** Jurisprudence Pleading & Practice Forms 2d Ed § 95:95, Request--Production of Documents for Inspection and Copying.